UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



SAURIN POPAT, M.D.,

                Plaintiff,

    v.

ELAD LEVY, M.D., et al.,

                Defendants.

**DECISION AND ORDER**

1:15-CV-01052 EAW

## INTRODUCTION

Plaintiff Saurin Popat, M.D. ("Plaintiff") brings various claims arising out of his employment against five defendants: (1) Elad Levy, M.D. ("Dr. Levy"); (2) The State University of New York at Buffalo (the "University"); (3) University at Buffalo School of Medicine and Biomedical Sciences ("Medical School"); (4) Kaleida Health ("Kaleida"); and (5) University at Buffalo Neurosurgery, Inc. ("UBNS") (collectively, "Defendants"). (Dkt. 21 at 1). Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, 42 U.S.C. §§ 1981 and 1983, the New York State Human Rights Law, New York Executive Law §§ 290, *et seq.* ("NYSHRL"), the United States Constitution, the New York State Constitution, and New York State common law. (*Id.* at ¶ 1). He raises six claims: (1) race and national origin discrimination and hostile work environment under Title VII; (2) retaliation under Title VII; (3) discrimination and retaliation under NYSHRL; (4) discrimination and retaliation under § 1981; (5) discrimination and retaliation under § 1983; and (6) tortious interference. (*Id.* at 9-15).

Presently before the Court is UBNS and Dr. Levy's motion to dismiss all of Plaintiff's claims, except those arising under § 1981, pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (Dkt. 32). For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the amended complaint and assumed to be true for purposes of this motion.

## I. Factual Background

The University controls and operates the Medical School and the University at Buffalo Neurosurgery Group ("UBNG"). (Dkt. 21 at ¶ 11). The UBNG is "an academic neurosurgical group comprised of physicians and other healthcare employees who are part of the University's 'UBMD Physicians Group,' which boasts more than 500 doctors . . . practicing medicine and teaching medical students and residents at [the University at Buffalo]'s Medical School and in area hospitals, including Kaleida facilities."[2] (*Id.*). The UBMD Physicians Group, also known as UBMD, Inc., "provides marketing services to other physician practice groups associated with the University, including [UBNS]." (*Id.* at ¶ 12). "UBNS is a New York not-for-profit corporation associated with the University, providing academic support and is a clinician care component for the University." (*Id.* at ¶ 13). Like UBNG, UBNS is part of the UBMD

---

[1] The remaining defendants—the University, the Medical School, and Kaleida—have answered the amended complaint. (Dkt. 28; Dkt. 29).

[2] UBNG and the UBMD Physicians Group are not parties to this action.

Physicians Group. (*Id.* at ¶ 15). Kaleida "is a large healthcare provider in Western New York" that "operates several hospitals and surgical facilities." (*Id.* at ¶ 14). Kaleida's neurosurgeons are all from the University, and Kaleida publicly identifies Plaintiff as "'a Kaleida Health physician.'" (*Id.*). Together, "[t]he University, UBNS, and Kaleida, in addition to being direct employers of Plaintiff, are also joint-employers of Plaintiff . . . [and] have: (i) an interrelation of operations; (ii) centralized control of labor relations; (iii) common management; and (iv) common ownership or financial control." (*Id.* at ¶ 16).

Dr. Levy is "a Caucasian individual . . . employed by the University, UBNS, and Kaleida." (*Id.* at ¶ 15). He is a University professor, a physician with UBNG and UBNS, Chief of Neurosurgery at Kaleida, and Co-Director of Kaleida Health Stroke Center and Cerebrovascular surgery. (*Id.*).

Plaintiff is of African and Southeast Asian origin and a doctor currently employed by the Delaware Medical Group, P.C., as its Director of Head and Neck/Skull Base Surgery. (*Id.* at ¶¶ 18-19). He was previously employed by the University as a faculty member in the Departments of Neurosurgery and Otolaryngology at the Medical School. (*Id.* at ¶ 20). The University compensated him and had the power to terminate his employment. (*Id.* at ¶¶ 21-22). He was "also considered an employee of Kaleida" (*id.* at ¶ 23), because he oversaw procedures of medical students and residents in Kaleida surgical facilities, and Kaleida gave him certain privileges and asserted direction and control over his work performance (*id.* at ¶¶ 22-24).

Plaintiff alleges that the University, UBNS, and Kaleida allowed Dr. Levy "to engage in severe and pervasive discrimination against women and people of color," and "to retaliate against Plaintiff for having complained of these wrongful acts." (*Id.* at ¶ 26). He also alleges that those defendants "interfered with his employment with the University, Kaleida, and Delaware Medical Group." (*Id.*). Plaintiff further alleges that "Dr. Levy engaged in severe and pervasive harassment toward Plaintiff due to his race and national origin, and he has otherwise created a hostile work environment for dark-skinned employees." (*Id.* at ¶ 27).

Plaintiff alleges two incidents in which Dr. Levy made inappropriate comments about race or national origin. First, Dr. Levy referred or allowed other individuals "to refer to UBNS as 'BUNS,' an acronym for 'Brown University Neurosurgery' because of the prevalence of physicians of color in that department." (*Id.* at ¶ 28). Second, on July 22, 2014, Dr. Levy "stated that he felt like he was at a 'UPS convention'" during an operation in which Plaintiff, Dr. Levy, and others participated. (*Id.* at ¶¶ 29-31). Plaintiff further alleged:

> Dr. Levy was asked to repeat himself and he did so by stating, "A UPS convention. Do you know what the UPS slogan is?" He specifically turned to Plaintiff and directly asked, "Do you know?" to which Plaintiff replied that he did not. Next, Dr. Levy stated, "What can <u>Brown</u> do for you?" There were eight people, including Plaintiff, in the operating room that had brown skin tones and were of African-American, South-East Asian, or Middle Eastern descent or origin.

