UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES DISTRICT COURT
FILED
SEP 17 2018
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

SAURIN POPAT, M.D.,

     Plaintiff,

 v.

ELAD LEVY, M.D., et al.,

     Defendants.

**DECISION AND ORDER**

1:15-CV-01052 EAW

## INTRODUCTION

  Plaintiff Saurin Popat, M.D. ("Plaintiff") asserts various claims arising out of his past and present employment relationships against five defendants: (1) Elad Levy, M.D. ("Dr. Levy"); (2) The State University of New York at Buffalo (the "University"); (3) University at Buffalo School of Medicine and Biomedical Sciences (the "Medical School"); (4) Kaleida Health ("Kaleida"); and (5) University at Buffalo Neurosurgery, Inc. ("UBNS") (collectively, "Defendants"). (Dkt. 60 at 3-5). Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, 42 U.S.C. §§ 1981 and 1983, the New York State Human Rights Law, New York Executive Law §§ 290, *et seq.* (the "NYSHRL"), the United States Constitution, the New York State Constitution, and New York State common law. (*Id.* at ¶ 1). He raises six claims: (1) race and national origin discrimination and hostile work environment under Title VII; (2) retaliation under Title VII; (3) discrimination and retaliation under the NYSHRL; (4) discrimination and retaliation under § 1981; (5) discrimination and retaliation under

§ 1983; and (6) tortious interference with contract, employment, and prospective economic advantage. (*Id.* at 13-18).

Presently before the Court are UBNS' and Dr. Levy's motion to dismiss all of Plaintiff's claims, except those arising under § 1981, pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. 63); the University and the Medical School's motion to dismiss all of Plaintiff's claims, except those arising under Title VII, pursuant to Rules 12(b)(1) and 12(b)(6) (Dkt. 65); and Kaleida's motion to dismiss all of Plaintiff's claims pursuant to Rule 41(b), and, in the alternative, its motion to dismiss Plaintiff's claims arising under § 1983 and New York common law (Dkt. 67). For the reasons set forth below, UBNS' and Dr. Levy's motion is granted in part and denied in part, the University and the Medical School's motion is granted, and Kaleida's motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the second amended complaint and assumed to be true for purposes of this motion.

### I. Factual Background

The University controls and operates the Medical School and the University at Buffalo Neurosurgery Group ("UBNG"). (Dkt. 60 at ¶ 11). The UBNG is "an academic neurosurgical group comprised of physicians and other healthcare employees who are part of the University's 'UBMD Physicians Group,' which boasts more than 500 doctors . . . practicing medicine and teaching medical students and residents at [the] . . . Medical School

and in area hospitals, including Kaleida facilities."[1] (*Id.*). The UBMD Physicians Group, also known as UBMD, Inc., "provides marketing services to other physician practice groups associated with the University, including [UBNS]." (*Id.* at ¶ 12). "UBNS is a New York not-for-profit corporation associated with the University, providing academic support and is a clinician care component for the University." (*Id.* at ¶ 13). Like UBNG, UBNS is part of the UBMD Physicians Group. (*Id.* at ¶ 15). Kaleida "is a large healthcare provider in Western New York" that "operates several hospitals and surgical facilities." (*Id.* at ¶ 17). Kaleida's neurosurgeons are all associated with the University, and Kaleida publicly identifies Plaintiff as "a Kaleida Health physician." (*Id.*).

With the exclusion of Dr. Levy, Defendants "have one or more agreements with each other defining their relationship and interrelation of operations." (*Id.* at ¶ 14). These agreements allegedly cover the management of "surgical training . . . for University medical students and clinical medical treatment for their joint patients," which includes "billing and expenses." (*Id.*). "UBNS never identified itself . . . as an entity separate or distinct from the University[,]" and the University frequently "works cooperatively or in a parent relationship to UBNS in investigating [discrimination] complaints." (*Id.* at ¶¶ 15-16). Dr. Levy is "a Caucasian individual . . . employed by the University, UBNS, and Kaleida." (*Id.* at ¶ 18). He is a University professor, a physician with UBNG and UBNS, Chief of Neurosurgery at Kaleida, and Co-Director of Kaleida Health Stroke Center and Cerebrovascular surgery. (*Id.*).

---

[1]     UBNG and the UBMD Physicians Group are not parties to this action.

Plaintiff is of African and Southeast Asian origin and a doctor currently employed in Buffalo, New York, by the Delaware Medical Group, P.C., as its Director of Head and Neck/Skull Base Surgery. (*Id.* at ¶¶ 9, 32-33). He was previously employed by the University as a faculty member in the Departments of Neurosurgery and Otolaryngology at the Medical School. (*Id.* at ¶ 34). The University compensated him and had the power to terminate his employment. (*Id.* at ¶¶ 35-36). He was "also considered an employee of Kaleida" because Kaleida gave him certain privileges and asserted direction and control over his work performance. (*Id.* at ¶ 37). Plaintiff received patient referrals from doctors employed by the University, UBNS, and Kaleida. (*Id.* at ¶ 39).

Plaintiff alleges that Defendants should be considered his functional employers under the single integrated employer doctrine, the joint employer doctrine, or the interference liability doctrine. (*Id.* at ¶ 19). First, Plaintiff alleges that "the University, UBNS, and Kaleida, nominally separate entities, are actually part of a single integrated enterprise." (*Id.* at ¶ 21). These entities work together "to provide surgical services for medical training purposes," and they "jointly hired [Dr. Levy]" to fulfill this objective and delegated to him "the power and control to hire and fire other doctors and staff." (*Id.*). Furthermore, UBNS "is under common ownership and management with the University," and is "organized as a separate not-for-profit corporation" only to comply with regulatory requirements. (*Id.* at ¶ 22).

Plaintiff points to one surgical training procedure as an example of the integrated activities of the University, UBNS, and Kaleida:

[Dr. Levy] directed the location for the surgery to be [at] Kaleida; [Dr. Levy] had the surgery scheduled at Kaleida; [Dr. Levy] selected the doctors to perform the surgery, including Plaintiff; [Dr. Levy] directed that medical students form [sic] the University and [M]edical [S]chool be present for training via the surgery; [Dr. Levy] directed a specific protocol for the surgery, including what each doctor and staff member and medical student present was or was not to do during the surgery and the order of events that would occur within the surgery; [Dr. Levy] controlled the process for billing for the surgery and how each doctor was to be compensated; and [Dr. Levy] subsequently terminated Plaintiff's University faculty position.

(*Id.* at ¶ 23).

Alternatively, Plaintiff alleges that if the University, UBNS, and Kaleida are not a single integrated enterprise, then they should be considered his employers under the joint employer doctrine. (*Id.* at ¶ 24). Specifically, Plaintiff claims that Dr. Levy appointed him to a position in the University where he "was expected to train University medical students" at "Kaleida surgical operation facilities." (*Id.* at ¶ 25). These trainings occurred while Plaintiff engaged in surgeries alongside UBNS doctors, such as Dr. Levy, and were directed by UBNS and Dr. Levy. (*Id.*). Dr. Levy terminated Plaintiff from his position for "allegedly not following [Dr. Levy's] surgery protocol for the operation and for allegedly attempting to reschedule that surgery." (*Id.*). Dr. Levy controlled the operation "on behalf of UBNS and/or Kaleida," and "all billings and compensation for the operation had to be submitted and coordinated through UBNS and Kaleida." (*Id.*). Finally, Plaintiff also alleges that the "interference liability theory" applies in this case because the University "delegated its responsibility and duty of selecting, hiring, firing, managing[,] and scheduling its faculty members for training and teaching experiences to UBNS." (*Id.* at ¶ 27).

Plaintiff alleges that the University, UBNS, and Kaleida allowed Dr. Levy "to engage in severe and pervasive discrimination against women and people of color," and "to retaliate against Plaintiff for having complained of these wrongful acts." (*Id.* at ¶ 40). He also alleges that those defendants "interfered with his employment with the University, Kaleida, and Delaware Medical Group." (*Id.*). Plaintiff further alleges that "[Dr. Levy] engaged in severe and pervasive harassment toward Plaintiff due to his race and national origin, and he has otherwise created a hostile work environment for dark-skinned employees." (*Id.* at ¶ 41).

Plaintiff alleges two incidents in which Dr. Levy made inappropriate comments about race or national origin. First, Dr. Levy has referred to or allowed other individuals "to refer to UBNS as 'BUNS,' an acronym for 'Brown University Neurosurgery' because of the prevalence of physicians of color in that department." (*Id.* at ¶ 42). Second, on July 22, 2014, Dr. Levy "stated that he felt like he was at a 'UPS convention'" during an operation in which Plaintiff, Dr. Levy, and others participated. (*Id.* at ¶¶ 43-45). Plaintiff further alleged:

> [Dr. Levy] was asked to repeat himself and he did so by stating, "A UPS convention. Do you know what the UPS slogan is?" He specifically turned to Plaintiff and directly asked, "Do you know?" to which Plaintiff replied that he did not. Next, [Dr. Levy] stated, "What can Brown do for you?" There were eight people, including Plaintiff, in the operating room that had brown skin tones and were of African-American, South-East Asian, or Middle Eastern descent or origin.

(*Id.* at ¶¶ 46-48).

On August 14, 2014, Plaintiff complained, by letter, about Dr. Levy to Dr. Michael E. Cain, Dean of the Medical School ("Dean Cain"), and Jody Lomeo, CEO of Kaleida,

and requested an investigation into Dr. Levy's discrimination based on these comments and his "other abusive and harassing conduct that . . . creat[ed] the hostile work environment." (*Id.* at ¶¶ 51-52). Plaintiff alleges that Dean Cain (or his representative) released Plaintiff's letter to Dr. Levy on or before August 19, 2014, despite the University's policy of confidentiality in such matters. (*Id.* at ¶ 53). Ten days later, on August 29, 2014, Dr. Levy terminated Plaintiff's faculty position. (*Id.* at ¶ 50).

Plaintiff alleges that Kaleida failed to investigate Dr. Levy and Plaintiff's letter complaint (*id.* at ¶ 54), and that the University, "[d]espite . . . issuing a report that strongly suggests that Plaintiff's complaints are accurate and that Dr. Levy committed wrongful acts," has not taken "definitive action," other than to require Dr. Levy to participate in anti-discrimination training (*id.* at ¶ 55). Plaintiff further alleges that, as retaliation for complaining about Dr. Levy, Defendants each "have interfered with the employment relationship between Plaintiff and Delaware Medical Group"—his current employer—by, *inter alia*, ceasing referrals to Plaintiff or the Delaware Medical Group, and by conspiring to interfere with his employment. (*Id.* at ¶ 56).

Plaintiff also alleges that, for several years, he had been building a specialized, shared practice—called the "Specialty Practice Group"—with employees of the University, UBNS, and Kaleida. (*Id.* at ¶ 57). According to Plaintiff, "the University, Kaleida, UBNS, and [Dr. Levy] . . . are unlawfully and improperly exerting pressure on the other doctors in their employ and under their control to retaliate against and punish Plaintiff for having made complaints about [Dr. Levy] and to interfere with his employment relationship with the Delaware Medical Group." (*Id.* at ¶ 58). Plaintiff contends that

Defendants, *inter alia*, "acted with a discriminatory animus toward [him] and retaliated against him for complaining of the discrimination and hostile work environment by interfering with his compensation and employment with Delaware Medical Group and interfering with his economic advantage and contracts with other doctors employed and/or controlled by Defendants." (*Id.*).

