**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**SAURIN POPAT, M.D.,**
                                **Plaintiff,**
**v.**                                                              **15-CV-1052W(Sr)**

**ELAD LEVY, MD.,**

**THE STATE UNIVERSITY OF NEW YORK**
**AT BUFFALO**

**UNIVERSITY AT BUFFALO SCHOOL**
**OF MEDICINE AND BIOSCIENCE,**

**UNIVERSITY AT BUFFALO**
**NEUROSURGERY GROUP,**

**UNIVERSITY AT BUFFALO**
**NEUROSURGERY, INC.,**

**and**

**KALEIDA HEALTH,**
                                **Defendants.**

_____

## <u>DECISION AND ORDER</u>

This matter was referred to the undersigned by the Hon. Elizabeth A.

Wolford, in accordance with 28 U.S.C. § 636(b), for all pretrial matters. Dkt. #17.


Currently before the Court is plaintiff's motion for sanctions pursuant to

Rule 37(e) of the Federal Rules of Civil Procedure ("FRCP"), against defendant UBNS

for its failure to preserve electronically stored information ("ESI"). Dkt. #158. Plaintiff

requests that the Court strike UBNS's answer or instruct the jury that it could presume

the evidence UBNS destroyed was helpful to plaintiff and harmful to UBNS. Dkt. #158-28, p.22.

## BACKGROUND

Plaintiff Saurin Popat is a medical doctor specializing in otolaryngology and the Director of Head and Neck Surgery for Delaware Medical Group, P.C. ("Delaware Medical"). Dkt. #60, ¶¶ 32-33. On December 18, 2013, upon recommendation by defendant Elad Levy, M.D., Chair of Neurosurgery at State University of New York at Buffalo School of Medicine and Bioscience ("UB Medical School"),[1] plaintiff was appointed to the position of Clinical Assistant Professor of Neurosurgery at UB Medical School. Dkt. #60, ¶ 18 & Dkt. #108-1, p.142.

By letter dated July 23, 2014, Dr. Levy terminated plaintiff's position with the Department of Neurosurgery at UB Medical School effective August 29, 2014. Dkt. #108-1, p.144. Dr. Levy claims that he terminated plaintiff from his position because of plaintiff's attempt to schedule a collaborative surgery when Dr. Levy would be away and because plaintiff deviated from the agreed upon protocol during that surgery on July 22, 2014. Dkt. #110-5, p.3.

By letter dated July 31, 2014, addressed to the Dean of UB Medical School, Michael Cain, M.D. ("Dean Cain"), plaintiff requested a formal investigation into

---

[1] Dr. Levy is also Chair of Neurosurgery at Kaleida Health and Chair of Neurosurgery for University at Buffalo Neurosurgery ("UBNS"), which is part of UBMD, the single largest medical group in Western New York, with more than 500 physicians in 18 medical specialties. Dkt. #60, ¶ 11.

alleged racial discrimination during surgery on July 22, 2014 and complained that Dr.

Levy had revoked his adjunct appointment with the Department of Neurosurgery. Dkt.

#158-9.

On August 19, 2014, Dean Cain sent an email to Dr. Levy at his UBNS

email address attaching a copy of plaintiff's letter and advising that he was referring

plaintiff's

> allegation to UB's Office of Equity, Diversity and Inclusion.
> You may be contacted by the Director, Sharon Nolan Weiss,
> in accordance with UB's policies regarding discrimination
> and harassment. Also, since the allegations involve UBNS
> as well, UBNS as a corporation should conduct its own
> investigation of the occurrences. Larry DiGiulio is able to
> serve as an independent fact gatherer on behalf of UBNS. In
> the past, the University and a representative of the practice
> plan (Larry) have participated in a joint investigation of this
> nature.

Dkt. #158-10.

On August 20, 2014, Dr. Levy used his UBNS email address to

acknowledge Dr. Cain's note regarding plaintiff's allegations, provide his perspective of

those allegations, and advise that he had requested that UBNS' CEO proceed with an

independent investigation to assess and address all the concerns of racial insensitivity

raised by plaintiff. Dkt. #158-5, p.5. Dr. Levy copied Dr. Siddiqui, Dr. Kedron and

Licensed Nurse Hopkins at their UBNS email addresses on this email. Dkt. #158-5, p.5.