(*Id.* at ¶¶ 32-34).

On August 14, 2014, Plaintiff complained, by letter, about Dr. Levy to Dr. Michael E. Cain, Dean of the Medical School, and Jody Lomeo, CEO of Kaleida, and

requested an investigation of Dr. Levy's discrimination based on the comments and his "other abusive and harassing conduct that . . . creat[ed] the hostile work environment." (*Id.* at ¶¶ 37-38). Plaintiff alleges that Dean Cain (or his representative) released Plaintiff's letter to Dr. Levy on or before August 19, 2014, despite the University's policy of confidentiality in such matters. (*Id.* at ¶ 39). Ten days later, on August 29, 2014, Dr. Levy terminated Plaintiff's faculty position. (*Id.* at ¶ 36).

Plaintiff alleges that Kaleida failed to investigate Dr. Levy, and that the University, "[d]espite . . . issuing a report that strongly suggests that Plaintiff's complaints are accurate and that Dr. Levy committed wrongful acts," has not taken "definitive action" about the complaint, other than to require Dr. Levy to participate in anti-discrimination training. (*Id.* at ¶ 40).

Plaintiff further alleges that, as retaliation for complaining about Dr. Levy, Defendants each "have interfered with the employment relationship between Plaintiff and Delaware Medical Group"—his current employer—by, *inter alia*, ceasing referrals to Plaintiff or the Delaware Medical Group, and also by conspiring to interfere with his employment. (*Id.* at ¶ 42).

Plaintiff also alleges that, for several years, he had been building a specialized, shared practice—called the "Specialty Practice Group"—with employees of the University, UBNS, and Kaleida. (*Id.* at ¶ 43). According to Plaintiff, "the University, Kaleida, UBNS, and Dr. Levy . . . are unlawfully and improperly exerting pressure on the other doctors in their employ and under their control to retaliate against and punish Plaintiff for having made complaints about Dr. Levy and to interfere with his

employment relationship with the Delaware Medical Group." (*Id.* at ¶ 44). Plaintiff contends that Defendants, *inter alia*, "acted with a discriminatory animus toward [him] and retaliated against him for complaining of the discrimination and hostile work environment by interfering with his employment with Delaware Medical Group and interfering with his economic advantage and contracts with other doctors employed and/or controlled by Defendants." (*Id*).

## II.    Procedural History

Plaintiff "filed a timely charge of discrimination against Defendants" with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at ¶ 7). Plaintiff's amended complaint does not specify the respondents named in the EEOC charge, nor is the identity of the respondents apparent from two right-to-sue letters that are attached to the amended complaint. (*Id.* at 18-19). Those right-to-sue letters were dated September 16, 2015. (*Id.*).

Plaintiff commenced this action on December 15, 2015, by filing a complaint. (Dkt. 1). On March 15, 2016, Plaintiff filed his amended complaint, which became the operative pleading in this case. (Dkt. 21). On April 15, 2016, UBNS and Dr. Levy moved to dismiss the amended complaint. (Dkt. 32). A motion hearing was held before the undersigned on October 28, 2016, at which time the Court requested additional briefing from both parties and reserved decision. (Dkt. 38). The parties submitted additional briefing on November 14 and 15, 2016. (Dkt. 39; Dkt. 40; Dkt. 41).

# DISCUSSION

## I.      Standard under Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Generally, the Court must accept as true all of the allegations contained in the complaint.  *See id.*  That rule does not apply to legal conclusions, however: "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . are not entitled to the assumption of truth." *Id.*; *see also Twombly*, 555 U.S. at 555 (stating that a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Plausibility is "a standard lower than probability." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).  "[A] given set of actions may well be subject to diverging interpretations, each of which is

plausible," and "[t]he choice between or among plausible inferences or scenarios is one for the factfinder." *Id.* A court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds that a different version is more plausible." *Id.* at 185.

## II.    Title VII Claims (First and Second Claims for Relief)

Plaintiff's first and second claims are for race and national origin discrimination, hostile work environment, and retaliation in violation of Title VII. (Dkt. 21 at 9-10). UBNS and Dr. Levy seek to dismiss these claims, arguing that Dr. Levy cannot be held liable under Title VII as an individual, that Plaintiff failed to exhaust his administrative remedies against UBNS, and that UBNS is not Plaintiff's employer for purposes of Title VII. (Dkt. 32-3 at 7-12).

### A. Individual Liability of Dr. Levy

Plaintiff concedes that he cannot hold Dr. Levy individually liable under Title VII. (Dkt. 35 at 14 n.3). Accordingly, the Court dismisses all of Plaintiff's Title VII claims asserted against Dr. Levy individually. *See, e.g., Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) ("Title VII does not impose liability on individuals. . . .").

### B. Plaintiff's Failure to Name UBNS in EEOC Charge

UBNS argues that Plaintiff's Title VII claims against it should be dismissed because Plaintiff did not name UBNS in any charge filed with the EEOC or complaint filed with the New York State Division of Human Rights, and so he failed to exhaust administrate remedies. (Dkt. 32-3 at 9-12). Plaintiff argues that the "identity of interest" exception to the naming requirement applies and allows him to proceed against UBNS,

notwithstanding the fact that he did not name UBNS in any administrative charge. (Dkt. 35 at 16-20).