## II. **Procedural History**

Plaintiff alleges that he "filed a timely charge of discrimination against Defendants" with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at ¶ 7). Plaintiff's second amended complaint does not specify the respondents named in the EEOC charge, nor is the identity of the respondents apparent from two right-to-sue letters that are attached to the amended complaint. (Dkt. 60-1 at 2-3). Those right-to-sue letters were dated September 16, 2015. (*Id.*).

Plaintiff commenced this action on December 15, 2015, by filing a complaint. (Dkt. 1). On March 15, 2016, Plaintiff filed his first amended complaint. (Dkt. 21). On April 15, 2016, UBNS and Dr. Levy moved to dismiss the first amended complaint. (Dkt. 32). A motion hearing was held before the undersigned on October 28, 2016, at which time the Court requested additional briefing from both parties and reserved decision. (Dkt. 38). The parties submitted additional briefing on November 14 and 15, 2016. (Dkt. 39; Dkt. 40; Dkt. 41).

On May 19, 2017, the Court issued its Decision and Order regarding UBNS' and Dr. Levy's motion. (Dkt. 42). The Court dismissed Plaintiff's Title VII claims asserted against UBNS and Dr. Levy, in his individual capacity, the NYSHRL claims asserted

against UBNS, the § 1983 claims asserted against UBNS and Dr. Levy, and the New York common law claims asserted against UBNS and Dr. Levy, all without prejudice. (*Id.* at 31-32). The Court also denied that portion of the motion seeking to dismiss the NYSHRL claims asserted against Dr. Levy. (*Id.*).

On October 19, 2017, Plaintiff filed his second amended complaint, which is the operative pleading in this case. (Dkt. 60). On November 2, 2017, UBNS and Dr. Levy, the University and the Medical School, and Kaleida filed three separate motions to dismiss. (Dkt. 63; Dkt. 65; Dkt. 67). Plaintiff has opposed each motion. (Dkt. 72; Dkt. 73). Oral argument was held on May 23, 2018, at which time the Court reserved decision. (Dkt. 84).

## DISCUSSION

### I. UBNS' and Dr. Levy's Motion to Dismiss

#### A. Legal Standard

In considering a Rule 12(b)(6) motion to dismiss, a court generally may only consider "facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference." *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). A court should consider the motion "accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citation omitted). To withstand dismissal, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("The plausibility standard is not akin to a probability requirement. . . . A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." (internal quotation marks and citations omitted)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration and citations omitted). Thus, "at a bare minimum, the operative standard requires the plaintiff to provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation marks and alteration omitted).

## B. Plaintiff's Title VII Causes of Action

### 1. Whether UBNS is a Covered Employer under Title VII

#### a. Single Employer Doctrine

Title VII prohibits discriminatory employment practices by an "employer." 42 U.S.C. § 2000e-2(a). "Consequently, the existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). When analyzing direct employment relationships under Title VII, the Court considers thirteen factors, as set forth by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989):

the hiring party's right to control the manner and means by which the product is accomplished . . . . [;] the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Gulino*, 460 F.3d at 371 (quoting *Reid*, 490 U.S. at 751-52). While no single factor is determinative, "the common-law element of control is the principal guidepost that should be followed." *Id.* (citation omitted).

An entity that is not formally the plaintiff's direct employer may also be liable under Title VII. *Kology v. My Space NYC Corp.*, 177 F. Supp. 3d 778, 781 (E.D.N.Y. 2016). That is, "courts construe the term 'employer' functionally, to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an employee's compensation or terms, conditions, or privileges of employment." *Id.* (quotation omitted).

"In the context of Title VII, there are two 'recognized doctrines that enable an employee in certain circumstances to assert employer liability against an entity that is not formally his or her employer.'" *Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 30 (2d Cir. 2015) (quoting *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 197 (2d Cir. 2005)).[2] The first is the "single employer" doctrine. *Arculeo*, 425 F.3d at 197. "A 'single

---

[2]     Plaintiff also alleges a third doctrine for applying indirect liability, known as the "interference liability" theory. (Dkt. 60 at ¶ 27). As the Court noted in its May 19, 2017, Decision and Order, this doctrine, although not necessarily foreclosed, is fairly circumscribed in this Circuit. (Dkt. 42 at 16-17 n.3). Because Plaintiff's allegations satisfy

employer' situation exists where two nominally separate entities are actually part of a single integrated enterprise." *Id.* at 198 (citation omitted). "[E]xamples may be parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management." *Id.* When considering whether two entities are a single employer, courts consider four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995) (citation omitted).

The second doctrine is the "joint employer" doctrine, which, by contrast, does not involve a single integrated enterprise. *Arculeo*, 425 F.3d at 198. Rather, joint employers are "separate legal entities, but . . . they handle certain aspects of their employer-employee relationship jointly." *Id.* (alterations, quotation marks, and citation omitted).

> Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.

*Id.*

The single employer test "has been confined to two corporate contexts: first, where the plaintiff is an employee of a wholly-owned corporate subsidiary; and second, where the plaintiff's employment is subcontracted by one employer to another, formally distinct,

---

the "joint employer" test, the Court finds that, at least at this stage of the proceedings, it need not wade through the "hazy realm of the interference test." *Gulino*, 460 F.3d at 373.

entity." *Gulino*, 460 F.3d at 378 (footnotes omitted).[3] "The Second Circuit cautioned that '[e]xtending this theory to cases involving the complex relations between levels of government would be impracticable and would implicate . . . constitutional concerns.'" *Zhao v. State Univ. of N.Y.*, 472 F. Supp. 2d 289, 314 (E.D.N.Y. 2007) (quoting *Gulino*, 460 F.3d at 378). The circumstances in *Zhao* did not involve multiple levels of government; rather, the purported single integrated enterprise was a private corporation that operated alongside the State University of New York ("SUNY"), and the SUNY entity itself. *Id.* While acknowledging this fact, the *Zhao* court determined that it would "still

---

[3] It should be noted that *Gulino* described this doctrine as the "single or joint employer" test. *Gulino*, 460 F.3d at 378. At least one district court has stated that the *Gulino* court "conflated the factors applicable to the single integrated employer test with the factors applicable to determining who is a joint employer." *Dwyer v. Horne*, No. 12 CV 1176 (NG) (VMS), 2017 WL 5197234, at *4 (E.D.N.Y. Nov. 9, 2017), *appeal dismissed*, No. 17-3976 (2d Cir. Feb. 13, 2018). As the *Dwyer* court noted, "[l]ater cases in the Court of Appeals confirm that the joint employer test used in . . . *Arculeo* is to be used, and they ignore *Gulino* in that regard." *Id.*; *see Griffin v. Sirva Inc.*, 835 F.3d 283, 293 (2d Cir. 2016) ("The district court made no apparent attempt to distinguish analytically the 'joint employer' doctrine from the 'single employer' doctrine."); *Shiflett*, 601 F. App'x at 30 (recognizing that the single employer doctrine and the joint employer doctrine are analytically distinct and noting that "factors courts have used to examine whether an entity constitutes a joint employer of an individual include 'commonality of hiring, firing, discipline, pay, insurance, records, and supervision'" (citation omitted)). In contrast, the *Gulino* court stated that "[t]he 'single or joint employer' test utilizes a four-factored analysis . . . to determine whether two or more employers can be treated as one for purposes of assigning liability." *Gulino*, 460 F.3d at 378 (citing *Cook*, 69 F.3d at 1240 ("[A] parent and subsidiary cannot be found to represent a *single, integrated enterprise* in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." (emphasis added) (citation omitted))). Since the "single employer" doctrine and the "joint employer" doctrines are distinct, and since *Gulino* refers to the factors involved under the "single employer" test, it appears that the *Gulino* court's language refers only to the "single employer" doctrine and conflates the correct nomenclature.

heed[] the Second Circuit's general guidance . . . [to] proceed with great caution in expanding this test beyond the parent/subsidiary contest, especially where a government entity is involved." *Id.* Under the circumstances of that case, the *Zhao* court declined to undertake a "single employer" analysis "because liability c[ould] be analyzed . . . under traditional indicators of common law agency." *Id.* at 314-15.

Plaintiff argues that UBNS, a non-profit corporation, should be considered a single integrated enterprise along with the University. As in *Zhao*, this Court is loath to extend the "single employer" doctrine outside of its well-defined limits, especially where, as here, a government entity is involved. *See Zhao*, 472 F. Supp. 2d at 314. As such, the Court refrains from analyzing Plaintiff's allegations under the "single employer" doctrine. Rather, the Court finds that the "joint employer" doctrine is more applicable given the allegations concerning the legal character of each entity and their respective responsibilities over Plaintiff's employment.

### b.    Joint Employer Doctrine

"The Second Circuit has 'not yet fully analyzed or described a test for what constitutes joint employment in the context of Title VII. . . . The indicia suggesting a conclusion of joint employment may vary depending on the purpose of the inquiry.'" *McFarlane v. Iron Mountain Inc.*, No. 17CV3311(DLC), 2018 WL 3773988, at *6 (S.D.N.Y. Aug. 9, 2018) (quoting *Arculeo*, 425 F.3d at 199 n.7); *see Echevarria v. Insight Med., P.C.*, 72 F. Supp. 3d 442, 459 (S.D.N.Y. 2014) (same). In *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61 (2d Cir. 2003), the court listed a number of factors to be used in assessing "the economic realities" of the relationship between the purported employers and

employees in the context of the Fair Labor Standards Act. *Id.* at 72. In other situations, courts have reviewed the relationship between the parties to determine whether "the defendant had immediate control over the formal employer's employees." *Dupree v. Urban Homesteading Assistance Bd. Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-1894 (JG) (JO), 2011 WL 1343163, at *6 (E.D.N.Y. Apr. 8, 2011) (citing *N.L.R.B. v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994) ("A joint employer relationship may be found to exist where there is sufficient evidence that the respondent had immediate control over the other company's employees.")). Under this test, "[r]elevant factors include commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *Solid Waste Servs., Inc.*, 38 F.3d at 94. In at least one Second Circuit decision involving Title VII, the court suggested that the latter set of factors could be used in determining whether a party should be deemed a "joint employer." *See Shiflett*, 601 F. App'x at 30 ("While we have not yet fully . . . described a test for what constitutes joint employment in the context of Title VII, factors courts have used to examine whether an entity constitutes a joint employer of an individual include commonality of hiring, firing, discipline, pay, insurance, records, and supervision." (quotation marks and citations omitted)).

UBNS argues that Plaintiff fails to state sufficient facts to plausibly infer that it is Plaintiff's employer under Title VII. Specifically, UBNS contends that Plaintiff's emphasis on Dr. Levy's actions during a single surgical procedural does not supply adequate factual support to implicate UBNS as a Title VII employer. (*See* Dkt. 63-2 at 8-9). However, Plaintiff's second amended complaint alleges that Dr. Levy—a professor at the University and a physician at UBNS—appointed Plaintiff to a faculty position with the

University. (Dkt. 60 at ¶¶ 18, 25); *see Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 466 (S.D.N.Y. 2017) ("[The plaintiff] alleges that [the alleged joint employee] hired him personally to work for [his employer], and was his supervisor."). As part of this position, Plaintiff was "expected to train University medical students." (Dkt. 60 at ¶ 25). Furthermore, "[t]his training was conducted only when Plaintiff was directed to perform surgeries along with UBNS doctors, including [Dr. Levy,] . . . [and t]he surgeries performed for this training were directed by UBNS." (*Id.*); *see Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F. Supp. 344, 348 (S.D.N.Y. 1984) ("When an employer has the right to control the means and manner of an individual's performance, . . . an employer-employee relationship is likely to exist."), *aff'd sub nom. Aharnare v. Merrill Lynch*, 770 F.2d 157 (2d Cir. 1985).