Dean Cain acknowledged Dr. Levy's email by email which was also copied to Dr.

SiddiquiDr. Kedron and Licensed Nurse Hopkins. Dkt. #158-5, p.5.

On August 28, 2014, UBNS Human Resources/Payroll Specialist Kimberly Drozdowski used her UBNS email address to send an email to Dean Cain attaching a letter regarding the investigation UBNS completed on the Levy/Popat matter. Dkt. #172-2. Dean Cain responded to the UBNS email address that "following UB policy, both the University under the direction of Sharon Nolan-Weiss and UB Associates under the direction of Larry Diguilio will follow the specified procedures." Dkt. #172-2, p.2.

By email dated September 10, 2014, Sharon Nolan-Weiss, Director, Office of Equity, Diversion and Inclusion for SUNY Buffalo, advised Dr. Levy that because plaintiff's claims also relate to matters involving UBNS, the investigation was being conducted jointly by SUNY Buffalo and UB Associates, Inc. (Chief Compliance Officer, Lawrence DiGuilio, Esq.). Dkt. #172-4. Later that day, counsel for UBNS advised counsel for UB Medical School that she represented UBNS and would "be involved in this claim brought by Dr. Popat." Dkt. #158-13.

By email dated January 12, 2015, Jody Leonardo used her UBNS email address to advise Dr. Levy that plaintiff had questioned her as to why she was no longer referring patients to plaintiff. Dkt. #158-14. By letter dated January 15, 2015, counsel for UBNS advised UB Medical School of concerns regarding plaintiff's communication with Dr. Leonardo and requested that plaintiff be instructed not to engage in any further contact with any UBNS employee "regarding the circumstances surrounding the July 22, 2014 surgery, UB's investigation into his complaint regarding same, or regarding referral of cases to him going forward." Dkt. #158-14.

-4-

Plaintiff filed a Charge of Discrimination with the United States Equal

Employment Opportunity Commission ("EEOC"), on June 2, 2015. Dkt. #158-15.

On June 10, 2015, Dr. Levy used his UBNS email address to advise

SUNY counsel's office that

> We contacted our HR director and our legal team. We have
> records kept on this matter. We are happy to comply with
> the record hold . . . please direct all future communication to
> [UBNS counsel].

Dkt. #172-7, p.2. Dr. Levy copied Ms. Drozdowski, Dr. Siddiqui, and UBNS counsel on

this email. Dkt. #172-7, p.2. SUNY counsel responded to Dr. Levy that

> The litigation hold was sent to you from UB Counsel
> because you are a UB [D]epartment Chair. The UB hold
> requires you to preserve all document maintained in the
> context of your University role, not as President of UBNS.
> Therefore, it would be inappropriate to communicate with
> you on this matter through an outside (UBNS) attorney or
> have UBNS' attorney provide University records should they
> be needed.

Dkt. #172-7, p.2. Dr. Levy responded:

> "Thank you for the clarification. Happy to comply."

Dkt. #172-7, p.2.

By email dated January 15, 2016, counsel for SUNY Buffalo advised Dr.

Levy that a lawsuit had been filed in federal court and asked him to contact her when

he had been served with the complaint. Dkt. #172-6, p.2. SUNY Buffalo counsel noted

that "UBNS will also likely be served" and advised Dr. Levy to "send a copy of this

Complaint to UBNS's attorney." Dkt. #172-6, p.2. SUNY counsel advised that she would

request that the NYS Attorney General represent Dr. Levy in his capacity as an

employee of SUNY Buffalo. Dkt. #172-6. Dr. Levy responded to SUNY Buffalo counsel from his UBNS email, copying UBNS counsel. Dkt. #172-6.

On February 4, 2016, counsel for SUNY Buffalo emailed Dr. Siddiqui a "litigation hold memorandum." Dkr. #172-7, p.4. Dr. Siddiqui responded from his SUNY Buffalo email account, with copies to Dr. Levy and Reagan O'Toole at their UBNS email addresses and to UBNS counsel, that he had received the email. Dkt. #172-7, p.4.