As a precondition to bringing a Title VII suit against a defendant in federal court, a plaintiff must file with the EEOC (or an authorized state agency) a charge of employment discrimination that names that defendant. *See* 42 U.S.C. § 2000e-5; *Strine v. Marion Cent. Sch. Dist.*, 280 F. Supp. 2d 75, 78 (W.D.N.Y. 2003) ("As a general rule, a party not named in an EEOC charge may not be named in a subsequent discrimination suit."). However, failure to name UBNS in the EEOC charge does not necessarily foreclose Plaintiff's Title VII claims against UBNS. The Second Circuit takes a "flexible stance in interpreting Title VII's procedural provisions, . . . so as not to frustrate Title VII's remedial goals," and therefore it recognizes an exception to the general rule that a defendant must be named in an EEOC charge. *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir. 1991) (internal citation and quotation omitted). The so-called "identity of interest" exception allows a plaintiff to proceed against a defendant not named in the administrative charge "where there is a clear identity of interest between the unnamed defendant and the party named in the administrative charge." *Id.*

A district court should consider four factors to determine whether an identity of interest exists between the unnamed defendant and the party named in the administrative charge:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to

include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.* at 209-10. "This four-prong test is not a mechanical one; no single factor is determinative." *Dortz v. City of N.Y.*, 904 F. Supp. 127, 143 (S.D.N.Y. 1995). "Ultimately, it is the plaintiff who has the burden of proving that the identity of interest exception applies." *Senecal v. B.G. Lenders Serv. LLC*, 976 F. Supp. 2d 199, 214 (N.D.N.Y. 2013).

As a threshold matter, Plaintiff was represented by counsel in the EEOC proceedings. (*See* Dkt. 32-2). Although the identity of interest exception is not limited to *pro se* parties, the fact that Plaintiff had the benefit of counsel is informative to the Court's consideration of the four factors catalogued above. *See Senecal*, 976 F. Supp. 2d at 214-15 (noting that the Second Circuit has not explicitly addressed whether a counseled party can benefit from the identity of interest exception and describing various approaches to that issue by district courts within the Second Circuit); *see also Lewis v. Livingston Cty. Ctr. for Nursing & Rehab.*, 30 F. Supp. 3d 196, 205-06 (W.D.N.Y. 2014) (noting that party had counsel in EEOC proceedings and that the exception is applied most commonly to *pro se* parties, but still performing identity of interest analysis despite that party was counseled); *Wood v. Pittsford Cent. Sch. Dist.*, No. 03-CV-6541T, 2005 WL 43773, at *3-4 (W.D.N.Y. Jan. 10, 2005) (declining to limit identity of interest exception to *pro se* cases).

Turning to the four factors, whether the identity of interest exception applies is unclear. Those factors appear to be a wash and do not weigh in favor of either side. Plaintiff's allegations concerning the nature of the relationship between UBNS and the other Defendants are somewhat nebulous. He alleges that UBNS is "a physician practice group[] associated with the University" (Dkt. 21 at ¶ 12), and a "not-for-profit corporation associated with the University, providing academic support and is a clinician care component for the University" (*id.* at ¶ 13). Although Plaintiff had the benefit of counsel in preparing his EEOC charge, "the roles of the various defendants are not easily determined; they are overlapping and somewhat unclear." *Fox v. City Univ. of N.Y.*, No. 94 CIV. 4398(CSH), 1998 WL 273049, at *6 (S.D.N.Y. May 27, 1998) (finding that the identity of interest exception applied and that the plaintiff could sue a non-named research foundation when the plaintiff had named the associated university in the EEOC charge). The lack of clarity in the relationships between Defendants also makes it difficult to weigh the second factor, that is, whether UBNS had similar interests with respect to obtaining voluntary conciliation and compliance in the EEOC proceedings. The amended complaint lacks any allegations relevant to the third and fourth factors. For its part, UBNS claims that it suffered prejudice and made no representations to Plaintiff that his relationship to UBNS was through either the University or Kaleida. (Dkt. 32-3 at 12).

Because the amended complaint contains only limited allegations concerning the relationships between UBNS and the named respondents, and because of the procedural posture of this case—a motion to dismiss, before any discovery has occurred—the

limited record does not permit a determination as to whether the identity of interest exception applies. "When it is unclear whether the identity of interest exception applies, courts routinely permit the unnamed parties to proceed as defendants in the action." *Lewis*, 30 F. Supp. 3d at 206 (collecting cases declining to resolve identity of interest issue at motion to dismiss stage). Accordingly, the Court denies without prejudice the motion to dismiss the Title VII claims against UBNS on the basis that it does not have an identity of interest with the respondents named in the EEOC charge.

### C. Whether UBNS is a Covered Employer Under Title VII

Defendants also argue that Plaintiff's Title VII claims against UBNS should be dismissed because it is not a covered employer under Title VII. (Dkt. 32-3 at 7-9). Plaintiff responds that UBNS is a part of—and the same entity as—the University, as well as a joint employer of Plaintiff. (Dkt. 35 at 14-16).

Title VII prohibits discriminatory employment practices by an "employer." 42 U.S.C. § 2000e-2(a). "Consequently, the existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). When analyzing direct employment relationships under Title VII, the Court considers thirteen factors, as set forth by the Supreme Court in *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 751-52 (1989):

> the hiring party's right to control the manner and means by which the product is accomplished . . . . [;] the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part

of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 371 (quoting *Reid*, 490 U.S. at 751-52). While no single factor is determinative, "the common-law element of control is the principal guidepost that should be followed." *Id.* (citation omitted).

In addition to an entity that has a direct employment relationship with the plaintiff, an entity that is not formally the plaintiff's employer may be liable under Title VII. *Kology v. My Space NYC Corp.*, 177 F. Supp. 3d 778, 781 (E.D.N.Y. 2016). That is, "courts construe the term 'employer' functionally, to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an employee's compensation or terms, conditions, or privileges of employment." *Id.* (quotation omitted). Two doctrines provide for such indirect liability. *See Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 197 (2d Cir. 2005) (comparing single employer and joint employer doctrines).

The first doctrine is the "single employer" doctrine. *Id.* "A 'single employer' situation exists where two nominally separate entities are actually part of a single integrated enterprise." *Id.* at 198 (citation omitted). "[E]xamples may be parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management." *Id.* When considering whether two entities are a single employer, courts consider four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or

financial control." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995) (quotation omitted).