Dr. Levy also allegedly terminated Plaintiff's position because Plaintiff failed to follow certain protocols during one such surgery. (Dkt. 60 at ¶ 25). In addition, "all billings and compensation for the operation had to be submitted and coordinated through UBNS and Kaleida," and the records of those surgeries were maintained by these entities. (*Id.*); *see Gainer v. United Auto. Aerospace Agric. Implement Workers (UAW) Region 9*, No. 08-CV-0501-WMS-MJR, 2017 WL 2988286, at *13 (W.D.N.Y. June 6, 2017) (finding the existence of an issue of fact as to whether the defendants could be considered joint employers under Title VII and the NYSHRL where, *inter alia*, the plaintiff "maintains that her work assignments, hours, compensation, vacation approvals and other day to day activities were controlled by" the supervisors of a purported joint employer); *see generally Laurin v. Pokoik*, No. 02 Civ. 1938 (LMM), 2004 WL 513999, at *8 (S.D.N.Y. Mar. 15,

- 16 -

2004) (noting that the joint employer analysis is used to encompass persons or entities who "control some aspect of an employee's compensation or terms, conditions, or privileges of employment" (quotation marks and citation omitted)); *cf. Shiflett*, 601 F. App'x at 31 ("As the district court explained, [the plaintiff] does not allege that she was hired, fired, or managed by an employee of [the alleged joint employer].").

Indeed, Plaintiff also alleges that UBNS determined who participated in the surgical training procedures, how compensation and billing for the surgeries would be managed and facilitated, and, ultimately, "which faculty members may be terminated." (Dkt. 60 at ¶ 27); *see St. Jean v. Orient-Express Hotels Inc.*, 963 F. Supp. 2d 301, 308 (S.D.N.Y. 2013) ("Plaintiff also maintains that Cupecoy's major employment decisions, including hiring and termination, . . . were handled by [the alleged joint employer's] employees."); *see also Green*, 248 F. Supp. 3d at 466 (noting that the plaintiff alleged that the purported joint employers "had the power to discipline [the plaintiff] and threaten him with termination"). Plaintiff further alleges that the University "works cooperatively or in a parent relationship to UBNS in investigating [discrimination] complaints." (Dkt. 60 at ¶ 15).

Based upon these facts, Plaintiff has plausibly alleged that UBNS and its employees maintained at least some control over the supervision, discipline, hiring, and firing of the University's employees, including Plaintiff. *See Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 314 (S.D.N.Y. 2014) (finding that the complaint sufficiently alleged that the purported joint employer "exercised a measure of control over the hiring, firing, supervision, leave, and discipline" of the relevant employees where the plaintiff alleged

that the purported employer "often asserts its authority to terminate and/or hire security personnel" (quotation marks and citation omitted)).

"Even where two companies are deemed a joint employer, however, it is not necessarily the case that both are liable for discriminatory conduct in violation of Title VII." *Goodman v. Port Auth. of N.Y. & N.J.*, 850 F. Supp. 2d 363, 386 (S.D.N.Y. 2012). "[C]ourts have found that even when a plaintiff establishes an entity's status as part of a joint employer, the plaintiff must still show that the joint employer knew or should have known of the [discriminatory] conduct and failed to take corrective measures within its control." *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) (quotation marks and citation omitted), *aff'd sub nom. Lima v. Adecco &/or Platform Learning, Inc.*, 375 F. App'x 54 (2d Cir. 2010). Here, Plaintiff alleges that he informed the Medical School's Dean Cain of his discrimination complaints, UBNS had "presented itself" as "a part of the University and the Medical School," and UBNS and the University cooperate to handle complaints of discrimination. (Dkt. 60 at ¶¶ 15-16, 51). Plaintiff also alleges that even though the University issued "a report that strongly suggests that Plaintiff's complaints are accurate and that [Dr. Levy] committed wrongful acts, no definitive action has been taken with regard to the complaints, other than directing [Dr. Levy] to undergo anti-discrimination training." (*Id.* at ¶ 55). These allegations raise a reasonable inference that UBNS knew of the alleged "discriminatory conduct and failed to take corrective measures within its control." *Lima*, 634 F. Supp. 2d at 400 (quotation marks and citation omitted).

Plaintiff may ultimately be unable to establish that UBNS was, in fact, his joint employer that should be held liable for any alleged misconduct. However, whether UBNS

should be considered a joint employer for purposes of Title VII cannot be determined at the pleading stage. *See St. Jean*, 963 F. Supp. 2d at 308 (denying the motion to dismiss because "whether the [two defendants] were [the p]laintiff's joint employers is a question of fact"). Enough has been alleged to survive a motion to dismiss.

Therefore, the Court denies UBNS's motion to the extent UBNS requests that Plaintiff's first and second causes of action be dismissed on the ground that Plaintiff failed to sufficiently allege that UBNS was his "employer" for purposes of Title VII liability.

### 2. Whether Plaintiff Exhausted His Administrative Remedies as Against UBNS

UBNS also argues that Plaintiff's Title VII causes of action should be dismissed as against it because Plaintiff failed to name UBNS as a respondent in any charge filed with the EEOC or complaint filed with the New York State Division of Human Rights, and thus, he failed to exhaust his administrative remedies. (*See* Dkt. 63-2 at 9-12). Plaintiff argues that the "law of the case" doctrine should apply because the Court already addressed this very issue in its May 19, 2017, Decision and Order, and determined that at this stage of the proceedings, it was unclear whether the "identity of interest" exception to the exhaustion requirement had been satisfied. (Dkt. 73 at 17-18; *see* Dkt. 42 at 8-12).

As a precondition to bringing a Title VII suit against a defendant in federal court, a plaintiff must file with the EEOC (or an authorized state agency) a charge of employment discrimination that names that defendant. *See* 42 U.S.C. § 2000e-5; *Strine v. Marion Cent. Sch. Dist.*, 280 F. Supp. 2d 75, 78 (W.D.N.Y. 2003) ("As a general rule, a party not named in an EEOC charge may not be named in a subsequent discrimination suit."). However,

the failure to name UBNS in the EEOC charge does not necessarily foreclose Plaintiff's Title VII claims against UBNS. The Second Circuit takes a "flexible stance in interpreting Title VII's procedural provisions, . . . so as not to frustrate Title VII's remedial goals," and therefore it recognizes an exception to the general rule that a defendant must be named in an EEOC charge. *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir. 1991) (internal citation and quotation omitted). The so-called "identity of interest" exception allows a plaintiff to proceed against a defendant not named in the administrative charge "where there is a clear identity of interest between the unnamed defendant and the party named in the administrative charge." *Id.*

A district court should consider four factors in determining whether an identity of interest exists between the unnamed defendant and the named party:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; [and] 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.* at 209-10. "This four-prong test is not a mechanical one; no single factor is determinative." *Dortz v. City of New York*, 904 F. Supp. 127, 143 (S.D.N.Y. 1995). "Ultimately, it is the plaintiff who has the burden of proving that the identity of interest exception applies." *Senecal v. B.G. Lenders Serv. LLC*, 976 F. Supp. 2d 199, 214 (N.D.N.Y. 2013).

In its May 19, 2017, Decision and Order, the Court analyzed the allegations in the first amended complaint in light of this four-factor test. (Dkt. 42 at 11). While acknowledging that Plaintiff had been represented by counsel during the EEOC proceedings, the Court also found that the allegations regarding how UBNS related to the other Defendants was unclear, and thus, the second factor could not yet be resolved. (*Id.*). Ultimately, the Court was unable to determine whether the exception applied to the first amended complaint based on the limited allegations set forth in that pleading at the motion to dismiss stage of this litigation. (*See id.* at 11-12 ("Because the amended complaint contains only limited allegations concerning the relationships between UBNS and the named respondents, and because of the procedural posture of this case—a motion to dismiss, before any discovery has occurred—the limited record does not permit a determination as to whether the identity of interest exception applies.")).

UBNS does not explain why the Court should reach a different conclusion in light of Plaintiff's second amended complaint. In fact, UBNS makes largely the same arguments that were presented in its first motion to dismiss on this issue. (*Compare* Dkt. 32-3 at 9-12, *with* Dkt. 63-2 at 9-12). By contrast, Plaintiff's new allegations only reinforce the apparent overlap between UBNS and the other named respondents. (*See, e.g.*, Dkt. 60 at ¶¶ 15 ("At all times, [UBNS] presented itself to Plaintiff as part of the UBMD Physician's Group and that it was therefore one-in-the-same as UBNG, a part of the University and the Medical School."), 16 ("The University routinely and as a practice passes copies of discrimination complaints to UBNS and works cooperatively or in a parent relationship to UBNS in investigating complaints."), 27 (alleging that the "University delegated its

responsibility and duty of selecting, hiring, firing, managing and scheduling its faculty members for training and teaching experiences to UBNS")). If anything, these new allegations strengthen any "identity of interest" that may exist between UBNS and the parties named in the administrative charge. Indeed, if UBNS presented itself to Plaintiff as a component entity of the University and the Medical School, this factor may weigh in favor of a finding that the identity of interest exception has been met. *See Johnson*, 931 F.2d at 210 (noting the relevance of "whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party" (quotation marks and citation omitted)).

Plaintiff's second amended complaint still does not contain any allegations relating to whether UBNS was prejudiced by its absence from the EEOC proceedings (*see* Dkt. 42 at 11 ("The amended complaint lacks any allegations relevant to the third [factor] . . . .")), and UBNS, for its part, argues that it was "clearly prejudiced by being prevented from initiating steps toward conciliation or resolution under the EEOC process" (Dkt. 63-2 at 11). Moreover, even considering Plaintiff's additional allegations that suggest a stronger relationship between UBNS and the University, the degree of overlap between these two entities is still unclear at this stage of the proceedings.

The "identity of interest" question is not always easily resolved in the context of a motion to dismiss, and when that is so, courts generally permit the case to proceed against the unnamed party. *See, e.g., Jackson v. N.Y.C. Transit*, No. 05-CV-1763 (FBLB), 2005 WL 2664527, at *3 (E.D.N.Y. Oct. 19, 2005) (denying the motion to dismiss the plaintiff's Title VII claims where the court "cannot conclude, based on the limited allegations in the

complaint, that there was no identity of interest"); *see also Johnson v. M. Melnick & Co.*, No. 91 Civ. 7961 (LAP), 1993 WL 118512, at *2 (S.D.N.Y. Apr. 13, 1993) (rejecting the argument that it would be futile to permit an amendment to the complaint that added a new defendant not named in the EEOC charge because "it is unclear at this stage whether the 'identity of interest' exception to the charging requirement is applicable").

"The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quotation marks and citation omitted). UBNS does not assert any reason—let alone a "cogent" or "compelling" one—for this Court to depart from its previous determination that the "identity of interest" issue cannot be decided at this stage of the proceedings. Plaintiff's new allegations only confirm that the parties should proceed to discovery on this issue to ascertain the full relationship between UBNS and the named respondents to the administrative charge. Accordingly, the Court adheres to its previous decision and denies the motion to dismiss the Title VII claims against UBNS on the basis that it was not named in the EEOC charge.