Plaintiff's First Request for Production of Documents from UBNS, dated January 16, 2019, requested, *inter alia*, "all documents concerning the Plaintiff, including, without limitation, emails among UBNS employees;" any "email communications sent to or about Plaintiff, or sent to UBNS from Plaintiff that references, mentions, concerns, pertains to and/or relates to Defendant's affiliation with Plaintiff and/or the events of July 22, 2014;" and "[a]ll documents regarding complaints made against Dr. Levy, including, without limitation, Plaintiff's complaints, related to working relationships and/or Defendant Levy's behavior with others." Dkt. #158-3, pp.6-7 & 8, No. 2, 7 & 10.

On March 12, 2019, UBNS responded that with the exception of communications between members of management and counsel, which were protected by attorney client privilege, no responsive documents exist, except for the investigative report that had already been provided. Dkt. #158-16, pp.5 & 8, No. 2 & 7. UBNS further responded that it had "no record of any complaints, verbal or written in any form, of complaints regarding Dr. Levy's 'behavior.'" Dkt. #158-16, p.9, No. 10.

By letter dated June 4, 2019, plaintiff advised that

> it appears that UBNS has not produced all responsive
> documents, as Plaintiff is in receipt of documents produced
> by other parties that indicate that UBNS likely possesses the
> same documents . . . . This raises concerns about the
> thoroughness of UBNS' document retention and/or
> production policies and procedures with regard to this
> matter. Accordingly, we request that UBNS review its files
> and make a supplemental production as quickly as possible.

Dkt. #158-17, p.7.

By letter dated August 29, 2019, counsel for UBNS responded:

> As to your general statement that it appears UBNS has not
> disclosed any and all responsive documents because you
> have received other documents from other parties does not
> warrant a response. UBNS and Dr. Levy have made all
> appropriate attempts to locate documents and have
> provided any and all documents not subject to attorney
> privilege and have produced same. Further, the statement
> that this raises "concern" of our retention policies, etc simply
> because other defendants may have a different policy or
> protocol for retention of documents is completely irrelevant,
> improper, and requires no further response.

Dkt. #158-4, p.5.

By letter dated September 16, 2021, plaintiff advised UBNS that SUNY's

document production included an email exchange dated August 20, 2014 between Dr.

Levy and Dr. Cain which copied Dr. Siddiqui, Dr. Kedron and Dr. Hopkins at their UBNS

email addresses that was obviously responsive to plaintiff's discovery demands but had

not been produced by UBNS. Dkt. #158-5, p.3. Plaintiff requested an explanation as to

why this email exchange was not produced and production of any other responsive

documents that may have been withheld. Dkt. #158-5, p.3.

By letter dated October 1, 2021, counsel for UBNS responded that the

Information Technology Director for UBNS advised that

> our initial request for all emails/documents was not made
> until 2018 when we received your first set of discovery
> demands. The email servers at UBNS do not retain emails,
> sent or received, for more than twelve (12) months.

Dkt. #158-6, p.3.

By letter dated October 22, 2021, plaintiff responded as follows:

> As I'm sure you know, a party has a common law duty to
> preserve evidence once that party has notice that the
> evidence is relevant to a lititgation or when the party should
> have known that the evidence may be relevant to future
> litigation. . . . Please explain when, if ever, your firm advised
> UBNS to issue a litigation hold and suspend its physical and
> electronic document destruction policies. Your October 1
> letter suggests that UBNS maintained its usual retention and
> destruction policies until receiving your first request for
> documents sometime in 2018. Thus, emails relevant to this
> litigation from 2014 through at least 2017 were destroyed.
> For obvious reasons, this is highly prejudicial to Plaintiff, and
> we intend to seek sanctions pursuant to Rule 37(e).

Dkt. #158-7, p.4.

By letter dated November 2, 2021, UBNS responded:

> The email at issue would have auto deleted on or about
> February 20, 2015. Your client did not file an EEOC
> Complaint until May 2015 and then his Civil Complaint in the
> WDNY in the fall of 2015 following the EEOC's dismissal for
> lack of merit. UBNS had no obligation whatsoever to change
> its protocol and/or preserve any emails or other documents
> prior to any litigation proceedings sans a litigation hold or
> pre-suit discovery Order from the Court. [Plaintiff's counsel]
> certainly could have served UBNS with a pre-suit litigation
> hold but failed to do so.

Dkt. #158-8, pp.1-2.