The second doctrine is the "joint employer doctrine," which, by contrast, does not involve a single integrated enterprise. *Arculeo*, 425 F.3d at 198. Rather, joint employers are "separate legal entities, but . . . they handle certain aspects of their employer-employee relationship jointly." *Id.* (alterations, quotation marks, and citation omitted).

> Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.

*Id.* "Here, courts look at 'commonality of hiring, firing, discipline, pay, insurance, records, and supervision' to determine whether an entity is a joint employer." *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) (quoting *N.L.R.B. v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994)), *aff'd sub nom. Lima v. Adecco &/or Platform Learning, Inc.*, 375 F. App'x 54 (2d Cir. 2010).

"Whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014). "To survive a motion to dismiss, therefore, a plaintiff need only allege facts 'sufficient to put [the defendant] on notice of the theory of employer liability upon which [the] claims are based.'" *Downey v. Adloox Inc.*, No. 16-CV-1689 (JMF), 2017 WL 816141, at *5 (S.D.N.Y. Feb. 28, 2017) (quoting *Fowler v. Scores Holding Co., Inc.*, 677 F. Supp. 2d 673, 681 (S.D.N.Y. 2009));

*Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 219 (S.D.N.Y. 2010) ("In order to state a claim against the defendants other than her direct, formal employer on the basis of the 'joint-employer' doctrine, [the plaintiff] must plead enough facts so that the claim is facially plausible and gives fair notice to defendants of her theory of employer liability.").

Plaintiff has not clearly alleged the nature of his alleged employment relationship with UBNS, claiming that it was both his direct and joint employer: "The University, *UBNS*, and Kaleida, in addition to being *direct employers* of Plaintiff, are *also joint-employers* of Plaintiff." (Dkt. 21 at ¶ 16 (emphasis added)). He asserts that those three entities "have: (i) an interrelation of operations; (ii) centralized control of labor relations; (iii) common management; and (iv) common ownership or financial control." (*Id.*). He also alleges that the University controls and operates UBNG, and that UBNS is part of UBNG. (*Id.* at ¶¶ 11, 15).

Plaintiff's opposition to the motion to dismiss is not any more precise regarding whether UBNS is his direct or joint employer. In his opposition, Plaintiff explains that he expects discovery to show that "UBNS is simply the practice management and billing shell for the University" (Dkt. 35 at 15), and therefore he asserts that UBNS "is a part of the University" (*id.* at 14), and that "the University, UB Medical, UBNG, and UBNS are all the same entity" (*id.* at 16). Yet he also reiterates his claim that the University, UBNS, and Kaleida jointly employed him. (*Id.* at 16). Moreover, despite Plaintiff's repeated assertion that UBNS is liable as a joint employer, he recites the four factors relevant to the single employer doctrine. (Dkt. 21 at ¶ 16; Dkt. 35 at 16). But, as

discussed, those two doctrines are distinct; the single employer doctrine contemplates liability against "another entity comprising part of the single integrated employer," while the joint employer doctrine "assumes that [the employers] are *separate legal entities*. . . ." *Arculeo*, 425 F.3d at 198 (emphasis added). So, assuming the truth of Plaintiff's allegation that UBNS is the same entity as the University and other defendants, the joint employer doctrine is inapplicable.

Even setting aside the confusion regarding the theories of employer liability advanced by Plaintiff[3] and assuming Plaintiff alleges them in the alternative, the Court

---

[3]     During oral argument, Plaintiff argued, for the first time, an additional theory of employer liability, known as "interference liability," based on *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973), the case in which it was first enunciated. *Gulino*, 460 F.3d at 373. Under the interference liability theory, an entity may be an employer for Title VII purposes if the entity "affirmatively interfered with or affected the plaintiff's direct employment or access to employment opportunities. . . ." *Id.* at 372.

"Normally, [the Court] will not consider arguments raised for the first time in a reply brief, let alone [at or] after oral argument." *United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) (citation omitted). Moreover, even if Plaintiff had properly raised that theory, the Court finds that he has not plausibly alleged UBNS's liability under it.

The interference liability theory, although not necessarily foreclosed, is fairly circumscribed in this Circuit. *See Yacklon v. E. Irondequoit Cent. Sch. Dist.*, 733 F. Supp. 2d 385, 389 (W.D.N.Y. 2010) (noting that the Second Circuit has "sharply limited the scope of that rule" and collecting cases); *see also Salamon v. Our Lady of Victory Hosp.*, No. 06-1707-cv, 2008 WL 2609712, at *12 (2d Cir. Jan. 16, 2008) ("We need not decide in this case whether *Gulino* closed the door entirely on the *Sibley* theory of interference liability in this Circuit. . . ."). The Second Circuit made a "foray into the hazy realm of the interference test," *Gulino*, 460 F.3d at 373, in *Spirit v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054 (2d Cir. 1982) (internal citations omitted), *vacated on other grounds*, 463 U.S. 1223 (1983), in which it held that "the term 'employer,' as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer.'" *Spirit*, 691 F.2d at 1063.

Following *Spirit*, in *Gulino*, the Second Circuit noted that it "has never adopted a broad reading of the *Sibley* interference test," *Gulino*, 460 F.3d at 374, and that *Spirit* "enunciated a narrow rule based upon a unique factual posture," *id.* at 377. The Second

finds that Plaintiff's Title VII claims against UBNS fail for the basic reason that the amended complaint lacks *any* factual allegations about the degree to which UBNS played a role in any aspect of his employment or shared employment decisions with the University and/or Kaleida.