### C. Plaintiff's Third Cause of Action Under the NYSHRL

#### 1. Whether UBNS is a Covered Employer Under the NYSHRL

To sufficiently plead that a plaintiff is an employee of a particular entity under [the] NYSHRL, a plaintiff must allege that the proposed employer: had the power of selection and engagement of the employee; made the payment of salary and wages to the employee; had the power of dismissal over the employee; and had the power to control the employee's conduct.

*Kearney v. Kessler Family LLC*, No. 11-CV-06016, 2011 WL 2693892, at *5 (W.D.N.Y. July 11, 2011) (citing cases). "The most important consideration in this analysis is whether the alleged employer exercised control over the employee's conduct and the incidents of his employment." *Gallagher v. Gallagher*, 130 F. Supp. 2d 359, 363 (N.D.N.Y. 2001) (citing *Robins v. Max Mara, U.S.A., Inc.*, 923 F. Supp. 460, 470 (S.D.N.Y. 1996)); *see Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998) (stating that a determination regarding whether an entity should be considered an "employer" for purposes of the NYSHRL "turns on a number of facts, in particular, whether the alleged employer exercised control over the employee's conduct and the incidents of his employment" (citation omitted)).

It is well established that "[t]he NYSHRL mirrors the[] federal obligations" under Title VII. *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014); *see Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir. 1996) ("We consider [the plaintiff's] state law claims in tandem with her Title VII claims because New York courts rely on federal law when determining claims under the [NYSHRL]."). Indeed, the Second Circuit has stated that "claims brought under [the NYSHRL] are analytically identical to claims brought under Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (quoting *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997)); *see Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008), *as amended* (Apr. 22, 2008) ("We typically treat Title VII and [NYSHRL] discrimination claims as analytically identical, applying the same standard of proof to both claims."); *Shipkevich v. Staten Island Univ. Hosp.*, No. 08-CV-1008 (FB) (JMA), 2009 WL 1706590,

at *3 (E.D.N.Y. June 16, 2009) ("The analysis used to determine whether an entity is an individual's employer pursuant to the [NYSHRL] . . . is substantially the same as that used under Title VII."); *see also Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 216-17 (S.D.N.Y. 2010) (applying the "joint employer" doctrine to claims under the NYSHRL).

However, as the Court noted in its May 19, 2017, Decision and Order, whether the joint employer doctrine applies when determining if an entity is an employer under a theory of indirect employer liability in the context of the NYSHRL remains unresolved. (*See* Dkt. 42 at 22-24); *see Griffin v. Sirva Inc.*, 835 F.3d 283, 293 (2d Cir. 2016) (stating that whether the joint employer doctrine applies to claims under the NYSHRL "remains unresolved"); *see also Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 187 (2017) (stating that "Section 296(6) [of the NYSHRL related to aider and abettor liability] extends liability to persons and entities beyond joint employers, and [that] this provision should be construed broadly"). Since the New York Court of Appeals' decision in *Griffin*, at least one district court in this Circuit has applied the "joint employer" doctrine in the context of the New York City Human Rights Law ("NYCHRL"). *See Alvarracin v. Volume Servs., Inc.*, No. 17-CV-3873 (PKC), 2018 WL 2452766, at *2 (S.D.N.Y. May 30, 2018) ("[T]o determine whether a defendant is a joint employer under the NYCHRL, courts apply an 'immediate control' test, which considers whether the defendant 'had immediate control over the other company's employees,' specifically as to 'setting the terms and conditions of the employee's work.'" (quoting *Brankov v. Hazzard*, 142 A.D.3d 445, 445-46 (1st Dep't 2016) ("In determining whether an ostensible non employer is actually a 'joint employer' for purposes of

employment discrimination claims under the State and City Human Rights Laws (HRLs), numerous Federal District Courts have applied the 'immediate control' test." (collecting cases)))). The NYCHRL is generally viewed as comparable to the NYSHRL. *See Lation v. Fetner Props., Inc.*, No. 17-CV-3276 (JPO), 2017 WL 6550691, at *4 n.4 (S.D.N.Y. Dec. 22, 2017) ("Although *Griffin* described the definition of 'employer' under the New York State Human Rights Law, 'courts generally treat the state and city Human Rights Laws as comparable.'" (quoting *Robins*, 923 F. Supp. at 471)).

At oral argument, Plaintiff's counsel and counsel for UBNS and Dr. Levy confirmed that it was their position that the "joint employer" analysis applies to claims brought pursuant to both the NYSHRL and Title VII. In light of this agreement and the absence of any additional guidance from the Second Circuit or New York State courts, for purposes of determining the issues raised in the instant motion, the Court assumes that the "joint employer" doctrine applies with equal force to claims asserted under the NYSHRL. This assumption is consistent with *Griffin*'s instruction that, in determining whether an entity is an employer under the NYSHRL, "the really essential element of the relationship is the right of control, that is, the right of one person, the master, to order and control another, the servant, in the performance of work by the latter." 29 N.Y.3d at 186 (quoting *State Div. of Human Rights on Complaint of Emrich v. GTE Corp.*, 109 A.D.2d 1082, 1083 (4th Dep't 1985)); *see generally Serv. Emps. Int'l Union, Local 32BJ v. N.L.R.B.*, 647 F.3d 435, 442 (2d Cir. 2011) ("[A]n essential element of any joint employer determination is sufficient evidence of immediate control over the employees . . . ." (quotation marks and citation omitted)).

Accordingly, the Court finds that Plaintiff has raised a plausible inference that UBNS is Plaintiff's "joint employer" under the NYSHRL for the same reasons relating to Plaintiff's Title VII claims as discussed above. *See Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999) ("[S]ince claims under the NYSHRL are analyzed identically to claims under . . . Title VII, the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII."), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006); *accord Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012); *see also Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 536 (E.D.N.Y. 2005) ("[A] district court need not explicitly evaluate a plaintiff's NYSHRL claims where it has thoroughly analyzed the plaintiff's Title VII claims."). Therefore, insofar as UBNS requests that Plaintiff's third cause of action be dismissed because Plaintiff has failed to state sufficient facts establishing that it was Plaintiff's "employer," the motion is denied.

### 2. Whether Dr. Levy is a Covered Employer under the NYSHRL

Dr. Levy contends that Plaintiff's third cause of action should be dismissed as against him because the second amended complaint does not sufficiently state facts supporting his status as a covered employer under the NYSHRL. (Dkt. 63-2 at 13-14). Plaintiff responds that Dr. Levy ignores this Court's May 19, 2017, Decision and Order in which the Court determined—based upon the allegations in the first amended complaint— that Plaintiff sufficiently alleged that Dr. Levy fell within the NYSHRL's "aider and abettor" theory of liability. (Dkt. 42 at 19-21; *see* Dkt. 73 at 20-21).

Under the NYSHRL, an individual may be liable for employment discrimination in two ways. *Sutera v. Rochester City Sch. Dist.*, No. 11-CV-6057-FPG, 2014 WL 4245957, at *5 (W.D.N.Y. Aug. 26, 2014). First, an individual can be liable for discrimination under New York Executive Law § 296(1) if the individual qualifies as an employer, that is, one who has "any ownership interest or any power to do more than carry out personnel decisions made by others." *Id.* (quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 543-44 (1984)).

Second, an individual may be liable under New York Executive Law § 296(6) as an aider or abettor of the discriminatory conduct. *Id.* Section 296(6) provides that it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6). "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he actually participates in the conduct giving rise to a discrimination claim." *Rojas*, 660 F.3d at 107 n.10 (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998)); *see Patrick v. Garlick*, 66 F. Supp. 3d 325, 332 (W.D.N.Y. 2014) (denying motion to dismiss NYSHRL claims against a supervisor because the plaintiff adequately alleged that the supervisor actively aided and abetted in discrimination and retaliation, and collecting cases).

Plaintiff correctly notes that the Court previously decided this issue in resolving UBNS' and Dr. Levy's previous motion to dismiss in its May 19, 2017, Decision and Order. (Dkt. 42 at 19-21). Plaintiff urges the Court to adhere to its prior decision, which

found that Plaintiff sufficiently stated a claim against Dr. Levy, as an individual, under the NYSHRL pursuant to that statute's "aider and abettor" provision. (*Id.* at 20-21; *see* Dkt. 73 at 20-21). Although Plaintiff has added additional allegations to his amended pleading, the same allegations relied upon by this Court in determining that Plaintiff sufficiently stated a claim against Dr. Levy in his first amended complaint are again asserted in his second amended complaint. (*See* Dkt. 60 at ¶¶ 41-42, 56). UBNS and Dr. Levy do not point to a change in the law, supply additional evidence, or state any other "cogent" or "compelling" reason for this Court to diverge from its previous determination that these allegations bring Dr. Levy within the scope of the NYSHRL. *See, e.g, Johnson*, 564 F.3d at 99.

Therefore, the Court again concludes that, in construing these allegations in the light most favorable to Plaintiff, Plaintiff has adequately stated a claim of discrimination and retaliation against Dr. Levy as an aider and abettor under the NYSHRL.

### D.       Plaintiff's Fifth Cause of Action under § 1983

#### 1.       The "State Action" Requirement

"An action under § 1983 has two elements: the defendant must (1) act under 'color of state law' to (2) deprive the plaintiff of a statutory or constitutional right." *Kennedy v. New York*, 167 F. Supp. 3d 451, 460 (W.D.N.Y. 2016) (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004)). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'"      *United States v. Int'l Bhd. of Teamsters, Chauffeurs,*

*Warehousemen & Helpers of Am., AFL-CIO*, 941 F.2d 1292, 1295 (2d Cir. 1991). As such, "[s]ection 1983 addresses only those injuries caused by state actors or those acting under color of state law." *Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992).

### 2. Dr. Levy as a "State Actor"

Plaintiff does not expressly allege that Dr. Levy is "state actor." Nor does he directly argue this point in his opposition papers, even though he references Dr. Levy's purported conduct and employment responsibilities. (*See* Dkt. 73 at 22; *see also* Dkt. 42 at 25 ("Plaintiff does not allege that UBNS and Dr. Levy are state actors . . . .")). Even still, Plaintiff alleges that Dr. Levy was employed as "a Professor and Chair of Neurosurgery and a Professor of Radiology for the University among other titles." (Dkt. 60 at ¶ 18). At oral argument, Plaintiff's counsel contended that the allegations in the second amended complaint also allege that Dr. Levy is a "state actor."

The law in this Circuit is "clear that a professor employed at a state university is a state actor." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir. 2003); *see Watson v. Richmond Univ. Med. Ctr.*, No. 14-CV-01033 (LDH) (LB), 2016 WL 8465986, at *11 (E.D.N.Y. June 24, 2016) ("[S]tate employment is generally sufficient to render a defendant a state actor under section 1983. Dr. Nowakowski is employed as a professor at SUNY Downstate, a state-funded institution." (quotation marks and citation omitted)), *report and recommendation adopted*, No. 14-CV-1033 (LDH) (LB), 2017 WL 943928 (E.D.N.Y. Mar. 8, 2017); *Millar v. Ojima*, 354 F. Supp. 2d 220, 226 (E.D.N.Y. 2005) ("Professor Ojima's position as a Chairman of the Chemistry Department at SUNY Stony Brook satisfies the requirement that the defendant exercised powers under color of state

law."); *see also Ideyi v. State Univ. of N.Y. Downstate Med. Ctr.*, No. 09-CV-1490 (ENV) (RML), 2010 WL 3938411, at *4 (E.D.N.Y. Sept. 30, 2010) ("Assuming arguendo that Sclafani was dually employed by the state and [New York City Health & Hospital Corporation], the claims for damages against him in his official capacity at SUNY Downstate cannot survive because SUNY (including its subdivisions) and its officials are entitled to the protection of sovereign immunity."). Accordingly, Plaintiff's allegations sufficiently allege that Dr. Levy is a "state actor" for purposes of § 1983 liability. *See generally Jones v. Nickens*, 961 F. Supp. 2d 475, 494 (E.D.N.Y. 2013) (rejecting the defendants' argument that they were employed by "separate private entities," accepting the plaintiffs' allegations in finding that "all three doctors were employed, at least in some capacity, by Stony Brook University Hospital (a public entity)," and concluding that the plaintiffs "sufficiently pled" that the doctors "are state actors for purposes of Section 1983").