<u>Motion for Sanctions</u>

Plaintiff argues that UBNS' duty to preserve evidence commenced no later than August of 2014 when Dr. Levy received plaintiff's letter complaining of discrimination and Dean Cain's instruction that UBNS should conduct its own investigation, at which point UBNS retained counsel. Dtk. #158-28, pp.7-8. Plaintiff also argues that he is prejudiced by UBNS' failure to preserve emails because plaintiff has no way of knowing whether other UBNS employees communicated about plaintiff's allegations within UBNS. Dkt. #158-28, pp.19-20. Although plaintiff obtained a copy of the August 20, 2014 email from discovery provided by other defendants who were copied on that email, plaintiff argues that he is unable to assess whether any UBNS employees who were copied on that email corroborated or contradicted Dr. Levy's recitation of events. Dkt. #158-28, pp.19 & 21. Plaintiff argues that UBNS' failure to preserve ESI was intentional and should warrant an adverse inference that UBNS destroyed emails that would have supported plaintiff's claim. Dkt. #158-28, p.22.

UBNS responds that it had no reason to believe its internal emails would have any bearing on an employment discrimination lawsuit given that plaintiff was not employed by UBNS and had no contractual agreement with UBNS. Dkt. #168-20, pp.4-7. UBNS also argues that plaintiff has failed to demonstrate prejudice caused by the failure to preserve ESI or any intent by UBNS to deprive plaintiff of evidence. Dkt. #168-20, pp.7-8. UBNS notes that plaintiff deposed numerous UBNS employees, as well as many employees of SUNY Buffalo, UB Medical School and Kaledia Health, but failed to ask them if there were any other email communications regarding the surgery on July

22, 2014 or the termination of his academic appointment with UB or that may relate to plaintiff's damages. Dkt. #168-20, pp.8-10. UBNS argues that the Court cannot conclude that there were internal UBNS emails that reflect on liability or damages when plaintiff failed to establish that any such evidence ever existed. Dkt. #168-20, p.9. Furthermore, UBNS argues that it's email retention policy was in place prior to the allegations giving rise to this lawsuit and was not instituted to deprive plaintiff of evidence. Dkt. #168-20, p.10.

Michael Cournyea, Chief Executive Officer at UBNS, submitted an affirmation in opposition to plaintiff's motion for sanctions, explaining that due to the very high volume of email, which causes UBNS servers to become inefficient, certain providers, including Dr. Levy, have  parameters set on their email accounts to help create space on UBNS servers by auto deleting incoming and outgoing messages that have not been archived. Dkt. #168-10, ¶ 6. Since at least 2008, Dr. Levy's email had been set to auto delete incoming and outgoing messages that were six months old and had not been archived. Dkt. #168-10, ¶ 6. Dr. Cournyea affirms that "several emails and letters were retained as part of this litigation at the direction of our counsel," but the August 20, 2014 email was not one of them. Dkt. #168-10, ¶¶ 10-11. Dr. Cournyea affirms that UBNS contacted the third party vendor which archives its data and asked it to retrieve server data so that UBNS could search for the August 20, 2014 letter, which it ultimately found. Dkt. #168-10, ¶¶ 14-15. Dr. Cournyea further affirms that UBNS conducted a general search of this server data "for any additional emails to/from Dr. Popat or with "popat" identified as the subject and[/]or in the body of the email," but was unable to locate any additional emails or documents. Dkt. #168-10, ¶ 16.

-10-

Plaintiff replied that UBNS had admitted its failure to preserve ESI and noted that other parties to this action had produced additional emails that should have been recovered by the search described by Dr. Cournyea. Dkt. #172, ¶¶ 13-22. Plaintiff argues that it is "simply unthinkable that between July 2014 and the present date there would be zero responsive emails exchanged between or among UBNS employees." Dkt. #172, ¶ 22. Plaintiff emphasizes that UBNS failed to inform plaintiff of its failure to preserve ESI even after plaintiff raised concerns about UBNS' document production. Dkt. #172, ¶ 25.

By letter dated April 8, 2022, UBNS advised plaintiff that it had requested that the third party vendor conduct additional searches for archive tapes from 2013 and 2014, resulting in the discovery of all of the missing emails referenced by plaintiff with the exception of the 2013 email chain wherein Dr. Levy instructed UB Medical School to approve plaintiff's voluntary appointment and the litigation hold letter from SUNY Buffalo to Dr. Levy in 2016. Dkt. #177-1. UBNS explained that it was not archiving emails prior to 2014. Dkt. #177-1.