Plaintiff's amended complaint does not give rise to a plausible inference that UBNS was a direct employer of Plaintiff. Apart from his conclusory statement that UBNS was his direct employer (Dkt. 21 at ¶ 16), he has alleged no facts concerning the extent to which UBNS exerted control over the manner and means by which he performed his duties, compensated him or provided him benefits, or played a role in any other aspect of his employment bearing on the *Reid* factors recited above. Rather than UBNS, the amended complaint plausibly alleges that Plaintiff had a direct employment relationship with the University, who had the power to terminate his position and compensated him, as well as Kaleida, who exerted control over Plaintiff and his work. (*See id.* at ¶¶ 20-24).

---

Circuit described the limited holding of *Spirit* as follows: "[W]here an employer has delegated one of its core duties to a third party . . . that third party can incur liability under Title VII." *Id.*; *see also Jansson v. Stamford Health, Inc.*, Civil Action No. 3:16-cv-260 (CSH), 2017 WL 1289824, at *23 (D. Conn. Apr. 5, 2017) ("[T]he Second Circuit has recognized a carefully limited 'interference' theory under Title VII: 'where an employer has delegated one of its core duties to a third party' (e.g., administration of a retirement plan)." (quoting *Gulino*, 460 F.3d at 377)).

Here, Plaintiff's amended complaint lacks any allegation that any "core employer responsibility," *Gulino*, 460 F.3d at 378, has been delegated to UBNS by one of the parties with which he has a clear direct employment relationship (the University or Kaleida). Accordingly, even if Plaintiff had not belatedly raised the interference theory at oral argument, the Court finds that Plaintiff has not plausibly alleged that UBNS is his employer for Title VII purposes under that theory.

Plaintiff's allegations fare no better with respect to the joint or single employment theories of liability. The only factual content relevant to the relationship between UBNS and the University or Kaleida is this: "UBNS . . . is a corporation associated with the University, providing academic support and is a clinician care component for the University." (*Id.* at ¶ 13). It is difficult to interpret Plaintiff's limited factual allegations—that UBNS is "associated with the University" and is the University's "clinician care component"—as plausibly suggesting that UBNS played a sufficient role in the employment matters of the University to be considered a joint or single employer. That is, these allegations do not sufficiently indicate "commonality of hiring, firing, discipline, pay, insurance, records, and supervision" as needed to plausibly suggest that UBNS acted as a joint employer. And, Plaintiff merely recites the four factors for the single employer doctrine, unaccompanied by any factual allegations to support that theory. (*Id.* at ¶¶ 11, 15). Thus, Plaintiff has not alleged facts sufficient to put UBNS on notice of the theory of employer liability upon which Plaintiff's claims are based. *See Downey*, 2017 WL 816141, at *5.

The Court therefore dismisses Plaintiff's claims against UBNS arising under Title VII. However, in light of the Second Circuit's caution that whether an entity is a covered employer under Title VII is generally is a fact-based question, *Brown*, 756 F.3d at 226, the Court finds it appropriate to dismiss these claims without prejudice to re-pleading.

### III.   NYSHRL Claims (Third Claim for Relief)

In his third claim for relief, Plaintiff asserts claims of discrimination, retaliation, and hostile work environment against all Defendants, in violation of the NYSHRL. (Dkt.

21 at ¶¶ 59-60).  UBNS and Dr. Levy move to dismiss this claim, arguing that neither one is a covered employer under the NYSHRL.  (Dkt. 32-3 at 13-15).

### A.  Dr. Levy

Under the NYSHRL, an individual may be liable for employment discrimination in two ways.  *Sutera v. Rochester City Sch. Dist.*, No. 11-CV-6057-FPG, 2014 WL 4245957, at *5 (W.D.N.Y. Aug. 26, 2014).  First, an individual can be liable for discrimination under New York Executive Law § 296(1) if the individual qualifies as an employer, that is, one who has "any ownership interest or any power to do more than carry out personnel decisions made by others." *Id.* (quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 543-44 (1984)).

Second, an individual may be liable under New York Executive Law § 296(6) as an aider or abettor of the discriminatory conduct. *Id.* Section 296(6) provides that it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law. § 296(6). "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he actually participates in the conduct giving rise to a discrimination claim." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (citing *Tomaka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998)); *Patrick v. Garlick*, 66 F. Supp. 3d 325, 332 (W.D.N.Y. 2014) (denying motion to dismiss NYSHRL claims against supervisor because plaintiff adequately alleged that the

supervisor actively aided and abetted in discrimination and retaliation, and collecting cases).

Although Plaintiff's amended complaint does not identify the theory of Dr. Levy's NYSHRL liability, Plaintiff's opposition papers specify that "Dr. Levy is a covered employer under the NYSHRL as an aider and abettor given his direct participation in the complained of discrimination." (Dkt. 35 at 23). Plaintiff plausibly alleges that Dr. Levy participated in the conduct giving rise to the discrimination and retaliation claims. Plaintiff alleges that Dr. Levy engaged in "severe and pervasive harassment toward Plaintiff due to his race and national origin, and has otherwise created a hostile work environment for dark-skinned employees" (Dkt. 21 at ¶ 27), and that he "fosters a culture at the University, UBNS, and Kaleida permitting sexist remarks, sexually explicit statements, and discriminatory comments about race and national origin" (*id.* at ¶ 28). Plaintiff also alleges that Dr. Levy, "in retaliation for Plaintiff having filed the discrimination complaints," ceased referrals to Plaintiff's current employer, the Delaware Medical Group. (*Id.* at ¶ 42). Construing these allegations in the light most favorable to Plaintiff, the Court finds that he has adequately stated a claim of discrimination and retaliation against Dr. Levy as an aider and abettor under the NYSHRL.

Some courts in this Circuit have not applied the aider and abettor theory of liability "to actions taken by one individual defendant," concluding that "an individual cannot be held liable for merely aiding and abetting her own discriminatory conduct." *Green v. Rochdale Vill. Soc. Servs.*, No. 15 Civ. 5824 (BMC), 2016 WL 4148322, at *10 (E.D.N.Y. 2016) (collecting cases). That distinction would not affect the result in this

case. Plaintiff asserts his NYSHRL claims against all Defendants, not just Dr. Levy; as a result, it is plausible that Dr. Levy aided and abetted the discriminatory conduct of other Defendants.