### 3. UBNS as a Private Entity "Acting Under Color of State Law"

UBNS contends that Plaintiff has failed to set forth sufficient factual allegations to support a plausible inference that it is either a state actor or a private entity acting under color of state law. (Dkt. 63-2 at 14-17). Plaintiff responds that his additional allegations create an inference that UBNS acted pursuant to "an unwritten policy" that permitted discrimination, harassment, a hostile workplace environment, and retaliation. (Dkt. 73 at 23). Plaintiff also argues that he "sufficiently alleges that there is joint activity, joint employer-status, a conspiracy, domination and control by Defendants over other Defendants and action under the color of law." (*Id.*).

For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate" ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)

(quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296

(2001)).

Plaintiff's assertion of state action relies upon the second of these doctrines: the "joint action" or "close nexus" test. (*See* Dkt. 73 at 22-23). As *Sybalski* and *Brentwood Academy* demonstrate, the "joint action" or "close nexus" test can be established upon one of several different theories. "[N]o one criterion must necessarily be applied," and if relevant facts support a finding of state action under one theory, "the implication of state action is not affected by pointing out that the facts might not loom large under a different test." *Brentwood Acad.*, 531 U.S. at 303. For purposes of determining whether Plaintiff adequately alleges that UBNS "acted under color of state law," the Court finds the "entwinement theory" to be dispositive.[4]

"In certain circumstances, a private organization may be so entwined with government that its conduct may be deemed *per se* state action." *Lown v. Salvation Army*,

---

[4] Although Plaintiff argues that his allegations satisfied the "joint action" or "close nexus" test for other reasons as well, and that he has also set forth facts sufficient to allege a § 1983 conspiracy, the Court need not, and does not, opine upon whether the "state action" requirement is satisfied under these theories for purposes of this motion.

*Inc.*, 393 F. Supp. 2d 223, 244 (S.D.N.Y. 2005). This variant of the "joint action" or "close nexus" test is "referred to as the entwinement theory," *Jones v. County of Suffolk*, No. 15-CV-0111(JS)(ARL), 2018 WL 2023477, at *11 (E.D.N.Y. May 1, 2018), *appeal filed*, No. 18-1602 (2d Cir. May 25, 2018), which permits a private entity to be "considered a state actor 'when it is entwined with governmental policies, or when government is entwined in its management or control,'" *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014) (quoting *Brentwood Acad.*, 531 U.S. at 296). "That is, the State need not have coerced or even encouraged the events at issue in the plaintiff's complaint if 'the relevant facts show pervasive entwinement to the point of largely overlapping identity' between the State and the entity that the plaintiff contends is a state actor." *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 154 (2d Cir. 2004) (quoting *Brentwood Acad.*, 531 U.S. at 303). "The Second Circuit specifically noted that to show state action in the context of an organization's employment decisions, a plaintiff is 'required to show that the State is so entwined with [the defendant's] management that its personnel decisions are fairly attributable to the State.'" *Stefanoni v. Darien Little League, Inc.*, 101 F. Supp. 3d 160, 174 (D. Conn. 2015) (quoting *Grogan*, 768 F.3d at 268). In other words, "the entwinement test focuses on the overlap or merger of public and private entities as a result of their shared leadership or other attributes that make it hard to separate their public functions from their private ones." *P.R.B.A. Corp. v. HMS Host Toll Roads, Inc.*, 808 F.3d 221, 225 (3d Cir. 2015).

The Second Circuit has noted the "nebulous character of the state action test," as well as the "expansive view of state action" suggested by the Supreme Court in *Brentwood*

*Academy*, where the Court "effectively broadened the state action test to include 'entwinement' for the first time." *Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 229-30 (2d Cir. 2004); *see Patterson v. City of New York*, No. 16-CV-3525 (NGG) (SMG), 2017 WL 3432718, at *6 (E.D.N.Y. Aug. 9, 2017) (noting that the "joint action" test has "been applied in a more expansive manner" through the "entwinement" theory), *appeal dismissed*, No. 17-2586, 2017 WL 7734129 (2d Cir. Nov. 21, 2017). In *Brentwood Academy*, the Supreme Court determined that a private secondary school athletic association was a "state actor." *Brentwood Acad.*, 531 U.S. at 299-302. In doing so, the Court emphasized that the defendant association was an organization of schools, 84% of which were public schools. *Id.* at 298. Those public schools were represented within the association "by their officials acting in their official capacity to provide an integral element of secondary public schooling." *Id.* at 299-300. As such, "[t]here would be no recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms." *Id.* at 300. The *Brentwood Academy* Court further noted that it was irrelevant that "the State neither coerced nor encouraged the actions complained of" where "the relevant facts show pervasive entwinement to the point of largely overlapping identity." *Id.* at 303.

A sufficiently "close nexus" between the State and the challenged action is required "to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see Sybalski*, 546 F.3d at 257-58 ("It is not enough . . . for a

plaintiff to plead state involvement in some activity of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action." (quotation marks omitted)). Through its decision in *Brentwood Academy*, "the Supreme Court has cautioned that the concept of responsibility is not to be read narrowly in the context of the state action inquiry." *Horvath*, 362 F.3d at 154.

Here, Plaintiff alleges that UBNS "presented itself to Plaintiff as part of the UBMD Physician's Group and that it was therefore one-in-the-same as UBNG, a part of the University and the Medical School." (Dkt. 60 at ¶ 15). In fact, "UBNS never identified itself to Plaintiff or to the public at large as an entity separate or distinct from the University and its medical school." (*Id.*). Plaintiff also claims that the University "controls and operates" UBNG. (*Id.* at ¶ 11). Furthermore, Plaintiff alleges that UBNS "is under common ownership and management with the University," and is "organized as a separate not-for-profit corporation" only to comply with regulatory requirements. (*Id.* at ¶ 22).

Based on Plaintiff's allegations, it appears that UBNS would be unrecognizable in its present capacity without the University. *See Brentwood Acad.*, 531 U.S. at 300 ("There would be no recognizable Association, legal or tangible, without the public school officials . . . ."). Indeed, Plaintiff has alleged that the University works "in a parent relationship to UBNS in investigating complaints" of discriminatory conduct, (Dkt. 60 at ¶ 16), and that the University has even "delegated its responsibility and duty of selecting, hiring, firing, managing and scheduling its faculty members for training and teaching experiences to UBNS" (*id.* at ¶ 27). Notably, Dr. Levy, who is employed as a professor at the University,

- 35 -

is also a physician at UBNS, (*id.* at ¶ 18), and it was Dr. Levy who terminated Plaintiff from his faculty position with the University (*id.* at ¶ 25). Furthermore, Plaintiff alleges that Dr. Levy "controls the staffing of [neurosurgery] operations by UBNS . . . staff," (*id.* at ¶ 18), and that he was also responsible for directing such procedures to train University medical students on behalf of UBNS (*see id.* at ¶ 25). Plaintiff also alleges that the UBMD Physicians Group "provides marketing services to other physician practice groups *associated with the University,*" including UBNS. (*Id.* at ¶ 12 (emphasis added)).

Giving Plaintiff the benefit of every reasonable inference at this stage of this litigation, Plaintiff's allegations indicate that the State is "pervasively entwined" within the operation and management of UBNS so as to cloak UBNS' management decisions with state authority. *See Galicki v. New Jersey*, No. CV 14-169 (JLL), 2016 WL 4950995, at *12 (D.N.J. Sept. 15, 2016) (finding that the plaintiff's allegations sufficiently established that the private entity and the state entity "were entwined" where the plaintiff alleged "significant cross-over between personnel" of the private entity and the state office, such that certain state employees and staff acted "on behalf of" the private entity), *reconsideration denied*, No. CV 14-169 (JLL), 2016 WL 7494257 (D.N.J. Dec. 1, 2016); *cf. Grogan*, 768 F.3d at 269 (finding that the plaintiff failed to demonstrate that the government had "any say" in the private entity's "management or personnel decisions"); *Patterson*, 2017 WL 3432718, at *6 ("Crucially absent . . . is any allegation that the City is 'entwined' in the 'management or control' of the WSP Groups' operations."); *Stefanoni*, 101 F. Supp. 3d at 174 ("The Town of Darien does not participate in the day-to-day decisions made by the Darien Little League regarding its staff of coaches. At oral argument,

it was conceded that no Town official directed the Darien Little League to take the actions it did against Mr. Stefanoni."); *Lown*, 393 F. Supp. 2d at 244 ("The Amended Complaint does not contain allegations that any government agents held positions of authority within the hierarchy of the Salvation Army . . . ."). To be clear, the question before the Court at the motion to dismiss stage "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Roy v. Law Offices of B. Alan Seidler, P.C.*, 284 F. Supp. 3d 454, 456 (S.D.N.Y. 2018) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)). The Court merely holds that Plaintiff has set forth sufficient factual allegations that raise a plausible inference that UBNS, though a private entity, acted "under color of state law," and, as such, Plaintiff's § 1983 claim may proceed against UBNS.

In sum, the allegations in the second amended complaint sufficiently establish Dr. Levy as a "state actor" and UBNS as a private entity acting "under color of state law." Accordingly, to the extent that Dr. Levy and UBNS move to dismiss Plaintiff's fifth cause of action on the grounds that the second amended complaint fails to sufficiently allege "state action" necessary to support a claim under § 1983, their motion is denied.

### E. Plaintiff's Tortious Interference with Contract Claim

Preliminarily, while UBNS and Dr. Levy request that the Court dismiss the sixth cause of action in its entirety, they only challenge Plaintiff's claim for tortious interference with contract (Dkt. 63-2 at 17-18); however, Plaintiff's sixth cause of action also includes

a separate and independent claim[5] for tortious interference with business relations and prospective economic advantage (*see* Dkt. 60 at ¶¶ 104, 106). Because UBNS and Dr. Levy failed to adequately brief any argument regarding the sufficiency of Plaintiff's allegations regarding his claim for tortious interference with business relations and prospective economic advantage, the Court does not opine upon the sufficiency of this claim as against these defendants, and those claims survive UBNS' and Dr. Levy's motion to dismiss.