By letter dated June 20, 2022, UBNS advised that the third party vendor had retrieved backup tapes from UBNS servers corresponding to the dates of the emails produced by other parties and UBNS had retrieved "most of the subject emails," but no additional emails were discovered following a search for the word "Popat" in the sender, recipient, subject and/or body of any document stored on those backup tapes. Dkt. #177.

By letter dated June 22, 2022, plaintiff argues that "UBNS still has never searched for emails responsive to Plaintiff's discovery demands for most of the relevant time period." Dkt. #176, p.1. Specifically, plaintiff argues that

> Even assuming each tape covered a few weeks, this means
> UBNS's search included data from (at most) only a few

months in 2014; June 2015; and January-February 2016. In
other words, the search did not include November-
December 2014, 11 months in 2015, the last ten months of
2016, or any dates in 2017, 2018, or 2019.

Dkt. #176, p.2. Moreover, even for the time period UBNS claims it has searched,

plaintiff states that it is aware of several responsive emails which should have been

retrieved but were not disclosed. Dkt. #176. Plaintiff argues that

> On two separate occasions, UBNS has now searched its
> internal records and managed to locate *only* those emails
> that have already been produced by other parties in this
> litigation. UBNS contends there is nothing more to find. But
> Defendant cannot know that (having never searched its
> records for most of the relevant time period), and it is
> extraordinarily difficult to believe there were never any
> responsive emails exchanged solely between or among
> UBNS employees.

Dkt. #176, p.2. Plaintiff replies that it is possible that other witnesses who may have

corroborated  plaintiff's claims or contradicted Dr. Levy's claims may have been

identified had UBNS preserved its ESI and argues that UBNS's intent to deprive plaintiff

of this information can be inferred from UBNS's failure to advise plaintiff of its failure to

preserve email communications. Dkt. #172-8, pp.12-13.


## DISCUSSION AND ANALYSIS

Rule 37(e) of the Federal Rules of Civil Procedure provides:

If electronically stored information that should have been
preserved in anticipation of litigation is lost because a party
failed to take reasonable steps to preserve it, and it cannot
be restored or replaced through additional discovery, the
court:

(1) upon finding prejudice to another party from loss of
the information, may order measures no greater than
necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

    (A)   presume that the lost information was unfavorable to the party;

    (B)   instruct the jury that it may or must presume the information was unfavorable to the party;

    or

    (C)   dismiss the action or enter a default judgment.

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp*., 247 F.3d 423, 435 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001). "While a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Id.* at 218.

Given Dr. Levy's overlapping roles as Chair of Neurology at UB Medical School and Chair of Neurosurgery at UBNS and the interrelationship of both entities

with SUNY Buffalo, and given Dr. Levy's consistent use of his UBNS email address to communicate with SUNY Buffalo, UB Medical School and UBNS regarding plaintiff's accusations, UBNS should have been aware of the potential that its servers contained relevant ESI well before the auto delete feature would have erased any such ESI from its servers. Dr. Levy requested that UBNS investigate plaintiff's allegations on August 20, 2014 and counsel for UBNS acknowledged her representation of UBNS with respect to plaintiff's claim on September 10, 2014. There is no excuse for UBNS' apparent failure to make any effort to preserve ESI referencing plaintiff at this time. UBNS's argument to the contrary is disingenuous.

        The intent standard for imposing the harshest sanctions imposed by Rule 37(e)(2) "is both stringent and specific," requiring "not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence" for use in the litigation. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.,* 341 F.R.D. 474, 496 (S.D.N.Y. 2022) (internal quotations omitted). If an intent to deprive is found, no separate finding of prejudice is required, because the finding of intent to deprive supports an inference that the opposing party was prejudiced by the loss of information. *Id.* (internal quotation omitted). The moving party bears the burden of demonstrating that the spoliating party acted with the intent to deprive. *Id.* "Although Rule 37(e)(2) does not specify the standard by which the 'intent to deprive' must be established, it is appropriate, given the severity of the sanctions permitted under that provision of the Rule, for the intent finding to be based on clear and convincing evidence." *Charlestown Capital Advisors, LLC v. Acero Junction, Inc*., 337 F.R.D. 47,