### B. UBNS

The NYSHRL defines an "employer" in relation to its employees; that is, the definition excludes "any employer with fewer than four persons in his or her employ. . . ." N.Y. Exec. Law § 292(5). To determine whether there is an employee-employer relationship under the NYSHRL, state courts generally look to four elements: "(1) the selection and engagement of the servant; (2) the payment of salary or wages; (3) the power of dismissal; and (4) the power of control of the servant's conduct." *Griffin v. Sirva Inc.*, 835 F.3d 283, 291 (2d Cir. 2016) (quoting *State Div. of Human Rights v. GTE Corp.*, 487 N.Y.S.2d 234, 235, 109 A.D.2d 1082 (4th Dept. 1985)), *certified question accepted sub nom. Griffin, Michael Godwin v. Sirva, Inc.*, 28 N.Y.3d 956 (2016). "Courts have often stressed that the 'really essential element of the relationship is the right of control, that is, the right of one person, the master, to order and control another, the servant, in the performance of work by the latter.'" *Id.* (quoting *GTE Corp.*, 487 N.Y.S.2d at 235).

In *Griffin*, two employees had brought an action against three entities—their former employer, a company that had a contractual relationship with the employer, and the contracting company's parent company—for discrimination on the basis of criminal convictions, in violation of NYSHRL § 296(15). *Id.* at 284. The Second Circuit certified three unsettled questions to the New York Court of Appeals:

(1)    Does Section 296(15) of the New York State Human Rights Law, prohibiting discrimination in employment on the basis of a criminal conviction, limit liability to an aggrieved party's "employer"?

(2)    If Section 296(15) is limited to an aggrieved party's "employer," what is the scope of the term "employer" for these purposes, i.e. does it include an employer who is not the aggrieved party's "direct employer," but who, through an agency relationship or other means, exercises a significant level of control over the discrimination policies and practices of the aggrieved party's "direct employer"?

(3)    Does Section 296(6) of the New York State Human Rights Law, providing for aiding and abetting liability, apply to § 296(15) such that an out-of-state principal corporation that requires its New York State agent to discriminate in employment on the basis of a criminal conviction may be held liable for the employer's violation of § 296(15)?

*Id.* at 294.  Section 296(15) is not at issue here; however, the Second Circuit described the question of whether the joint employer and single employer doctrines apply to the NYSHRL as unresolved, stating, "Both have been applied by courts in this circuit when considering discrimination claims against businesses that are not the plaintiff's 'direct employer.'  But whether one or the other (or both) applies to the NYSHRL, especially Section 296(15), remains unresolved." *Id.* at 293.[4]

---

[4]    Some district court cases that have applied the single or joint employer doctrines to NYSHRL claims have relied on *Fowler v. Scores Holding Co., Inc.*, 677 F. Supp. 2d 673, 680-81 (S.D.N.Y. 2009).  *See, e.g., Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 217 n.54 (S.D.N.Y. 2010) (citing *Fowler*, 677 F. Supp. 2d at 680-81).  The *Fowler* court cited to the Second Circuit's decision in *Arculeo* for the proposition that "[u]nder New York law, there are two well-established doctrines—the single and joint employer doctrines—that allow an employee to assert employer liability against an entity that is not formally his or her employer." *Fowler*, 677 F. Supp. 2d at 680-81 (citing *Arculeo*, 425 F.3d at 197-98).  However, the appeal in *Arculeo* was taken from the district court's grant of summary judgment on the Title VII claims and dismissal of the NYSHRL claims without prejudice.  *Arculeo*, 425 F.3d at 197.  Accordingly, the *Arculeo* case did not address those doctrines in the context of the NYSHRL; rather, its discussion was limited to Title VII.

On May 4, 2017, the New York Court of Appeals issued a decision in *Griffin v. Sirva, Inc.*, ___ N.E.3d ___, 2017 WL 1712423 (2017), in response to the certified questions listed above. As noted above, one question certified by the Second Circuit was the scope of the term "employer" for purposes of § 296(15). In answering that question, the New York Court of Appeals noted that, "[i]n a different context, we have held that '[t]he standards for establishing unlawful discrimination under section 296 of the Human Rights Law are the same as those governing title VII cases under the Federal Civil Rights Act of 1964.'" *Id.* at 12 (quoting *Rainer N. Mittl, Ophthalmologist, P.C. v. New York State Div. of Human Rights*, 100 N.Y.2d 326, 330 (2003)).[5] The New York Court of Appeals stated that "to determine who is an employer under the Human Rights Law," the four-factor test from *GTE Corp.* governs, with the "really essential element" being "the right of control." *Id.* at 12-13. Thus, the New York Court of Appeals held that "common-law principles, as discussed in *GTE*, determine who may be liable as an employer under section 296(15) of the Human Rights Law, with greatest emphasis placed on the alleged employer's power 'to order and control' the employee in his or her performance of work." *Id.* at 13.

Thus, while the New York Court of Appeals' answer to the question posed by the Second Circuit was ultimately constrained to § 296(15), which is not at issue in this case, its analysis is relevant to this case in two respects. First, the New York Court of Appeals confirmed that "'[t]he standards for establishing unlawful discrimination under section

---

[5]     Pinpoint citations to the New York Court of Appeals' decision in *Griffin* refer to the .pdf of the decision, available for download on that court's website: https://www.nycourts.gov/ctapps/Decisions/2017/May17/May17.html.