"To plead a claim of tortious interference with a contract under New York law, a plaintiff must allege '(1) the existence of a valid contract between a third party and plaintiff, (2) that defendant had knowledge of that contract, (3) that defendant intentionally procured a breach, and (4) damages.'" *Katz*, 241 F. Supp. 3d at 404 (quoting *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996)); *see also Zahler v. Empire Merchs., LLC*, No. 11-CV-3163 JG CLP, 2012 WL 273698, at *6 (E.D.N.Y. Jan. 31, 2012) (stating that allegations regarding tortious interference with contract, tortious interference with business relations, and tortious interference with prospective economic advantage all "require a basic three-

5      Although Plaintiff styles his allegations for tortious interference with business relations and tortious interference with prospective economic advantage as two independent claims, "tortious interference with business relations and tortious interference with prospective economic advantage are not distinct causes of action." *Glob. Packaging Servs., LLC v. Glob. Printing & Packaging*, 248 F. Supp. 3d 487, 494 (S.D.N.Y. 2017) (quoting *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 105-06 (2d Cir. 2012)); *see Katz v. Travelers*, 241 F. Supp. 3d 397, 404 (E.D.N.Y. 2017) ("Tortious interference with a business relationship is sometimes called 'tortious interference with prospective economic advantage'; no matter the term used, the elements are the same."), *reconsideration denied*, No. 16-CV-4389(ADS) (SIL), 2017 WL 4180012 (E.D.N.Y. Sept. 20, 2017).

party structure: A (the plaintiff) has a contract or relationship with B (a third party) and C (the defendant) interferes by inducing B to breach the contract or cease doing business with A, causing harm to A"). "Specifically, a plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct." *Burrowes v. Combs*, 25 A.D.3d 370, 373 (1st Dep't 2006); *see Anderson v. Janson Supermarkets, LLC*, 32 Misc. 3d 1218(A), at *8 (N.Y. Sup. Ct., Suffolk County 2011) ("[T]here are no allegations that 'but for' Rose's actions said contract or contracts would not have been breached."). "Plaintiffs must allege each of these elements in a non-conclusory fashion in their complaint." *Flash Elecs., Inc. v. Universal Music & Video Distribution Corp.*, 312 F. Supp. 2d 379, 403 (E.D.N.Y. 2004).

UBNS and Dr. Levy argue that Plaintiff's allegations are too conclusory to support a cause of action for tortious interference with contractual relations. (Dkt. 63-2 at 17-18). Specifically, they contend that Plaintiff failed to describe the terms of any oral agreement or allege that he is the "rightful party" to the fruits of any such contract. (*Id.* at 18). Plaintiff responds that he has sufficiently alleged the existence of two oral agreements—one between himself and UBNS, and another between himself and a UBNS physician, Dr. Jody Leonardo ("Dr. Leonardo")—and that the benefits derived from each have been lost to Plaintiff. (*See* Dkt. 73 at 24-25).

Although Plaintiff alleged that "the actions by the respective Defendants procured the breach of these contracts and agreements" (Dkt. 60 at ¶ 101), Plaintiff has not sufficiently pled that there was an "actual breach" of Dr. Leonardo's agreement. *See Baylis v. Marriott Corp.*, 906 F.2d 874, 877 (2d Cir. 1990) ("Under traditional principles of New

York law, a party may not recover for tortious inducement of breach of a contract without proving that the underlying contract has been breached."); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) ("Tortious interference with contract requires the . . . actual breach of the contract . . . ."); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006) ("The district court correctly determined . . . that the plaintiffs fail to allege the fourth element [of a claim for tortious interference with contract], actual breach."). Conclusory allegations that a breach has occurred absent any factual support are insufficient. *See Skyline Travel, Inc. (NJ) v. Emirates*, No. 09 Civ. 8007 (LTS) (MHD), 2011 WL 1239783, at *5 (S.D.N.Y. Mar. 28, 2011) (dismissing the claim for tortious interference with contract where the plaintiffs "simply assert that 'there were breaches, interferences . . . [and] total failures of performance of contractual duties'" (citation omitted)), *aff'd*, 476 F. App'x 480 (2d Cir. 2012); *see also World Wide Commc'ns, Inc. v. Rozar*, No. 96Civ.1056(MBM)(NRB), 1997 WL 795750, at *7 (S.D.N.Y. Dec. 30, 1997) ("[T]he law requires some factual specificity in pleading tortious interference.").

Plaintiff does not allege that Dr. Leonardo, in particular, breached the alleged oral contracts as a result of any purported misconduct by Dr. Levy or UBNS. *See Kirch*, 449 F.3d at 402 ("Nowhere do they assert that [the third party] actually breached its contract with [the plaintiff]."); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 208 (S.D.N.Y. 2008) ("Importantly, Counterclaim 4 fails to allege a breach of contract by [the third-party]; it only states that 'Sugo lost the contract with [the third-party].'"); *see also Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 368 (S.D.N.Y. 2012) ("[The p]laintiff does not allege that any third party breached its contract, but instead

alleges that [the p]laintiff breached its contracts with third parties as a result of [the defendant]'s alleged breaches of the Agreement. Such an allegation is insufficient."); *Lama Holding Co.*, 88 N.Y.2d at 425 (finding that there is "no allegation that . . . [the third party] in fact breached its contract"). Relatedly, Plaintiff's claim further suffers from his failure to plead *how* Dr. Leonardo supposedly breached the oral agreement; in other words, what specific term or terms were breached by Dr. Leonardo as a result of Dr. Levy's and UBNS's alleged misconduct. Absent sufficient factual allegations of an "actual breach" by Dr. Leonardo, *see A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461, 485 (S.D.N.Y. 2017) (rejecting the argument that it would be "reasonable to infer" that the third parties breached their contractual obligations, and concluding that the counterclaim "does not allege . . . that either [third party] breached their contracts with [the plaintiff]"), Plaintiff fails to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

Therefore, because Plaintiff's claim for tortious interference with contract against UBNS is based upon its alleged interference with Plaintiff and Dr. Leonardo's oral agreement, this claim is dismissed as against UBNS to the extent it is based upon an alleged breach of Dr. Leonardo's oral agreement. However, Plaintiff has also alleged that Dr. Levy interfered with Plaintiff and UBNS' contract to develop a specialty practice group. (Dkt. 60 at ¶ 99; *see id.* at ¶ 96).[6]

---

[6] Plaintiff has not alleged that UBNS interfered with the contract held between itself and Plaintiff presumably because "a plaintiff bringing a tortious interference claim must

- 41 -

Plaintiff's second amended complaint alleges that Dr. Levy terminated Plaintiff's University faculty position after Plaintiff submitted a letter complaint responding to, among other things, Dr. Levy's alleged use of racially-charged comments. (*See* Dkt. 60 at ¶¶ 50-52, 58). Plaintiff further alleges that the University "delegated its responsibility and duty of selecting, hiring, firing, managing and scheduling its faculty members for training and teaching experiences to UBNS." (*Id.* at ¶ 27). Indeed, Dr. Levy is employed by UBNS, (*id.* at ¶ 33), and it was Dr. Levy who terminated Plaintiff's University faculty position (*id.* at ¶ 50). In addition, Dr. Levy was also aware of Plaintiff's letter complaint several days before Plaintiff was terminated, (*id.* at ¶ 53), and, according to Plaintiff, UBNS routinely investigates complaints of discrimination alongside the University (*id.* at ¶ 16).

In light of Dr. Levy's employment relationship with UBNS and UBNS's alleged receipt of Plaintiff's discrimination complaints, Plaintiff has plausibly alleged that UBNS was aware of Dr. Levy's purported discriminatory behavior, and yet still condoned,

---

show that the defendants were *not parties to the contract*." *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996); *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 88 (S.D.N.Y. 2012) ("[O]nly a stranger to a contract, such as a third party, can be held liable for tortious interference with the contract." (quotation marks and citation omitted)); *Ashby v. ALM Media, LLC*, 110 A.D.3d 459, 459 (1st Dep't 2013) (same); *see also New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 331 (S.D.N.Y. 2000) ("[T]here can be no liability for tortiously interfering with one's own contract . . . ."). Moreover, whether or not Dr. Levy can ultimately be held liable for a breach of contract by UBNS is not an issue presently before the Court. *See, e.g., Lutz v. Caracappa*, 35 A.D.3d 673, 674 (2d Dep't 2006) (an agent cannot be held liable for inducing his or her principal to breach a contract with a third person when that agent is acting on behalf of the principal and within the scope of the agent's authority."); *see also Schmidt & Schmidt, Inc. v. Town of Charlton*, 68 A.D.3d 1314, 1316 (3d Dep't 2009) (where "an agent is alleged to have induced its principal to breach a contract, the agent cannot be found liable unless it does not act in good faith and commits independent torts or predatory acts directed at another for personal pecuniary gain" (quotation marks omitted)).

assented to, or otherwise failed to prevent Dr. Levy from terminating Plaintiff's position in an allegedly retaliatory manner. Counsel for UBNS and Dr. Levy urges the Court to find that Plaintiff has failed to allege that the viability of the contract between UBNS and Plaintiff was tied to Plaintiff's continued status as a University faculty member. The Court acknowledges that Plaintiff does not expressly allege that the fulfillment of this contract was dependent upon his position with the University. However, given Plaintiff's alleged association with University and UBNS employees in developing a shared, specialty practice, (*id.* at ¶ 57), as well as UBNS's alleged responsibility under the agreement to contribute financial resources and specialty physicians toward developing the specialty practice group, (*id.* at ¶ 96), it is not unreasonable to infer—in light of UBNS's close relationship with the University—that Plaintiff's status as a University faculty member was essential to the establishment of the specialty practice group. Under the circumstances presented, and in giving Plaintiff the benefit of every reasonable inference, the Court cannot say, at this stage of the litigation, that Dr. Levy's allegedly wrongful termination of Plaintiff's University faculty position did not "intentionally induce[]" UBNS "to breach or otherwise render performance of [the] contract with . . . [P]laintiff impossible." *Wash. Ave. Assocs., Inc. v. Euclid Equip., Inc.*, 229 A.D.2d 486, 487 (2d Dep't 1996).

Accordingly, viewing the operative pleading as a whole, and in the light most favorable to Plaintiff, the Court concludes that Plaintiff's second amended complaint sufficiently alleges a claim for tortious interference with contractual relations against Dr. Levy based upon an alleged breach of the oral agreement between UBNS and Plaintiff to develop a specialty practice group. Therefore, UBNS' and Dr. Levy's motion to dismiss

the sixth cause of action is granted only insofar as Plaintiff has attempted to allege a tortious interference with contract claim against UBNS based upon the alleged interference with the contract between Plaintiff and Dr. Leonardo, but the motion is in all other respects denied.

## II. The University and the Medical School's Motion to Dismiss is Granted in its Entirety

### A. The Eleventh Amendment

"The Eleventh Amendment bars a suit in federal court against a state or one of its agencies in the absence of the state's explicit consent to be sued or Congress's unequivocal abrogation of immunity." *Chinn v. City Univ. of N.Y. Sch. of Law at Queens Coll.*, 963 F. Supp. 218, 224 (E.D.N.Y. 1997) (footnote omitted); *see Lee v. Saltzman*, No. 10-CV-103S, 2011 WL 5979162, at *3 (W.D.N.Y. Nov. 27, 2011) ("It is well settled that the Eleventh Amendment bars suits against states and state agencies."). "For Eleventh Amendment purposes, S.U.N.Y. is an integral part of the government of the State of New York and when it or one of its constituent campuses is sued the State is the real party." *Barsoumian v. Williams*, 29 F. Supp. 3d 303, 311 (W.D.N.Y. 2014) (citing *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990), *cert. denied*, 501 U.S. 1211 (1991)), *aff'd sub nom. Barsoumian v. Univ. at Buffalo*, 594 F. App'x 41 (2d Cir. 2015).