66-67 (S.D.N.Y. 2020). Thus, the failure to take reasonable steps to preserve ESI, without more, is insufficient to warrant sanctions under Rule 37(e)(2). *See In re Keurig*, 341 F.R.D. at 522 (finding the failure to ensure server remained accessible amounts to, at most, ordinary negligence); *Charlestown,* 337 F.R.D. at 67 (disregard of obligation to preserve, search and produce relevant evidence and lack of technical competence insufficient); *Karsch v. Blink Health Ltd.,* 17-CV-3880, 2019 WL 2708125, at *22 (S.D.N.Y. June 20, 2019) (failure to take reasonable steps to preserve ESI on server or to subsequently take reasonable steps to locate and search backup insufficient to conclude intent under Rule 37(e)(2)); *Int'l Bus. Machines Corp. v. Naganayagam*, 15 Civ. 7991, 2017 WL 5633165, at *6 (S.D.N.Y. Nov. 21, 2017) (failure to place a litigation hold on emails alleges negligence, rather than intentionality). Concealment and misleading representations may also be insufficient. *Charlestown*, 337 F.R.D. at 67.  In the instant case, even assuming that relevant ESI was lost due to UBNS' failure to make reasonable effort to preserve ESI, there is insufficient evidence to suggest the level of intent required to impose sanctions pursuant to Rule 37(e)(2).

Regardless of the circumstances surrounding the initial failure to preserve ESI, absence of prejudice can be established by subsequent recovery. Because ESI "often exists in multiple locations," for example, "loss from one source may often be harmless when substitute information can be found elsewhere." F.R.C.P. 37(e) (adv. comm. n. to 2015 amend). As is the case here, emails sent to or from one party are not lost if they are produced by other parties. *See In re Keurig,* 341 F.R.D. at 474, 495-496 (collecting cases). In addition, UBNS affirms that its ESI was archived and that it has

searched server data for emails referencing plaintiff, ultimately retrieving all but one of the emails produced by other parties, that one email being dated in 2013, before UBNS began archiving emails, but discovering no other emails. *See, e.g, Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co*, 15-CV-2926, 2019 WL 5694256, at *10 (E.D.N.Y. July 22, 2019) (ESI removed from laptop not lost where it was backed up on server), *R&R adopted by* 2020 WL 1242616 (March 16, 2020). The Court finds it reasonable to infer from the lack of discovery of internal emails during the time period when emails were being exchanged with external parties that UBNS employees were not engaged in internal communications at other times either. *See, e.g., Gen-On Mid-Atlantic, LLC v. Stone & Webster, Inc*., 282 F.R.D. 346, 358-359 (S.D.N.Y. 2012) (rejecting inference of prejudice from absence of 6 back up tapes where 14 tapes that were available from the relevant time period did not contain material ESI), *aff'd* 2012 WL 1849101 (S.D.N.Y. May 21, 2012). Lack of prejudice can also be inferred from a lack of evidence that additional emails existed. *See, e.g., Khaldei v. Kaspiev,* 961 F. Supp.2d 564 (S.D.N.Y. 2013)("because plaintiff's argument that there has been any actual loss of evidence relevant to the claims or defenses in this case amounts to pure speculation, it is insufficient to sustain a motion for spoliation sanctions), *aff'd* 961 F. Supp.2d 572 (S.D.N.Y. 2013); *Tri-County Motors, Inc. v. Ameircan Suzuki Motor Corp*., 494 F. Supp.2d 161, 177 (E.D.N.Y. 2007) (speculative assertions as to the existence of emails do not suffice), *aff'd* 301 Fed. App'x 11 (2008); *See also Int'l Bus. Machs.,* 2017 WL 5633165, at * 6 (no prejudice found where, even assuming emails were lost, defendant failed to question plaintiff's employee as to their content so as to establish the relevance of any such emails).

-16-

**CONCLUSION**

Based on the foregoing, plaintiff's motion for sanctions (Dkt. #158), is

denied.


**SO ORDERED.**


**DATED:**      **Buffalo, New York**
               **September 29, 2022**

                                    *s. H. Kenneth Schroeder, Jr.*
                                    **H. KENNETH SCHROEDER, JR.**
                                    **United States Magistrate Judge**

-17-