296 of the Human Rights Law are the same as those governing title VII cases. . . ." *Id.* at 12 (quoting *Rainer*, 100 N.Y.2d at 330). Second, it affirmed the use of the four-factor test from *GTE Corp.* to identify whether an entity is an aggrieved party's employer. *Id.* at 12-13. Yet the New York Court of Appeals' analysis did not explicitly address the question of whether the joint or single employer doctrines apply when determining if an entity is an employer under a theory of indirect employer liability; thus, the question appears to remain "unresolved." *Griffin*, 835 F.3d at 293.

In any event, this Court need not grapple with that issue to resolve this motion to dismiss because, under any of the tests discussed above (the four-factor test, joint employer doctrine, and single employer doctrine), Plaintiff has failed to sufficiently plead that UBNS is a covered employer under the NYSHRL. Applying the four-factor test, Plaintiff's amended complaint fails because it includes no factual allegations regarding whether UBNS had the power of selection, payment of wages, or power of dismissal or control over Plaintiff. Assuming that the single or joint employer doctrines apply, Plaintiff's NYSHRL claims against UBNS are insufficient for the same reasons as his Title VII claims against UBNS, as discussed above. Accordingly, because Plaintiff has not sufficiently alleged that UBNS is his employer for NYSHRL purposes, the Court dismisses Plaintiff's claims against UBNS arising under the NYSHRL, without prejudice to re-pleading.

## IV.  Section 1983 Claims (Fifth Claim for Relief)

In his fifth claim for relief, Plaintiff alleges that Defendants, acting under the color of state law, deprived him of his constitutional rights in violation of § 1983.  (Dkt. 21 at ¶¶ 74-79).

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting § 1983).  To state a § 1983 claim, a plaintiff must not only allege the defendant deprived the plaintiff of a Constitutional right, but also that the defendant was a state actor or a private individual that acted "under color of state law." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002).  "[A] private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." *Id.* at 324 (quotation omitted).  A private actor may also be liable under § 1983 if that actor conspires with a state actor to deprive a plaintiff of his constitutional rights. *Id.* at 324-25.  "[T]o survive a motion to dismiss on [a] § 1983 conspiracy claim, [a plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Id.*  Whether alleging participation in "joint activity" or a § 1983 conspiracy, a plaintiff must set forth more than mere conclusory allegations. *Id.* at 324-25.

Plaintiff does not allege that UBNS and Dr. Levy are state actors; rather, he alleges generally that all Defendants, "acting under the color of state law, infringed upon and deprived [Plaintiff] . . . of his Constitutional rights. . . ."  (Dkt. 21 at ¶ 75).

Otherwise, Plaintiff repeatedly alleges that Defendants acted together to discriminate or retaliate against him. (*See, e.g., id.* at ¶¶ 76-78). Those vague and conclusory allegations are unsupported by factual content plausibly alleging an agreement or concerted action between UBNS, Dr. Levy, and the other Defendants. *See Ciambriello*, 292 F.3d at 324-35. Accordingly, because Plaintiff has not alleged enough facts to support an inference of state action by UBNS or Dr. Levy, the Court dismisses Plaintiff's § 1983 claims against those defendants without prejudice.

## V. Claims for Tortious Interference with a Contract (Sixth Claim for Relief)

In his sixth claim for relief, entitled "Tortious Interference," Plaintiff alleges that he had "contracts, agreements, and relationships with other members and employees of Defendants for the Specialty Practice Group" (Dkt. 21 at ¶ 81), which Defendants knew of and interfered with by:

> discriminating against [Plaintiff], terminating his faculty position, retaliating against [Plaintiff] by not sending referrals to him or Delaware Medical Group, discouraging others involved with the Specialty Practice Group and employed by the University, UBNS, and Kaleida to cease working with [Plaintiff] and cease sending referrals to him and Delaware Medical Group, and otherwise conspiring to end the Specialty Practice Group.

(*Id.* at ¶ 83). Plaintiff further alleges that Defendants' actions resulted in "breach of these contracts and agreements; prevented the making of future contracts and agreements; and otherwise interfered with the relationships and performance of the contracts and agreements." (*Id.* at ¶ 84). He further alleges that the actions "were intentional, done by wrongful means and with malicious intent, and without any lawful justification" (*id.* at

¶ 85) and diminished his earnings and opportunities for professional development and harmed his reputation (*id.* at ¶ 86).

Plaintiff's amended complaint does not identify precisely the nature of his tortious interference claim. (*Id.* at 14). UBNS and Dr. Levy contend that this cause of action, which they construe as a claim for tortious interference with a contract, must be dismissed because Plaintiff has not alleged the existence of any valid contract. (Dkt. 32-3 at 18-19). Plaintiff responds that he has not only sufficiently pleaded a claim for tortious interference with a contract, but he has also sufficiently pleaded claims for "tortious interference with employment" and for "tortious interference with contracting relations and prospective economic advantage." (Dkt. 35 at 25).

## A. Tortious Interference with a Contract and Tortious Interference with Employment

"Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996).

In his opposition papers, Plaintiff attempts to clarify the nature of this claim. First, he identifies the contract at issue as a "verbal contract relating to the building [of] a special practice with other doctors at UBNS with the goal of developing an economically successful practice." (Dkt. 35 at 25 (citing Dkt. 21 at ¶ 43)). However, the amended complaint itself sets forth no facts concerning the nature of the contract (including

whether it was verbal, as alleged in his opposition papers, or in writing) or the parties with whom he made any contract. *See Katz v. Travelers*, 16-cv-439 (ADS) (SIL), 2017 WL 1317000, at *4 (E.D.N.Y. Mar. 10, 2017). Moreover, the claim is alleged against all Defendants, even though it appears that some Defendants are allegedly parties to the purported contract to build a Specialty Practice Group; however, Defendants cannot be both a party to the contract and the interfering party.