### B. Plaintiff's Third and Sixth Causes of Action are Dismissed as Against the University and the Medical School

Plaintiff's third cause of action alleges a violation of the NYSHRL, and Plaintiff's sixth cause of action asserts New York common law torts. (Dkt. 60 at 15, 18-21). The University and the Medical School argue that these claims must be dismissed pursuant to

the Eleventh Amendment. (Dkt. 65-1 at 4-5). "The district courts in this Circuit have repeatedly held that the [NYSHRL] 'does not include a waiver of the State's sovereign immunity to suit in federal court.'" *Moshenko v. State Univ. of N.Y. at Buffalo*, No. 07-CV-0116(A)(M), 2009 WL 5873236, at *4 (W.D.N.Y. Sept. 16, 2009) (quoting *Smith v. State Univ. of N.Y.*, No. 1:00-CV1454(FJS/RFT), 2003 WL 1937208, *7 (N.D.N.Y. Apr. 23, 2003)); *see Jacobs v. SUNY at Buffalo Sch. of Med.*, 204 F. Supp. 2d 586, 593 (W.D.N.Y. 2002) (dismissing the plaintiff's NYSHRL claims against SUNY on Eleventh Amendment grounds); *Campbell v. City Univ. Constr. Fund*, No. 98 Civ. 5463 (JSM), 1999 WL 435132, at *2 (S.D.N.Y. June 25, 1999) (stating that the NYSHRL "do[es] not waive Eleventh Amendment immunity"). Accordingly, Plaintiff's third cause of action under the NYSHRL is dismissed as against the University and the Medical School.

In addition, "the State of New York has not waived its Eleventh Amendment immunity to suit in federal court for state common law [torts]." *Hayut v. State Univ. of N.Y.*, 127 F. Supp. 2d 333, 340 (N.D.N.Y. 2000); *see Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 244 (E.D.N.Y. 2015) ("New York State has not consented to . . . claims arising under state common law" (quotation marks and citation omitted)); *see also Lambert v. N.Y. State Office of Mental Health*, No. 97-CV-1347 (JG), 2000 WL 574193, at *7 (E.D.N.Y. Apr. 24, 2000) ("Likewise, the Eleventh Amendment bars [the plaintiff]'s common law tort claim for intentional infliction of emotional distress."), *aff'd*, 22 F. App'x 71 (2d Cir. 2001). Therefore, Plaintiff's sixth cause of action alleging state common law tort claims is dismissed as against the University and the Medical School.

### C. Plaintiff's Fourth Cause of Action is Dismissed as Against the University and the Medical School

Plaintiff also alleges a cause of action for discriminatory and retaliatory conduct against the University and the Medical School pursuant to § 1981. (Dkt. 60 at 15-17). The University and the Medical School argue that Plaintiff is barred from asserting this claim against them in federal court pursuant to the Eleventh Amendment as well. (Dkt. 65-1 at 5-6). "Section 1981 does not abrogate states' Eleventh Amendment immunity." *Chinn*, 963 F. Supp. at 224 n.1; *see Wang v. Office of Prof'l Med. Conduct, N.Y.*, 354 F. App'x 459, 460 (2d Cir. 2009) ("The district court correctly determined that [the plaintiff]'s § 1981 claim was precluded by Eleventh Amendment immunity."); *Lee*, 2011 WL 5979162, at *3 ("Among the claims barred by the Eleventh Amendment are those claims [the p]laintiff brings under 42 U.S.C. § 1981 seeking to recover money damages for damage done to his career and mental health."); *Concey v. N.Y. State Unified Court Sys.*, No. 08 Civ. 8858 (PGG), 2011 WL 4549386, at *7 (S.D.N.Y. Sept. 30, 2011) ("Because the state has not waived its Eleventh Amendment immunity to claims brought under § 1981, . . . these claims will be dismissed and the Court need not reach their merits." (quotation marks, citation, and footnote omitted)). Accordingly, Plaintiff's fourth cause of action under § 1981 is dismissed as against the University and the Medical School.

### D. Plaintiff's Fifth Cause of Action is Dismissed as Against the University and the Medical School

Plaintiff further alleges a § 1983 cause of action for discriminatory and retaliatory conduct against the University and the Medical School. (Dkt. 60 at 17). The University

and the Medical School contend that "States and their administrative units are not a 'person' within the meaning of § 1983." (Dkt. 65-1 at 6). "Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws." *Cohane v. Greiner*, No. 04-CV-943S, 2006 WL 625842, at *5 (W.D.N.Y. Mar. 10, 2006). However, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see Syrkin v. State Univ. of N.Y.*, No. 04-CV-4336 (FB) (RML), 2005 WL 2387819, at *3 (E.D.N.Y. Sept. 29, 2005) ("[The plaintiff] cannot state a § 1983 claim against SUNY because 'the State University is not a "person" within 42 U.S.C. § 1983.'" (quoting *Blanton v. State Univ. of N.Y.*, 489 F.2d 377, 382 (2d Cir. 1973))); *Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143, 178 (S.D.N.Y. 2002) ("Because neither the State nor its agencies qualify as 'persons' under § 1983, they are not subject to suit under that statute.").

Therefore, Plaintiff's fifth cause of action under § 1983 is dismissed as against the University and the Medical School.

## III. Kaleida's Motion to Dismiss is Granted in Part and Denied in Part

### A. Motion to Dismiss Pursuant to Rule 41(b)

Kaleida argues that Plaintiff's second amended complaint should be dismissed in its entirety because Plaintiff did not comply with the Local Rules of this District. (Dkt. 67-3 at 7-8). Specifically, Kaleida notes that Plaintiff filed the operative complaint three days after the timeframe permitted by the Local Rules. (*Id.* at 8). Pursuant to Local Rule 15(c), a party seeking to file an amended pleading "must file and serve the amended pleading

upon the existing parties within fourteen (14) days of entry of the order granting the motion." L.R. Civ. P. 15(c). On October 2, 2017, United States Magistrate Judge H. Kenneth Schroeder, Jr. granted Plaintiff's motion to amend his first amended complaint. (Dkt. 59). However, Plaintiff did not file and serve his amended pleading until October 19, 2017 (Dkt. 60), 17 days after Judge Schroeder's order. Furthermore, Kaleida submits a copy of what appears to be an email conversation between the parties' attorneys—occurring on October 18, 2017—at which time Kaleida's counsel notified Plaintiff's counsel that the deadline for timely filing the amended pleading had passed on Monday, October 16, 2017. (Dkt. 67-2). Plaintiff filed and served his amended pleading the next day. (Dkt. 60). Plaintiff argues that he should be excused from any negative consequences of this untimely submission because his untimeliness was not due to bad faith, resulted in no prejudice to Kaleida, and was merely "due to an errant docketing date." (Dkt. 72 at 9-10).

"[T]he Second Circuit has held that while district courts lack the authority to enlarge statutory filing limits, they do have the discretion to excuse non-compliance with the Local Rules, which are not statutes, in the interest of justice." *Total Energy Corp. v. Stolt*, 334 F. Supp. 2d 413, 414 (S.D.N.Y. 2004) (quoting *Wight v. BankAmerica Corp.*, 219 F.3d 79, 85 (2d Cir. 2000)); *see Taylor v. Always Ready & Reliable Sec., Inc.*, No. 13 Civ. 8524 (CM), 2014 WL 5525745, at *1 (S.D.N.Y. Oct. 27, 2014) ("District courts have broad discretion about how to enforce local rules."). "In fact, the Second Circuit has held that the court has such discretion as to all Local Rules, without distinction among them."

*Yurkov-Shkolnik v. Allstate Life Ins. Co. of N.Y.*, No. 06 Civ. 5451 (RLC), 2008 WL 4093490, at *2 (S.D.N.Y. Sept. 2, 2008) (citing *Wight*, 219 F.3d at 85).

Kaleida has not asserted that it suffered any prejudice from Plaintiff's three-day delay in filing and serving the amended pleading. (*See* Dkt. 67-3 at 7-8; Dkt. 82 at 4). For his part, Plaintiff's counsel appears to blame an "errant docketing date" for his untimeliness. (Dkt. 72-1 at ¶ 8 ("I responded to her email the same day indicating that we would file the Second Amended Complaint immediately and that my office had a different calculation of its due date.")).

Although this oversight is attributable to a miscalculation by Plaintiff's counsel's office, there is no assertion, let alone any evidence, that this was a product of bad faith conduct or that it resulted in any prejudice to Kaleida. *See Charles v. Young Life Lake Champion*, No. 11 CV 401 VB, 2013 WL 2362242, at *1 n.1 (S.D.N.Y. May 29, 2013) (declining "to disregard [the] plaintiff's opposition for noncompliance with local rules because [the] defendants have articulated no prejudice resulting from such non-compliance"); *Pierre v. City of New York*, No. 05-CV-5018 (JFB) (KAM), 2008 WL 1700441, at *2 n.1 (E.D.N.Y. Apr. 9, 2008) (acknowledging that the plaintiffs failed to "timely submit their objections," but because "[b]oth parties have expended time and resources in briefing the instant motion," the motion was just five days late, and the defendants did not claim to have been prejudiced, the court disregarded any untimeliness). Indeed, even where the delay is "not insignificant," if it does not arise from bad faith conduct and does not create "undue prejudice" to the opposing party, a "simple oversight" that "had little or no effect on th[e] case" may be disregarded. *Godson v. Eltman, Eltman*

- 49 -

*& Cooper, P.C.*, 285 F.R.D. 255, 261 (W.D.N.Y. 2012). Since Plaintiff's three-day delay was a negligible oversight that neither inflicted undue prejudice upon Kaleida nor was the result of bad faith conduct, the Court—in the exercise of its discretion—will disregard Plaintiff's noncompliance with the Local Rules. Accordingly, to the extent Kaleida's motion requests that Plaintiff's second amended complaint be dismissed in its entirety for the failure to comply with Local Rule 15(c), it is denied.

### B.   Kaleida's Motion to Dismiss Pursuant to Rule 12(b)(6)

Alternatively, Kaleida requests that the Court dismiss Plaintiff's fifth and sixth causes of action on the ground that Plaintiff has failed to state a claim for relief. (Dkt. 67-3). In regards to Plaintiff's fifth cause of action, Kaleida argues that the second amended complaint fails to sufficiently allege that it was acting "under color of state law," as required by § 1983. (Dkt. 67-3 at 9). Plaintiff's response reprises many of the same arguments made in opposition to UBNS' and Dr. Levy's motion to dismiss. (*See* Dkt. 72 at 10-12).

Plaintiff does not allege that Kaleida is a state actor. Instead, he alleges that all Defendants, "acting under color of state law, infringed upon and deprived [Plaintiff] of his Constitutional rights . . . ." (Dkt. 60 at ¶ 89). In opposition to Kaleida's motion, Plaintiff again argues that the allegations in the second amended complaint raise a plausible inference that "there is an unwritten policy that permits . . . unlawful discrimination, harassment, [a] hostile work environment[,] and retaliation" at the work place. (Dkt. 72 at 12). Apparently relying upon his most recent allegations that all Defendants should be considered his direct and/or functional employers, Plaintiff also argues that he has

sufficiently alleged the existence of "joint activity, joint employer-status, a conspiracy, domination and control by Defendants over other Defendants and action under the color of law." (*Id.*).