Second, Plaintiff maintains that he has also stated a claim for tortious interference with his employment, arguing that UBNS and Dr. Levy "interfered with his employment relationship with his employer by intentionally causing harm to [him]." (Dkt. 25 at 27). Whether this refers to Plaintiff's employment relationship with the University or with Delaware Medical Group is unclear; in either scenario, Plaintiff has not identified whether he was an at-will employee or had a valid employment contract. These shortcomings are fatal to Plaintiff's claim, which, as discussed, requires Plaintiff to plead the existence of a valid contract between a third party and Plaintiff. *See Katz*, 2017 WL 1317000, at *8 ("[F]ailure to identify specific entities with which the [p]laintiffs had contracts is fatal to their tortious interference with a contract cause of action."); *Plasticware, LLC v. Flint Hills Resources, LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012) ("Plaintiff has not plausibly alleged adequate details about a specific contract between itself and a third party, but merely has alleged that it has 'agreements' with its customers. This is insufficient."); *Bose v. Interclick, Inc.*, No. 10-CV-9183, 2011 WL 4343517, at *10–11 (S.D.N.Y. Aug. 17, 2011) (dismissing a tortious interference with contract claim where plaintiff generally claimed that it had contracts with various parties, but did not

give any "facts regarding the terms of the contracts or the specific parties to the contracts"); *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 255 (S.D.N.Y. 2009) (denying leave to amend tortious interference with contract claim that had been dismissed, because plaintiffs alleged only that "defendants interfered with their customer contracts," but did not "specify a single customer contract with which defendants interfered"); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 208 (S.D.N.Y. 2008) (holding that claim for tortious interference with a contract failed to state grounds for relief because it "simply allege[d] that a contractual relationship existed between [the parties], but sets forth no facts to allege what kind of contract [they had], whether it was nonexclusive, and whether it was valid"). Accordingly, the Court dismisses Plaintiff's claims for tortious interference with a contract and employment without prejudice.

## B. Tortious Interference with Prospective Economic Advantage

To plead a claim for tortious interference with a business relationship—which is sometimes also called tortious interference with prospective economic advantage—the plaintiff must allege the following elements: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Katz*, 2017 WL 1317000, at *4 (quoting *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).

In his opposition papers, Plaintiff clarifies that the business relationship at issue was that between Plaintiff and his current employer, Delaware Medical Group, and that Defendants interfered with that relationship by ceasing referrals. (Dkt. 35 at 26). UBNS

and Dr. Levy argue that they could not tortuously interfere with business relations between Plaintiff and Delaware Medical Group because those business relations belong to his employer, not to Plaintiff. (Dkt. 36 at 11). "In New York, an employee cannot state a claim for tortious interference with a business opportunity where the opportunity belongs to his employer and not to him." *Brennen v. Phyto-Riker Pharm., Ltd.*, No. 01 CIV. 11815 (DLC), 2002 WL 1349742, at *4 (S.D.N.Y. June 20, 2002) (citing *Robins v. Max Mara, U.S.A., Inc.*, 923 F. Supp. 460, 468 (S.D.N.Y. 1996)); *see also Frishberg v. Esprit de Corp.*, 778 F. Supp. 793, 804 (S.D.N.Y. 1991) ("It is clear under New York law that employees cannot state a claim against their employers for tortious interference with business relations since the business relations belong to the employers, not the employees."), *aff'd sub nom. Frishberg v. Espirit De Corp.*, 969 F.2d 1042 (2d Cir. 1992). This raises a question as whether the business opportunities (in this case, the patient referrals) belong to Plaintiff as opposed to Delaware Medical Group. The amended complaint is devoid of any allegations in this regard. Accordingly, the Court dismisses Plaintiff's claim for tortious interference with prospective economic advantage without prejudice.

## VI. Leave to Amend

Plaintiff's opposition papers request the opportunity to amend his complaint in the event that the Court grants any portion of Plaintiff's motion to dismiss. (Dkt. 35 at 7, 13-14, 27). Plaintiff does not explain why leave to amend is warranted or how any potential defects will be cured. (*See id.*).

Plaintiff's cursory request is procedurally defective under the Local Rules of Civil Procedure. *See Wi3, Inc. v. Actiontec Elecs.*, 71 F. Supp. 3d 358, 363 (W.D.N.Y. 2014) (finding request for leave to amend defective for failure to comply with Local Rules of Civil Procedure); *see also Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73, 76 (2d Cir. 2011) (finding district court did not abuse its discretion in denying leave to amend complaint when request to amend was made "on the final page of their brief in opposition to defendants' motion to dismiss, in boilerplate language and without any explanation as to why leave to amend was warranted" and collecting cases). Local Rule 15(a) provides that "[a] movant seeking to amend or supplement a pleading must attach an unsigned copy of the proposed amended pleading as an exhibit to the motion," and Local Rule 15(b) requires parties represented by counsel to identify the proposed amendments "through the use of a word processing 'redline' function or other similar markings. . . ." L.R. Civ. P. 15(a), (b). Because Plaintiff has failed to comply with the Local Rules, the Court exercises its discretion in denying this "cursory or boilerplate request[] . . . made solely in a memorandum in opposition to a motion to dismiss." *Malin v. XL Capital, Ltd.*, 312 F. App'x 400, 402 (2d Cir. 2009) (citation omitted). If Plaintiff wishes to seek leave to amend his amended complaint, he should do so through a procedurally-compliant motion.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 32) is granted in part and denied in part. Specifically, the motion is granted with respect to Plaintiff's Title VII claims against Dr. Levy individually, which are dismissed with prejudice. The

motion is denied with respect to Plaintiff's NYSHRL claims against Dr. Levy individually, which may proceed. The following claims are dismissed without prejudice: (1) Title VII claims against UBNS; (2) NYSHRL claims against UBNS; (3) § 1983 claims against both UBNS and Dr. Levy; and (4) tortious interference claims against UBNS and Dr. Levy.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: May 19, 2017
Rochester, New York