For similar reasons outlined above relating to UBNS' status as a private entity acting "under color of state law," Plaintiff plausibly alleges that Kaleida is a private entity acting "under color of state law" pursuant to the "entwinement theory." Plaintiff alleges that *all* of Kaleida's neurosurgeons are associated with the University. (Dkt. 60 at ¶ 17). In addition, Dr. Levy, who is a state actor employed by the University, is the "Chief of Neurosurgery" and the "Co-Director of Kaleida Health Stroke Center and Cerebrovascular surgery" at Kaleida. (*Id.* at ¶ 18). Indeed, while Plaintiff was employed as a faculty member in the Departments of Neurosurgery and Otolaryngology at the Medical School, he was "also considered an employee of Kaleida." (*Id.* at ¶¶ 34, 37). Plaintiff further alleges that Dr. Levy appointed him to a position at the University where he "was expected to train University medical students" at "Kaleida surgical operation facilities." (*Id.* at ¶ 25). Plaintiff also alleges that Dr. Levy "controls the staffing of [neurosurgery] operations by . . . Kaleida staff." (*Id.* at ¶ 18). Furthermore, Dr. Levy directed at least one such surgery to be performed at Kaleida, where students enrolled at the University and the Medical School were expected to attend for training purposes, (*id.* at ¶ 23), and it was this surgical procedure that gave rise to the instant action (*see id.* at ¶¶ 25, 44-53). Dr. Levy was responsible for directing similar training procedures for the University and the Medical School's students at Kaleida facilities. (*Id.* at ¶ 25).

Giving Plaintiff the benefit of all reasonable inferences at this stage of this litigation, the Court finds that Plaintiff has set forth sufficient factual allegations that permit the Court to infer that Kaleida was pervasively entwined with the State due to the substantial overlap between Kaleida's neurosurgeons and those associated with the University, the University's extensive use of Kaleida's facilities, and Dr. Levy's direct control over Kaleida's operations and personnel management. *See Lynch v. Southampton Animal Shelter Found. Inc.*, 971 F. Supp. 2d 340, 353 (E.D.N.Y. 2013) (finding that a reasonable jury could find that the private entities and the state entities "were significantly entwined so as to satisfy the close nexus or joint action test" where a town official "was also serving as the Animal Shelter supervisor even after it was privatized," his official position included responsibilities as the animal shelter supervisor, the Shelter employees were expected to report to him, and "the Town's Animal Control Unit and the Shelter were operating out of the same facility"); *cf. Grogan*, 768 F.3d at 269; *Patterson*, 2017 WL 3432718, at *6; *Stefanoni*, 101 F. Supp. 3d at 174; *Lown*, 393 F. Supp. 2d at 244. Again, the Court concludes only that Plaintiff has set forth sufficient factual allegations that raise a plausible inference that Kaleida, though a private entity, acted "under color of state law," and thus, Plaintiff's § 1983 claim may proceed against Kaleida. The Court does not opine upon whether Plaintiff will ultimately prevail on his claim.

Therefore, to the extent Kaleida requests that Plaintiff's fifth cause of action be dismissed in the absence of sufficient allegations of "state action," Kaleida's motion is denied.

## C. Plaintiff's Sixth Cause of Action is Dismissed as Against Kaleida

### 1. Tortious Interference with Contract

Kaleida also argues that Plaintiff's sixth cause of action should be dismissed because Plaintiff has failed to allege that Delaware Medical Group, P.C. breached its contract with Plaintiff. (Dkt. 67-3 at 10). Plaintiff's opposition papers recite a litany of allegations establishing the existence of oral agreements between himself and UBNS, Dr. Leonardo, and Delaware Medical Group, P.C. (*See* Dkt. 72 at 13-14). However, Plaintiff's responsive papers fail to point out any allegations that Kaleida procured an actual breach of any contract by Delaware Medical Group, P.C. In fact, the only paragraph in the second amended complaint that alleges Kaleida's specific interference with a contract is paragraph 106, where Plaintiff alleges that Kaleida "interfered with [Plaintiff]'s employment agreement with the Delaware Medical Group, P.C." (Dkt. 60 at ¶ 106). However, this paragraph does not allege that any wrongful action by Kaleida caused Delaware Medical Group, P.C. to breach its employment agreement with Plaintiff—indeed, Plaintiff was still employed by Delaware Medical Group, P.C. at the time he filed the second amended complaint. (*Id.* at ¶ 33); *see, e.g., Kirch*, 449 F.3d at 402; *A.V.E.L.A., Inc.*, 241 F. Supp. 3d at 485; *Berman*, 580 F. Supp. 2d at 208; *Lama Holding Co.*, 88 N.Y.2d at 425.

While several paragraphs in the second amended complaint refer to the University's, Dr. Levy's, and UBNS' wrongful interference with the contracts held between Plaintiff and UBNS and Plaintiff and Dr. Leonardo, respectively, these allegations do not refer to Kaleida's alleged misconduct. (*See* Dkt. 60 at ¶¶ 99-100; *see also id.* at ¶ 101 ("[T]he actions by the *respective* Defendants procured the breach of these contracts and agreements

. . . ." (emphasis added))). Plaintiff's limited and general allegations of interference by Kaleida are insufficient to sustain a cause of action for tortious interference with contract. *See, e.g., Skyline Travel, Inc. (NJ)*, 2011 WL 1239783, at *5; *World Wide Commc'ns, Inc.*, 1997 WL 795750, at *7. Accordingly, for the same reasons discussed above pertaining to UBNS's alleged interference with Plaintiff and Dr. Leonardo's agreement, the Court concludes that Plaintiff has failed to allege sufficient facts to support the fourth element of his claim for tortious interference with contract as against Kaleida.

### 2. Tortious Interference with Business Relations and Prospective Economic Advantage

Kaleida also requests that this Court dismiss Plaintiff's claim for tortious interference with business relations or prospective economic advantage because Plaintiff has not alleged that Kaleida used "wrongful means" by engaging in any such interference, or that the relevant business relationship was injured as a result. (Dkt. 67-3 at 11-13). Plaintiff responds that "all Defendants interfered with his business opportunities without justification and by wrongful means, including the ceasing of referrals to [himself] and Delaware Medical and pressuring other doctors under their supervision to do the same with malicious intent." (Dkt. 72 at 14).

> To state a claim for [tortious interference with business relations] under New York law, four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008); *accord Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002) (reciting the

same elements for the claim of "tortious interference with prospective economic advantage"). "Interference that does not rise to the level of a breach of agreement or severance of the relationship does not amount to an injury sufficient to make a tortious interference claim." *RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 198 (S.D.N.Y. 2011).

"In order to recover damages for tortious interference with prospective business relations, a plaintiff must demonstrate both 'wrongful means' and 'that the wrongful acts were the proximate cause of the rejection of the plaintiff's proposed contractual relations.'" *Pacheco v. United Med. Assocs., P.C.*, 305 A.D.2d 711, 712 (3d Dep't 2003) (citations omitted). "[A]s a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004). "A defendant who has not committed a crime or independent tort or acted solely out of malice may nevertheless be liable if he has employed 'wrongful means.' 'Wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and 'extreme and unfair' economic pressure." *Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009) (quotation marks and citations omitted).

At least one state trial court has held, in what it described as a case of first impression under New York law, that "unlawful discrimination is sufficiently culpable to support a claim of interference with prospective economic relations." *30 CPS, LLC v. Bd. of Managers of Cent. Park S. Med. Condo.*, 23 Misc. 3d 1024, 1032 (Sup. Ct., NY County

- 55 -

2009). While acknowledging that "[d]iscrimination is not a tort claim[, . . . [n]or is it a crime[,] . . . [the court stated that] it is morally reprehensible and unlawful to discriminate based upon national origin." *Id.* As such, the court analogized such discriminatory conduct as "akin to malice," stating that "there should be redress where an incipient contract is scuttled by someone motivated by hostility toward the national heritage of the proposed contracting party." *Id.*

While the Court is inclined to agree that discriminatory, retaliatory, or hostile conduct on the basis of one's race or national origin is sufficiently reprehensible so as to constitute a "wrongful means," the Court is mindful that "the wrongful conduct that is relevant [is] that which was directed not at the plaintiff, but at the third party with whom the plaintiff has or seeks to have a relationship." *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 349 (S.D.N.Y. 2009) (citing *Carvel Corp.*, 3 N.Y.3d at 192). Here, there are no allegations that Kaleida directed any behavior that could be construed as constituting "wrongful means" towards Delaware Medical Group, P.C., or that any such conduct interfered with Plaintiff's business relations or his prospective economic advantage with that employer. *See Korn v. Princz*, 226 A.D.2d 278, 279 (1st Dep't 1996) (concluding that the plaintiff failed to state a cause of action for tortious interference with prospective business relations because "there is no allegation that plaintiff was actually and wrongfully prevented from entering into or continuing in a specific business relationship"). Furthermore, insofar as Plaintiff alleges that Kaleida stopped sending patient referrals to him or discouraged other employees from working with him, (Dkt. 60 at ¶ 106), Plaintiff "fails to particularize any damage to [his] relationships" with any patients or with Delaware

Medical Group, P.C. that resulted from Kaleida's alleged conduct, *Alzheimer's Disease Res. Ctr., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 981 F. Supp. 2d 153, 164-65 (E.D.N.Y. 2013); *see, e.g., Black Radio Network, Inc. v. NYNEX Corp.*, No. 96 Civ. 4138 (DC), 2000 WL 64874, at *4 (S.D.N.Y. Jan. 25, 2000) (concluding that the plaintiff's allegations of "lost customers" were insufficient to support a claim for tortious interference with prospective economic advantage); *Pacheco*, 305 A.D.2d at 712-13 ("[The] plaintiff has not alleged how or whether his contractual relationships, prospective or current, with specific patients, [United Health Services Hospitals, Inc.] or other treating physicians were actually damaged by [the] defendants' conduct.").

In any event, Plaintiff has not adequately responded to Kaleida's argument that he failed to plead sufficient factual allegations suggesting that his business relationship with Delaware Medical Group, P.C. was injured as a result of any alleged misconduct. *See, e.g., RFP LLC*, 788 F. Supp. 2d at 198 ("Where 'the underlying business relations remained undisturbed,' a claim for tortious interference is 'fatally defective.'" (quoting *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 270 (2d Cir. 1987), *abrogated on other grounds by Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 n.9 (2d Cir. 1998))). The Court concludes that Plaintiff's allegations, taken as true, do not sufficiently allege that his employment relationship with Delaware Medical Group, P.C. was damaged, nor do they adequately identify any patients who may have secured Plaintiff's services absent any alleged wrongdoing. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 115 (2d Cir. 2010) (allegations that certain alleged tortious conduct caused "harm to [the plaintiff]'s career development, economic harm in the form of lost income and benefits, [and] harm to

her professional and personal reputation" were "too conclusory, vague, and lacking in a factual basis"). Therefore, because Plaintiff has failed to supply sufficient allegations in support of his claims of tortious interference with contractual relations and tortious interference with business relations and prospective economic advantage, Plaintiff's sixth cause of action is dismissed in its entirety as against Kaleida.

## CONCLUSION

For the foregoing reasons, UBNS' and Dr. Levy's motion to dismiss (Dkt. 63) is granted to the extent it seeks dismissal of Plaintiff's sixth cause of action against UBNS for tortious interference with contractual relations based upon the alleged interference with the contract between Plaintiff and Dr. Leonardo, but it is otherwise denied; the University and the Medical School's motion to dismiss (Dkt. 65) is granted in its entirety (so that the only remaining claims against those defendants are Plaintiff's Title VII claims); and Kaleida's motion to dismiss (Dkt. 67) is granted to the extent it requests dismissal of Plaintiff's sixth cause of action, but it is otherwise denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge


Dated:      September 17, 2018
            Rochester, New York