UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SAURIN POPAT, M.D.,

                              Plaintiff,

              v.

ELAD LEVY, M.D., THE STATE
UNIVERSITY OF NEW YORK AT
BUFFALO, UNIVERSITY AT
BUFFALO SCHOOL OF MEDICINE
AND BIOSCIENCE, UNIVERSITY
AT BUFFALO NEUROSURGERY
GROUP, UNIVERSITY AT BUFFALO
NEUROSURGERY, INC. and
KALEIDA HEALTH,[1]

                              Defendants.

_____

**DECISION AND ORDER**

15-CV-01052 EAW

## **INTRODUCTION**

Plaintiff Saurin Popat, M.D. ("Dr. Popat") asserts various claims arising out of his

putative employment relationships against five defendants: (1) Elad Levy, M.D. ("Dr.

Levy"); (2) The State University of New York at Buffalo (the "University"); (3) University

at Buffalo School of Medicine and Biomedical Sciences (the "Medical School"); (4)

Kaleida Health ("Kaleida"); and (5) University at Buffalo Neurosurgery, Inc. ("UBNS")

---

[1]      University at Buffalo Neurosurgery Group was originally named as a defendant in
this action (as opposed to University at Buffalo Neurosurgery, Inc. (*see* Dkt. 1; *see also*
Dkt. 92 at 1 (noting improper naming)), and it has never been formally terminated as an
improperly named party.  Plaintiff having offered no basis for continuation of the
University at Buffalo Neurosurgery Group as a separately named defendant, the Court
directs the Clerk of Court to terminate the University at Buffalo Neurosurgery Group as a
defendant in this action.

(collectively, "Defendants").  (Dkt. 60 at 3-5).  Dr. Popat alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, 42 U.S.C. §§ 1981 and 1983, the New York State Human Rights Law, New York Executive Law §§ 290, *et seq.* (the "NYSHRL"), the United States Constitution, the New York State Constitution, and New York State common law.  (*Id.* at ¶ 1).  He asserts six claims: (1) race and national origin discrimination and a hostile work environment under Title VII; (2) retaliation under Title VII; (3) discrimination and retaliation under the NYSHRL; (4) discrimination and retaliation under § 1981; (5) discrimination and retaliation under § 1983; and (6) tortious interference with contract, employment, and prospective economic advantage.  (*Id.* at ¶¶ 59-108).  Dr. Levy asserts a counterclaim for slander per se.  (Dkt. 94 at ¶¶ 126-32).

Presently before the Court are: (1) Kaleida's motion for summary judgment (Dkt. 205); (2) Dr. Popat's motion for summary judgment (Dkt. 206); (3) Dr. Levy and UBNS's motion for summary judgment (Dkt. 207); and (4) the University and Medical School's (collectively, the "University Defendants") motion for summary judgment (Dkt. 211).  For the reasons below, Kaleida's motion is granted, Dr. Popat's motion is granted in part and denied in part, Dr. Levy and UBNS's motion is granted in part and denied in part, and the University and Medical School's motion is granted in part and denied in part.

## FACTUAL BACKGROUND

### I.   Statement of Material Facts

Before setting forth the factual background of this matter, the Court must resolve a threshold procedural issue.  As required by Local Rule of Civil Procedure 56(a)(1), each defendant submitted with its motion for summary judgment "a separate, short, and concise

statement, in numbered paragraphs, of the material facts as to which the moving party

contends there is no genuine issue to be tried."  L. R. Civ. P. 56(a)(1) (emphasis omitted).

As relevant here, Local Rule 56(a)(2) requires:

> The papers opposing a motion for summary judgment shall include a
> response to each numbered paragraph in the moving party's statement, in
> correspondingly numbered paragraphs and, if necessary, additional
> paragraphs containing a short and concise statement of additional material
> facts as to which it is contended there exists a genuine issue to be tried.

L. R. Civ. P. 56(a)(2) (emphasis omitted).

Dr. Popat failed to comply with this rule.  Rather than providing "a response to each

numbered paragraph in the moving party's statement," he submitted documents styled as

"Plaintiff's Local Rule 56(a)(1) Statement of Material Facts."  (Dkt. 215-3; Dkt. 216-3;

Dkt. 217-3).  The documents do not directly respond to statements of material fact

submitted by each defendant.  (*See id.*).  Admitting his failure to comply with the Court's

Local Rule 56(a)(2) (Dkt. 222 at ¶ 4), Dr. Popat belatedly sought leave to file revised

counterstatements of fact, but the Court denied that motion for lack of diligence and

because allowing Dr. Popat to do so on the eve of the filing deadline for reply papers would

unduly prejudice Defendants (Dkt. 227).

Where, as here, a party violates a district court's local rules, a court has discretion

to deem facts admitted for lack of compliance with its local rules.  *See N.Y. State Teamsters*

*Conf. Pension & Ret. Fund v. Express Servs., Inc*., 426 F.3d 640, 648-49 (2d Cir. 2005)

(holding it was within district court's discretion to deem the moving party's statement of

material facts admitted where the opposing party "offered mostly conclusory denials" and

"failed to include any record citations" contrary to the district's local rules); *Gubitosi v.*

*Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998) (because plaintiff failed to respond to defendant's statement of material facts submitted in accordance with local rules, "the material facts contained in his statement are deemed to be admitted as a matter of law"). However, a district court should not deem unopposed facts to be admitted when those facts are unsupported by the record. *N.Y. State Teamsters*, 426 F.3d at 649. For these reasons, for purposes of Defendants' summary judgment motions, the Court has accepted as true the facts set forth in Defendants' Statements of Material Fact to the extent they are supported by admissible evidence in the record and are not directly controverted by the facts and exhibits in the record. When a material fact is disputed, the Court has noted the same.

## II.    Factual Background

The following facts are taken from Dr. Popat's Statement of Material Facts (Dkt. 206-2), Kaleida's Statement of Undisputed Material Facts (Dkt. 205-1), Dr. Levy and UBNS's Statement of Undisputed Facts (Dkt. 207-27), and the University Defendants' Statement of Undisputed Facts (Dkt. 211-1), as well as the exhibits submitted by the parties. Unless otherwise noted, these facts are undisputed.

### A.    The Parties

Dr. Popat is a medical doctor who specializes in otolaryngology. (Dkt. 206-2 at ¶ 1; Dkt. 218-1 at ¶ 1; Dkt. 219-2 at ¶ 1). Dr. Popat identifies as of African and Southeast Asian origin. (*Id.*; Dkt. 206-1 at ¶ 2 ("Specifically, I am of Indian heritage, but I was born in Uganda, . . .")). At all times relevant, Dr. Popat was employed by the Delaware Medical Group, P.C. ("Delaware Medical") as its director of head and neck/skull base surgery. (Dkt.

206-2 at ¶ 2; Dkt. 218-1 at ¶ 2; Dkt. 219-2 ¶ 2).  Dr. Popat received a salary from Delaware Medical, as well as bonuses, reported as W-2 income.  (Dkt. 211-1 at ¶ 30).  Dr. Popat began working at Erie County Medical Center ("ECMC") in 2011.  (*Id.* at ¶ 31; *see* Dkt. 211-3 at 263:15-18).  His wages from ECMC are reported as W-2 income.  (Dkt. 211-1 at ¶ 32; Dkt. 211-3 at 14:19-22, 171:18-22).

The University is a "university center," which is an administrative unit within the State University of New York ("SUNY").  (Dkt. 211-1 at ¶ 4).  The University is a public corporation organized under § 352 of the New York Education Law.  (*Id.*).  The Medical School is an administrative unit within the University.  (*Id.* at ¶ 5).  The Medical School contains various departments based on medical specialties.  (*Id.* at ¶ 12).  Each Medical School department is headed by a chair.  (*Id.* at ¶ 14).  Department chairs report to the dean of the Medical School.  (*Id*. at ¶ 15).  During the relevant time period, the Medical School dean was Dr. Michael Cain.  (*Id.*; Dkt. 211-6 at 5).

UBNS is one of eighteen practice plans, also known as faculty practice corporations, associated with the Medical School.  (*See* Dkt. 211-1 at ¶¶ 7, 12).  Practice plans exist for "the purpose of supporting the educational mission of [the Medical School] by providing clinical instruction and supervision of students . . . and, incident thereto, rendering professional services."  (*Id.* at ¶ 13 (quoting N.Y. Not-for-Profit Corp. Law § 1412 (a))).  The president of each practice plan is, by tradition, the chair of the parallel medical school department.  (*Id.* at ¶ 14; Dkt. 205-25 at 26).  Each practice plan associated with the University, including UBNS, contributes 5 percent of its clinical income to the University, also known as the "dean's tax."  (*See* Dkt. 211-1 at ¶ 26).

Dr. Levy is a double board-certified neurosurgeon and tenured full professor of neurosurgery and an adjunct full professor of radiology at the University. (Dkt. 206-2 at ¶ 10; Dkt. 207-27 at ¶ 9; Dkt. 211-1 at ¶ 8; Dkt. 211-5 at 17:3-7). Dr. Levy is also chair of the Medical School's Department of Neurosurgery and president of UBNS. (Dkt. 205-1 at ¶ 6; Dkt. 206-2 at ¶¶ 10, 13; Dkt. 207-27 at ¶ 10; Dkt. 211-1 at ¶ 8). As of July 2014, UBNS, pursuant to an independent contractor agreement with Kaleida, appointed Dr. Levy as Medical Director of Neuroendovascular services at Buffalo General Medical Center/Gates Vascular Institute, a Kaleida facility. (Dkt. 218-1 at ¶ 12; Dkt. 206-3 at 405). The position did not afford Dr. Levy oversight over Kaleida employees, and he lacked the authority to make any employment decisions on Kaleida's behalf, or to grant or revoke privileges, although Dr. Levy could offer input on the issue to the appropriate Kaleida staff. (Dkt. 218-1 at ¶ 12; Dkt. 211-5 at 38:11-16; 39:4-9; *id.* at 39:14-18).

Kaleida is a not-for-profit corporation that operates hospital and surgical facilities in Western New York. (Dkt. 205-1 at ¶ 3). Buffalo General Medical Center ("BGMC") is one of Kaleida's hospital facilities. (*Id.*). Kaleida has approximately 1,300 physician members on its medical and dental staff, but only 100 or so are employed by Kaleida, including those working on a per diem basis. (*Id.* at ¶ 13). Most physicians who care for patients at Kaleida's facilities hold privileges to treat their patients at Kaleida but are employed by, and practice as part of, University practice plans or private practice physician groups. (*Id.* at ¶ 14). Physicians obtain privileges at Kaleida through an application process overseen by Patricia Vorpahl, vice president of physician services and medical affairs, and her team. (*Id.* at ¶ 15).

B.        **Relationships Among the Parties**

1.        **Dr. Popat and the University Defendants**

The Medical School has both full-time faculty members and volunteer faculty members, among other faculty members.  (Dkt. 211-1 at ¶ 17; Dkt. 211-7 at 50:3-51:14).  Volunteer faculty members are physicians or surgeons in private practice who also participate in the education of students and residents through supervision and training in clinical settings.  (Dkt. 206-2 at ¶ 14; Dkt. 211-1 at ¶ 18).  Volunteer faculty members in the Neurosurgery Department have students and residents participate in the evaluation of patients, learn surgical procedures in the operating room and follow the patient in post-operative care.  (Dkt. 211-1 at ¶ 19).  The expectation is that volunteer faculty engage in teaching, and in turn the residents do some of the work, such as documenting in medical charts and performing opening and closing procedures in surgery.  (*Id.* at ¶ 21; Dkt. 211-7 at 53:4-18; *see* Dkt. 206-2 at ¶ 22).  The chairs of each department at the Medical School have the authority to terminate, or decline to renew, volunteer faculty appointments.  (Dkt. 211-1 at ¶ 16).  A faculty appointment is a prerequisite to formally working with medical students, residents, and fellows.  (Dkt. 206-2 at ¶ 26; Dkt. 211-1 at ¶ 20).  Volunteer faculty members receive a University email address, access to the University's library, and a title as a faculty member.  (Dkt. 206-2 at ¶ 22; Dkt. 211-1 at ¶ 23).

In November 2009, Dr. Popat became a volunteer clinical assistant professor of otolaryngology at the University and Medical School.  (Dkt. 211-1 at ¶ 35; Dkt. 205-1 at ¶ 37).  Dr. Popat continued to hold the position through at least 2021.  (Dkt. 211-1 at ¶ 35; Dkt. 211-6 at 11; *see* Dkt. 206-2 at ¶ 5).  His duties included resident education, by way of

didactic teaching, or in the operating room, at patients' bedside, or in offices or clinics. (Dkt. 211-1 at ¶ 40).  From 2014 through 2020, Dr. Popat received stipends, usually for $5,000, for his clinical assistant professor role at the Department of Otolaryngology, reported as 1099 income.  (Dkt. 206-2 at ¶ 5; *see* Dkt. 211-1 at ¶ 43).  No taxes were withheld, and the University Defendants did not provide Dr. Popat with health insurance, vacation time, or sick days.  (Dkt. 211-1 at ¶¶ 44, 46).

In or around 2012, Dr. Popat first expressed interest in an appointment to the Neurosurgery Department as volunteer faculty.  (Dkt. 207-27 at ¶ 8; Dkt. 211-3 at 101:19-102:10, 197:11-19).  At the time Dr. Popat initially had discussions about the appointment, Dr. Nick Hopkins was the chair of the Neurosurgery Department.  (Dkt. 207-10 at 26).  Dr. Levy assumed the chair of the Neurosurgery Department around November 2013, and he became president of UBNS at an unspecified time thereafter.  (Dkt. 207-27 at ¶ 10; Dkt. 207-18 at 14:18-23, 53:12-19).  On December 11, 2013, Dr. Levy sent a letter to the University asking that the appointment be approved.  (Dkt. 211-9).  By letter dated December 18, 2013, Dr. Popat was appointed as volunteer clinical assistant professor in the Neurosurgery Department with a term to run from January 1, 2014 to December 31, 2016.  (Dkt. 206-2 at ¶ 61; Dkt. 211-1 at ¶ 36; Dkt. 206-3 at 28).  Dr. Popat testified that he did not see his appointment letter until it was shown to him at his deposition and that he was not officially aware that he had been appointed to a volunteer faculty position with the Neurosurgery Department until he was notified by letter that he received on July 25, 2014, that his appointment would cease as August 29, 2014.  (Dkt. 206-2 at ¶ 74; Dkt. 211-3 at 192:15-193:2, 196:22-197:10).  However, Dr. Popat acknowledged that he "kind of knew"

that he had received the Neurosurgery Department appointment "because the IT person for UB Neurosurgery had called me and asked me how I would like my name title written out, and that was months before this July 22nd, 2014 event." (Dkt. 211-3 at 197:2-7).

### 2.    Dr. Popat and UBNS

Between 2010 and July 2014, Dr. Popat was asked to assist various members of the Neurosurgery Department in surgeries that would benefit from his area of expertise— gaining access to areas of the skull base. (Dkt. 207-27 at ¶ 4; Dkt. 211-3 at 23:13-17, 39:4-9, 165:23-166:5, 342:12-18). Among the surgeons Dr. Popat worked with were Dr. Jody Leonardo, Dr. James Budny and Dr. Adnan Siddiqui. (Dkt. 207-27 at ¶ 4). Dr. Popat also worked occasionally with Dr. Greg Castiglia and Dr. John Fahrbach, both of whom worked at UBNS, and he continued to do so as of 2021. (Dkt. 207-27 at ¶ 7). Dr. Castiglia and Dr. Fahrbach's professional relationships with Dr. Popat predated their joining UBNS. (Dkt. 206-2 at ¶ 103; Dkt. 218-1 at ¶ 103).

Dr. Popat and Dr. Leonardo, among others, were interested in forming a collaborative specialty practice at different hospitals in Western New York (Dkt. 207-27 at ¶ 12; Dkt. 206-3 at 328-29; Dkt. 211-3 at 116:13-117:12, 341:9-344:14), although the parties dispute whether Dr. Popat and Dr. Leonardo were pursuing the project in their individual capacities or under the aegis of any of the Defendants in this action (Dkt. 206-2 at ¶ 112, Dkt. 207-27 at ¶¶ 8, 12; Dkt. 218-1 at ¶ 116; Dkt. 219-2 at ¶ 112; Dkt. 220-1 at ¶ 35). Dr. Levy testified that those interested in forming the collaborative specialty practice were of the thinking that "if they can create a multidisciplinary brand, perhaps they can

grow the practice . . . [and] try to recruit patients from outside the Western New York area."
(Dkt. 211-5 at 74:9-13).

The parties also disagree on how far these plans proceeded.  (Dkt. 206-2 at ¶¶ 112-
120; Dkt. 218 at ¶¶ 116-20; Dkt. 219-2 at ¶¶ 112, 116-20; Dkt. 220-1 at ¶¶ 35-41).   Dr.
Popat averred that he "had an oral agreement with UBNS and Kaleida Department of
Neurosurgery to develop a Specialty Practice Group focusing on Skull Based Surgery,
particularly for skull-based tumor removal, by investing each parties' time and financial
resources in developing a cross-specialty practice group."  (Dkt. 206-1 at ¶ 52).  Dr. Popat
further averred that "[u]nder this agreement, I would utilize my specialty skills of
otolaryngology and, in return, UBNS would contribute UBNS employed doctors, including
Dr. James Budny and Dr. Siddiqui, who possess other neurosurgery specialties to work
together for public recognition of this practice area, receive referrals jointly from outside
parties, treat patients jointly, and develop an economically successive professional
practice."  (*Id.*).

Dr. Popat also averred that Dr. Leonardo agreed "to share patients and work together
to market these joint specialties, particularly in a sub-specialty of Endoscopic Base
Skull Surgery []."  (*Id.* at ¶ 53).  The two "agreed, among other things, to share patients,
attend related conferences, consult each other regarding patient treatment and our joint
practice development, collaborate to obtain favorable insurance rates for our joint services,
and collaborate on research in this field.  Additionally, we began publishing peer reviewed
academic journal articles jointly."  (*Id.*).

Dr. Popat sent an email in June 2014 to ECMC's chief executive officer and counsel stating that he had been collaborating and working with Drs. Levy, Siddiqui, Leonardo, and Budny for the last three years on the endoscopic skull base surgery specialty.  (Dkt. 205-16 at 2-4).  Dr. Popat testified he did not speak directly to Dr. Levy about the proposed collaboration.  (Dkt. 211-3 at 119:13-16).  UBNS disputes that it was involved with the project, which it describes as "an individual project being pursued by Dr. Popat and Dr. Leonardo."  (Dkt. 219-2 at ¶ 112).  Kaleida disputes that any agreement involving Kaleida was ever reached, and contends that the record evidence does not establish that Kaleida had any knowledge of or involvement in the project.  (Dkt. 218-1 at ¶ 112).  Dr. Popat testified that he needed ECMC's "buy in" for the idea before approaching Kaleida, and he did not get it.  (Dkt. 211-3 at 344:6-346:3).  Dr. Popat stated that he never met with Kaleida about the proposed practice.  (*Id.* at 331:17-25).

### 3. Dr. Popat and Kaleida

To care for patients at a Kaleida facility, a physician must be credentialed and approved for privileges.  (Dkt. 205-1 at ¶ 15).  Credentialing requires verification of the physician's education, training, work experience, and licensing, among other factors.  (Dkt. 205-28 at ¶ 9).  Privileging is granting permission for a physician to perform specific procedures based on documented competence in the specialty area in which privileges are requested.  (*Id.*).  There is an application process for credentials and obtaining privileges at

Kaleida, which it manages internally.  (Dkt. 205-1 at ¶ 15).  Neither the University nor UBNS have any control over Kaleida's credentialing or privileging.[2]  (*Id.* at ¶ 17).

Dr. Popat is a member of Kaleida's medical staff.  (*Id.* at ¶ 27).  He holds privileges in otolaryngology/ear, nose, and throat, and is a member of the Otolaryngology Service.  (*Id.*).  He never held privileges in neurosurgery at Kaleida.  (*Id.*).  Kaleida never paid Dr. Popat any monetary compensation, either directly or through one of Dr. Popat's other employers.  (*Id.* at ¶ 29).  Kaleida also never provided Dr. Popat with any employment-related benefits, such as health, disability, or life insurance, retirement contributions, vacation time or other paid time off.  (*Id.*).[3]  Kaleida does not bill for Dr. Popat's services related to any procedure he performs at a Kaleida facility.  (*Id.* at ¶¶ 33-34).

### 4. Kaleida and the University

Kaleida, the University, and ECMC are parties to an Affiliation Agreement.  (Dkt. 205-9).  The University lacks a dedicated hospital attached to its medical school where University faculty can teach medical students and residents in a direct patient care environment.  (Dkt. 205-1 at ¶ 39).  The Affiliation Agreement allows University faculty

---

[2]     Dr. Levy testified that in his role as co-director of stroke-related services, he "would have some input into granting privileges for physicians to perform stroke services[,]" and with regards to revoking privileges, he "would have input if I thought there was a doctor who was dangerous or a clinician who didn't perform their duties consistent with expectations of Kaleida[.]"  (Dkt. 211-5 at 36:17-37:10).  He disclaimed any decisional authority, stating, "Kaleida decides who they grant or revoke privileges from, that would not be up to me."  (*Id.* at 37:19-38:4).

[3]     In his deposition, Dr. Popat testified that he believed that there was an opportunity to get disability insurance through Kaleida at one point, but he did not know for certain.  (Dkt. 211-3 at 274:15-21).  The Court does not consider this statement to raise an issue of material fact as to whether Kaleida provided employment-related benefits to Dr. Popat.

to use their direct patient care performed at Kaleida, ECMC, and other area hospitals as teaching opportunities.  (*Id.*).  Affiliation agreements are required by the accrediting body of U.S. medical schools when medical education takes place in hospitals.  (*Id.* at ¶ 40). Kaleida provides the facilities, but the actual teaching and instruction is managed by the University and its various practice plans.  (*Id.* at ¶ 41).

The Affiliation Agreement specifically reserves to Kaleida and ECMC the authority and responsibility to appoint and retain members of its own medical, dental, administrative and support staff; and to the University to appoint and retain its faculty members and administrative staff.  (Dkt. 205-9 at 7 § 2.5, 26 § 7.1; Dkt. 205-1 at ¶ 43). The University is responsible for appointing members of its faculty and its department chairs.  (Dkt. 205-9 at 27-28 § 8.1; Dkt. 205-1 at ¶ 44).  Each party also retains control over its own management, assets, and affairs.  (Dkt. 205-9 at 7 § 2.5; Dkt. 205-1 at ¶ 45). Kaleida and the University do not share officers and directors.  (Dkt. 205-1 at ¶ 45). Kaleida and the University do not share finances—each maintains separate payroll, accounts, books, and bank accounts, and prepares and files separate tax returns.  (*Id.* at ¶ 46).  Kaleida and the University lack any authority to control the appointment, hiring, termination or discipline of the other's workforce.  (Dkt. 205 at ¶ 30; Dkt. 205-1 at ¶ 47).

The Affiliation Agreement provides that medical students and residents are not employed by Kaleida.  (Dkt. 205-9 at 8 § 3.5, 13 § 4.5; Dkt. 205-1 at ¶ 48).  Residents are employed by University Medical Resident Services, P.C. ("UMRS").  (Dkt. 205-9 at 13 § 4.5; Dkt. 205-1 at ¶ 48).  The University is responsible for setting residents' schedules and determining which doctors will work with students and residents.  (Dkt. 205-1 at ¶ 48).

With some minor disputes that do not raise a question of material fact, the parties agree that Kaleida makes lump sum payments to UMRS to cover "resident pay lines" at its sites. (Dkt. 206-2 at ¶ 47; Dkt. 205-1 at ¶ 49; Dkt. 205-9 at 22 § 5.3; Dkt. 218-1 at ¶ 47). With the same caveat, the parties generally agree that Kaleida also makes a payment to the University Research Foundation to cover salary lines for faculty using a formula based on the number of residents. (Dkt. 206-2 at ¶ 48; Dkt. 218-1 at ¶ 48). The Affiliation Agreement requires Kaleida to provide the University with space, such as conference rooms, and access to information technology at its facilities to support the medical education program, and the University compensates Kaleida for this. (Dkt. 205-9 at 9 § 3.7, 25 § 6.5, 31-32 § 10.4, 33 § 11.1; Dkt. 205-1 at ¶ 50).

### 5.    Kaleida and UBNS

Kaleida contracts with different physician groups, including UBNS, to provide certain administrative and clinical coverage. (Dkt. 205-10; Dkt. 206-2 at ¶ 54; Dkt. 205-1 at ¶ 51). Kaleida's agreement with UBNS ("UBNS Agreement") specifies that each is a separate entity responsible for its own operations and employees. (Dkt. 205-10 at 3 § 1(d); Dkt. 205-1 at ¶ 52). The UBNS Agreement provides that UBNS is an independent contractor of Kaleida. (Dkt. 205-10 at 3 § 1(e); Dkt. 205-1 at ¶ 52). Kaleida is financially separate from UBNS, and the two maintain separate payrolls and do not comingle accounts, books, or bank accounts, or prepare joint tax returns. (Dkt. 205-1 at ¶ 53). Kaleida pays UBNS a lump sum to cover the services UBNS provides but lacks any say in how the money is allocated by UBNS to its physicians. (*Id.* at ¶ 54).

- 14 -

C.    **The July 2014 Surgery**

Early in July 2014, Dr. Levy asked Dr. Popat to perform a surgery on a teenaged patient with him, and Dr. Popat agreed.  (Dkt. 206-2 at ¶ 63; Dkt. 211-1 at ¶ 51; Dkt. 211-5 at 127:2-18).  Dr. Levy also asked Dr. Siddiqui to participate in the surgery.  (Dkt. 206-2 at ¶¶ 63, 65; *see also* Dkt. 211-1 at ¶ 53).  Dr. Levy asked Dr. Popat to participate because the surgery involved a tumor positioned in a way that raised the possibility the jaw might have to be separated, falling within Dr. Popat's area of expertise.  (Dkt. 211-1 at ¶ 52).

Dr. Popat met with the patient's family on July 11, 2014, and advised that Dr. Siddiqui would participate in the surgery.  (Dkt. 211-1 at ¶ 54).  The evidence is unclear as to whether Dr. Popat asked the family to meet with Dr. Siddiqui.  (Dkt. 211-3 at 53:23-54:12; Dkt. 211-10 at 2-3).  Dr. Levy called Dr. Popat later that day, in some state of unhappiness, because Dr. Popat had allegedly sent them to see Dr. Siddiqui without Dr. Levy's knowledge and consent and because Dr. Levy thought that Dr. Popat was intending to reschedule the surgery to a time when Dr. Levy would be out of the country.  (Dkt. 211-3 at 60:9-14; Dkt. 211-5 at 128:10-16; Dkt. 211-10 at 3).  In notes kept by Dr. Popat, he acknowledged that "I was clearly in the wrong in terms of professional etiquette and at least 3 times over the phone, I apologized to Dr. Levy with all sincerity."  (Dkt. 211-10 at 3; Dkt. 211-1 at ¶ 55).

Dr. Levy's office called Dr. Popat's scheduler at Delaware Medical Group and proposed the surgery be performed July 22, 2014.  (Dkt. 211-1 at ¶ 56).  Dr. Popat agreed to the date, which required him to reschedule about 24 patients and several procedures at ECMC to accommodate the date Dr. Levy requested.  (*Id.*; Dkt. 211-3 at 212:4-12).  The

parties appear to dispute whether Dr. Levy and Dr. Popat reviewed the surgical plan together. (Dkt. 206-2 at ¶ 66; Dkt. 207-27 at ¶¶ 26-27; Dkt. 211-1 at ¶ 57; Dkt. 220-1 at ¶ 13). Dr. Popat did discuss the surgical plan with Dr. Siddiqui. (Dkt. 211-3 at 213:25-214:3).

The surgery took place July 22, 2014. (Dkt. 211-1 at ¶ 58). Eight of the individuals in the room—including Dr. Popat and several neurosurgery residents and students—had "brown skin tones" and were of African-American, Southeast Asian, or Middle Eastern descent or origin. (Dkt. 205-1 ¶ 60; Dkt. 211-3 at 98:2-14). Dr. Levy was not present when the surgery started, and Dr. Popat and Dr. Siddiqui began to clear a path in the neck to reach the tumor. (Dkt. 206-2 at ¶ 67; Dkt. 211-1 at ¶ 58). The surgical plan called for Dr. Levy to join the surgery when the tumor path was cleared so that Dr. Levy could remove the tumor. (Dkt. 206-2 at ¶ 66; Dkt. 207-27 at ¶ 26; Dkt. 211-1 at ¶¶ 58, 60). The parties agree that the tumor was partially or mostly removed before Dr. Levy joined the surgery to remove it. (Dkt. 206-2 at ¶¶ 67-68; Dkt. 207-27 at ¶¶ 32-34; Dkt. 211-1 at ¶ 60). Those who were present in the operating room offer differing accounts as to whether and which members of the surgical team put the tumor back into the "wound bed" of the patient before Dr. Levy arrived. (*See* Dkt. 207-6 at 4, 6; Dkt. 211-3 at 77:24-82:10; Dkt. 211-5 at 179:6-16, 184:15-24; Dkt. 211-11 at 154:3-11).

Dr. Levy believed that for the patient's safety and as part of the surgical plan, the surgical team should use a microscope while clearing a path to the tumor, and he was troubled when he arrived in the operating room to find that the microscope appeared to have gone unused. (*See* Dkt. 211-5 at 113:6-21, 117:5-12, 165:7-21). Dr. Popat testified

that he did not plan to use a microscope for this surgery and that, instead, the team had "loupes with telescopic magnification." (Dkt. 211-3 at 41:18-42:2).

The parties also offer conflicting versions of what occurred when Dr. Levy entered the operating room, specifically with respect to comments referencing "UPS", the package delivery company. The parties dispute or cite conflicting evidence regarding the substance of the remarks and who made which remarks. (Dkt. 205-1 at ¶¶ 61-62; Dkt. 206-2 at ¶¶ 69-70; Dkt. 207-27 at ¶ 31; Dkt. 211-1 at ¶¶ 61-62). For example, Dr. Popat testified during his deposition that Dr. Levy "said I feel like I'm at a UPS convention." (Dkt. 211-3 at 92:10-12). The investigative report prepared by the University and UBNS (the "Report") notes that "Dr. Popat stated that following Dr. Levy's arrival, Dr. Levy commented the room 'reminded him of a UPS convention' and asked Drs. Siddiqui and Popat if they knew the UPS motto. Dr. Levy then said, 'What can brown do for you?'" (Dkt. 211-15 at 3). Dr. Siddiqui testified he said, "we got it all set for you, boss, just like UPS." (Dkt. 211-11 at 153:15-16). Dr. Siddiqui testified that "somebody asked hey, what does that mean," and the parties disagree whether Dr. Levy or Dr. Siddiqui replied, "like the UPS slogan, what can brown do for you. . . ." (*Id.* at 153:20-24; Dkt. 219-2 at ¶¶ 69-70). Dr. Popat adopted Dr. Siddiqui's version of events in his Rule 56.1 statement, even though it does not align with his deposition testimony. (Dkt. 206-2 at ¶¶ 69-70).

By letter dated July 23, 2014, Dr. Levy advised Dr. Popat that his volunteer faculty appointment with the Department of Neurosurgery would cease as of August 29, 2014. (Dkt. 205-11). Dr. Levy testified that he terminated Dr. Popat's role because: (1) he was upset that Dr. Popat tried to schedule the surgery for a time that Dr. Levy was out of the

country when it was Dr. Levy's patient in the first instance; (2) he was unhappy with how Dr. Popat compromised the patient's safety by allegedly putting the tumor back into the wound bed and then encouraging a resident to not tell Dr. Levy about what Dr. Popat had done; (3) he was unhappy with the lack of opportunities Dr. Popat provided the residents in general; and (4) he was unhappy with Dr. Popat's alleged billing irregularities.  (Dkt. 211-5 at 112:9-115:11, 184:15-24).  Dr. Levy testified that he was "fine" with anyone else at UBNS or otherwise working with Dr. Popat, but he personally did not want to do so because:

> He's accused me and my department and the University of condoning racism, which is hurtful.  I feel I can't trust him. Trust is very important when you're operating, and so for all the -- and, again, to be sensitive to time, I won't list all the reasons, but it's a matter of trust.

(*Id.* at 214:5-17).  Dr. Levy testified his concerns did not extend to Dr. Popat's ability to "wield surgical instruments."  (*Id.* at 215:18-20).

By letter dated July 31, 2014 and postmarked August 13, 2014, Dr. Popat wrote to Dean Cain indicating that he wanted to register a complaint, request a formal investigation, and seek remediation for a "racial discriminatory event that occurred on July 22, 2014." (Dkt. 211-13).  Dr. Popat also alleged in the letter that "there were a series of multiple events preceding and subsequent to this racially harassing comment by Dr. Levy that clearly demonstrate abusive conduct and conduct detrimental to patient care."  (*Id.*).  Dr. Popat further alleged that Dr. Levy had improperly revoked Dr. Popat's adjunct faculty appointment to the Neurosurgery Department.  (*Id.*).  The University and UBNS undertook an investigation, headed by Sharon Nolan-Weiss, the University's Director of the Office of

Equity, Diversity, and Inclusion, and Lawrence DiGiulio, the Chief Compliance Officer for UB Associates, Inc. (Dkt. 211-15). Dr. Popat and Dr. Levy were interviewed as part of the investigation, as were Dr. Siddiqui, Dr. Leonardo, as well as residents and medical students who were listed as present during the surgery. (*Id.*).

The investigation concluded that "[t]here is insufficient evidence of conduct that rose to the level of creating a hostile environment based on national origin, color or race." (*Id.* at 9). The investigation also found that during the surgery at issue, "[t]here is an issue of fact as to whether Dr. Levy made the initial UPS comment or whether he was explaining a comment made by Dr. Siddiqui." (*Id.*). The Report also noted that residents in the program joked "that instead of 'UBNS' . . . the department's name should be 'BUNS' (Brown University Neurosurgery)." (*Id.* at 3; *see also id.* at 4, 8). The Report recommended "the Neurosurgery Department's faculty and residents receive training in discrimination and harassment prevention[,]" as "Dr. Levy acknowledged that the jokes noting the prevalence of people of color in the department were made on a repeated basis, and explained that the residents felt the representation of physicians of color was a point of pride and that their comments reflected this." (*Id.* at 9). The Report concluded that there was insufficient evidence to find that "the termination of Dr. Popat's volunteer academic appointment with the Department was based on a discriminatory or retaliatory reason." (*Id.*).

Dr. Popat also sent a letter dated July 31, 2014 and received on August 14, 2014, to then-Kaleida Chief Executive Officer Jody Lomeo complaining of Dr. Levy's alleged comments during the July 22, 2014 surgery and alleging "a series of multiple events

- 19 -

preceding and subsequent to this racially harassing comment by Dr. Levy[.]" (Dkt. 205-5).   Dr. Popat asked Kaleida to investigate.   (*Id.*).   Kaleida conducted an internal investigation led by its then-Senior Director of Human Resources Karen Swartz.  (Dkt. 205-8; Dkt. 205-29 at ¶ 1).  Swartz interviewed the five members of Kaleida's staff in the operating room at the time, and all but one had no recollection of hearing any UPS-related comments.  (Dkt. 205-8 at 2-3).  One staff member had a "vague recollection" about comments related to UPS and its trucks being brown, but she could not recall who was involved in the conversation or when it occurred.  (*Id.* at 2).  Kaleida concluded that the allegations were not corroborated, and there was insufficient evidence to support a finding that any inappropriate comments or behavior occurred in violation of Kaleida's harassment policy.  (*Id.* at 3; Dkt. 205-29 at ¶ 21).  Kaleida did not interview either Dr. Levy or Dr. Popat because it did not consider the two Kaleida employees, and because it understood that the University and UBNS were conducting their own investigations.  (Dkt. 205-1 at ¶ 70).

On August 24, 2014, a meeting was held at Dr. Siddiqui's house to discuss the situation, with Dr. Levy, Dr. Leonardo,  Dr. Popat, and Dr. Siddiqui in attendance.  (Dkt. 206-2 at ¶ 87; Dkt. 207-27 at ¶ 46; Dkt. 219-2 at ¶ 87).  The parties dispute the contents of the discussions, including what proposed resolutions were discussed and who offered or supported different proposals.  (*See* Dkt. 206-2 at ¶¶ 88-91; Dkt. 218-1 at ¶ 90; Dkt. 219-2 at ¶¶ 88-90; Dkt. 220-1 at ¶ 90). Dr. Levy testified it was "possible" he might have reinstated Dr. Popat if Dr. Popat "showed contrition, if he explained the billing - -  if he just said hey, this is what happened, I apologize . . . maybe the conversation would have

been very different."  (Dkt. 211-5 202:12-23).  Instead, Dr. Levy thought Dr. Popat "was dug in with his opinions."  (*Id.* at 207:20-24).    Dr. Levy testified that "Dr. Popat wanted to have his volunteer faculty appointment back.  He had made an allegation of racism.  He was willing to walk back that allegation of racism in exchange for me reinstating him as volunteer faculty."  (Dkt. 211-5 at 122:5-14).  Dr. Levy's position was that "it's a matter of principle, I'm not going to let somebody play a race card in order to get a volunteer faculty appointment back."  (*Id.* at 122:17-20).  Dr. Levy testified that "I think I still gave him the option to resign.  I said let me know if you . . . want to resign. . . [I]f you want to give me a resignation letter, I'll remove the termination letter."  (*Id.* at 210).  Dr. Siddiqui testified that he may have been the one to suggest Dr. Popat retract his complaint in exchange for reappointment.  (Dkt. 211-11 at 198:2-8).  The termination was not rescinded.

## PROCEDURAL BACKGROUND

Dr. Popat filed a charge of discrimination with the Equal Employment Opportunity Commission and received his right-to-sue letters, dated September 16, 2015.  (Dkt. 206-3 at 25-26).  He commenced this action with the filing of his initial complaint on December 15, 2015.  (Dkt. 1).  He filed an amended complaint on March 15, 2016 (Dkt. 21), and a second amended complaint ("Complaint") on October 19, 2017 (Dkt. 60).  The Complaint alleged: (1) race and national origin discrimination and hostile work environment in violation of Title VII; (2) retaliation in violation of Title VII; (3) race and national origin discrimination, hostile work environment, and retaliation in violation of the NYSHRL; (4) race discrimination, hostile work environment, and retaliation in violation of § 1981;

(5) discrimination and retaliation in violation of § 1983; and (6) tortious interference with contract, employment, and prospective economic advantage.  (*Id.* at 13-18).

Dr. Levy and UBNS filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims other than those arising under § 1981.  (Dkt. 63).  The University Defendants filed a Rule 12(b)(6) motion to dismiss all claims other than those arising out of Title VII.  (Dkt. 65).  Kaleida filed a motion to dismiss all of Dr. Popat's claims pursuant to Rule 41(b), and, in the alternative, Plaintiff's claims arising under § 1983 and New York common law pursuant to Rule 12(b)(6).  (Dkt. 67).

The Court issued a decision and order on September 17, 2018.  (Dkt. 85).  It granted UBNS's and Dr. Levy's motion in part, dismissing the sixth cause of action against UBNS for tortious interference with contractual relations.  (*Id.* at 58).  The Court granted the University Defendants' motion in its entirety, such that the only claims remaining against the University and Medical School are the Title VII claims.  (*Id.*).  The Court granted Kaleida's motion in part, dismissing the cause of action for tortious interference as against Kaleida.  (*Id.*).  The University Defendants filed an answer on October 9, 2018 (Dkt. 86), Kaleida filed an answer on October 15, 2018 (Dkt. 87), and Dr. Levy and UBNS filed an amended answer on October 23, 2018 (Dkt. 94).  Dr. Levy also filed a counterclaim against Dr. Popat for slander per se in his filing on October 23, 2018.  (*Id.* at ¶¶ 126-32).

Kaleida, Dr. Popat, and Dr. Levy and UBNS filed motions for summary judgment on December 29, 2023.  (Dkt. 205; Dkt. 206; Dkt. 207).  The University Defendants filed for summary judgment on January 8, 2024.  (Dkt. 211).  Dr. Popat responded to each of the motions made against him on February 16, 2024. (Dkt. 215; Dkt. 216; Dkt. 217).

Defendants each filed replies on March 15, 2024. (Dkt. 230; Dkt. 231; Dkt. 232). Defendants each responded to Dr. Popat's motion for summary judgment on February 16, 2024 (Dkt. 218; Dkt. 219; Dkt. 220), and Dr. Popat filed a reply on March 15, 2024 (Dkt. 229). In addition, Dr. Levy and UBNS filed a motion to seal certain documents on January 8, 2024 (Dkt. 210); the University Defendants filed a motion to seal certain documents on February 12, 2024 (Dkt. 214). The Court addressed the sealing motions in its Decision and Order of May 14, 2024. (Dkt. 233).

## DISCUSSION

### I.   Legal Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, it finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quotation marks, citations, and footnote omitted). A court's obligation to decide whether the movant is entitled to summary judgment is not extinguished by a party's failure to address an argument advanced by the movant. *See, e.g., Vermont Teddy Bear Co., Inc.*

*v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.").

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Where, as here, there are cross motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

"In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citing *Anderson*, 477 U.S. at 249). "In short, '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . .'" *Id.* (quoting *Anderson*, 477 U.S. at 255); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)).

## II.   **Employment Status**

Title VII makes it unlawful "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 2000e-2(a)(1). Because Title VII is limited to discrimination by an employer,

"[t]he plausible existence of a requisite employer-employee relationship is thus a

cornerstone of an adequately pled Title VII complaint." *Felder v. U.S. Tennis Ass'n*, 27

F.4th 834, 842 (2d Cir. 2022). An employee relationship is also necessary to pursue

discrimination claims under the NYSHRL. *See Eisenberg v. Advance Relocation &

Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000).

To proceed, Dr. Popat must demonstrate that he is an employee of each of the

Defendants. "[I]n alleging an employer-employee relationship, an employee is not

squarely limited to claims against his or her *formal* employer." *Felder*, 27 F.4th at 838.

Here, Dr. Popat argues there is no question of material fact as to whether he is: (1) an

employee of the University Defendants under a direct employment theory; (2) an employee

of UBNS and Kaleida under a joint employment theory; and (3) an employee of Kaleida

and the University under a joint employment theory.[4]   (Dkt. 206-4 at 14-26). Kaleida both

opposes Dr. Popat's motion for summary judgment on the issue of employment (Dkt. 218

at 9-16) and moves for summary judgment finding Dr. Popat is not its employee under any

theory of employment (Dkt. 205-31 at 11-19). UBNS opposes Dr. Popat's motion on the

ground that it did not directly employ him (Dkt. 219 at 7) and seeks summary judgment in

---

[4]      In a footnote, Dr. Popat argues that he "may also be considered an employee under
(1) an interference theory, (2) a finding that defendants are joint employers with Delaware
Medical Group, and/or (3) that UBNS and Kaleida were [his] direct employers."  (Dkt.
206-4 at 14 n.1).  Dr. Popat has failed to develop these theories and the Court declines to
consider arguments set forth in a footnote. *See Ononsamba-Ohindo v. Searls*, 678 F. Supp.
3d 364, 374 (W.D.N.Y. 2023) (collecting cases).

its favor on the same ground (Dkt. 207-2 at 9).  The University Defendants oppose Dr. Popat's motion for summary judgment, arguing they neither directly nor jointly employed him (Dkt. 220 at 5-9) and move for summary judgment on the ground that Dr. Popat is not their employee under any theory of employment (Dkt. 211-19 at 7-12).  For the reasons given below, Dr. Popat's motion for summary judgment is denied, Kaleida's motion for summary judgment is granted, UBNS's motion for summary judgment is granted in part and denied in part, and the University Defendant's motion for summary judgment is granted in part and denied in part.

### A.    Direct employment by the University Defendants

"Title VII itself defines an employee as 'an individual employed by an employer.'  In applying this somewhat 'circular' definition, we use a two-part test."  *United States v. City of N.Y.*, 359 F.3d 83, 91 (2d Cir. 2004) (quoting 42 U.S.C. § 2000e(f)).  First, courts determine whether a plaintiff was "hired by the putative employer" by establishing that the plaintiff "received remuneration in some form for her work."  *Id*. at 91-92.  "This remuneration need not be a salary, but must consist of 'substantial benefits not merely incidental to the activity performed.'"  *Id*. at 92 (citing *York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 126 (2d Cir. 2002) (internal citation omitted)).

If remuneration is established, courts turn to a factor test, drawn from the common law of agency, set forth by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ("*Reid*") "to determine whether an employment relationship exists."  *Id.*  No one *Reid* factor is dispositive and other factors may be considered, but the greatest weight is given to "the hiring party's right to control the manner and means by

which the product is accomplished." *Reid*, 490 U.S. at 751; *Eisenberg*, 237 F.3d 111 at 114 n.1, 117.  The other *Reid* factors are:

> The skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52 (footnotes omitted).

It is undisputed that Dr. Popat received stipends for teaching in the University's Department of Otolaryngology.  (Dkt. 206-2 at ¶ 5; Dkt. 211-1 at ¶ 43; Dkt. 207-10 at 49). The stipends suffice to satisfy the requirement for remuneration, no matter what other benefits the University may or may not provide to Dr. Popat.  *See Summa v. Hofstra Univ.*, 2011 WL 1343058, at * 11 (E.D.N.Y. April 7, 2011) (holding that a stipend is remuneration), *aff'd in part, vacated on other grounds in part*, 708 F.3d 115 (2d Cir. 2013).

As to the second step of the analysis, there are genuine issues of material fact that preclude granting summary judgment to either party.  In particular, the parties dispute how much control the University exercised over the "manner and means" by which Dr. Popat performed his tasks.  *See Eisenberg*, 237 F.3d 111 at 117 (holding that courts "should [] place special weight on the extent to which the hiring party controls the 'manner and means' by which the worker completes her assigned tasks").  While the University Defendants argue they exercised no control over how Dr. Popat performed his teaching duties and that Dr. Levy did not exercise control over Dr. Popat's participation in the

surgery in question (*see* Dkt. 220 at 7), the Second Circuit cautions that courts should avoid assigning a physician's independence to exercise his medical judgment too much weight. *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 228-29 (2d Cir. 2008).   Otherwise, the Circuit observed, the "manner and means" factor "would carve out all physicians, as a category, from the protections of the antidiscrimination statutes."  *Id.*  "While a physician, like any professional, must be given latitude in which to choose a course of action, especially considering the exigencies of medical practice, the mere existence *vel non* of that latitude is not dispositive of the manner-and-means test."  *Id.* at 229.   At bottom, "[t]here is nothing intrinsic to the exercise of discretion and professional judgment that prevents a person from being an employee, although it may complicate the analysis."  *Id.* "The issue is the balance between the employee's judgment and the employer's control." *Id.*  Even assuming Dr. Popat exercised complete control over how to treat his patients, that fact alone cannot dictate the outcome of the "manner and means"  analysis.

With regards to his teaching duties as a volunteer faculty member, Dr. Popat and the University Defendants disagree as to whether the University exercises "oversight of volunteer faculty members when the faculty members are supervising and training residents and medical students."  (Dkt. 206-2 at ¶ 15; Dkt. 220-1 at ¶ 3).  The University Defendants contend Dr. Popat undertook his teaching without direction from the University Defendants.  (Dkt. 211-19 at 8; Dkt. 220 at 7).  Nolan-Weiss testified:

Q:     . . . what benefit does SUNY receive from these people being
       appointed as SUNY faculty?

A:     Well, the volunteer appointments assist us in terms of the
       supervision and teaching of our residents and students.

Q:     Okay.  So, therefore does SUNY dictate how to supervise and teach
       the students?

A:     I'm not sure in terms of the word dictate.  You know, certainly we
       would expect somebody in supervising and teaching students and
       residents that they would impart their knowledge, that they would
       communicate respectfully and appropriately, that they would do a
       competent job of teaching the students and residents.

(Dkt. 207-4 at 26).  Dr. Popat testified that he did receive direction and feedback:

A:     Not a specific didactic instruction, it's an instruction over time and
       through evaluation and feedback from the residents, from other
       attendings, you know, through Dr. Sherris and program directors of
       the Residency Education Program.

Q:     And when you say "feedback," that's feedback to you as to how
       you're doing your job?

A:     Yes, and any questions and concerns that are raised or plans or
       projections for improving education in general. For example, every
       year there is an evaluation that the ACGME, which is the American
       College of Graduate Medical Education, conducts of all the residents,
       and they list the residents' concerns, the goods and bads of the
       residency, and that goes back to our program director and chairman
       and that is communicated to us on how we should improve our
       educational process.

(Dkt. 211-3 at 184:23-185:14).  Volunteer professors are required to follow the University's

policies, practices, and guidelines when supervising and training students.  (Dkt. 206-2 at

¶ 17).  The assignment of volunteer faculty members to their respective duties is made by

the University.  (Dkt. 206-2 at ¶ 19).  On this record, a reasonable juror could conclude that

the University exercised control over the "manner and means" by which Dr. Popat

undertook his teaching duties and treated his patients.

The remaining *Reid* factors do not tip in favor of either party sufficiently to resolve the issue. Several factors favor finding Dr. Popat an employee. The University controlled the duration of its relationship with Dr. Popat, as he needed to be reappointed to his volunteer faculty position approximately every one to three years. (*See* Dkt. 206-2 at ¶ 24; Dkt. 219-2 at ¶ 24; Dkt. 207-14). Dr. Popat did not hire or pay the residents who assisted him with tasks such a documenting information in patient's charts. (*See* Dkt. 205-9 at 13 § 4.5 (providing that residents are employed by the University); Dkt. 211-1 at ¶ 21; Dkt. 211-7 at 53:15-18 ("residents do some of the legwork" for volunteer faculty, including "documentation in the charts and things like that, opening and closing for surgeries.")). Other factors favor finding Dr. Popat was not employed by the University. Dr. Popat's job is a skilled one, weighting toward finding him an independent contractor, and Dr. Popat testified that the University did not provide him with the instruments necessary to perform his work. (Dkt. 211-3 at 187:23-188:6). On this record, and drawing all inferences in Dr. Popat's factor, a reasonable juror could conclude that he was directly employed by the University. Also on this record, and drawing all inferences in the University's favor, a reasonable juror could conclude that the University did not directly employ Dr. Popat.

## B.   **Joint employment**

"[I]n alleging an employer-employee relationship, an employee is not squarely limited to claims against his or her *formal* employer." *Felder*, 27 F.4th at 838. "Pursuant to the 'joint employer doctrine,' an employee may assert Title VII liability against a 'constructive employer'—an entity that shares in controlling the terms and conditions of a plaintiff's employment." *Id*. (quoting *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d

193, 198 (2d Cir. 2005). "A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly." *Arculeo*, 425 F.3d at 198 (quoting *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985)). When "an employee, formally employed by one entity, . . . has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity," this "may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer." *Id.*; *see also Felder*, 27 F.4th at 843 (holding that a joint employment relationship exists "when two or more entities, according to common law principles, share significant control of the same employee").

"This means that an entity other than the employee's formal employer has power to pay an employee's salary, hire, fire, or otherwise control the employee's daily employment activities, such that we may properly conclude that a constructive employer-employee relationship exists." *Felder*, 27 F.4th at 844. "Because the exercise of control is the guiding indicator, factors indicating a joint-employment relationship may vary depending on the case, and any 'relevant factor[ ] may . . . be considered so long as [it is] drawn from the common law of agency that *Reid* seeks to synthesize.'" *Id.* (quoting *Eisenberg*, 237 F.3d at 114 n.1).

### 1.    Joint employment by UBNS and Kaleida

Dr. Popat relies on *Pappas v. XP Controle Participações S.A.* for the proposition that sharing a senior manager, such as Dr. Levy, creates a joint employment relationship between UBNS and Kaleida. No. 1:19-cv-11137-GHW, 2023 WL 317353, at *4 (S.D.N.Y.

Jan. 18, 2023) (Dkt. 206-4 at 21-22).  There, plaintiff was a securities broker hired by a U.S. subsidiary of a Brazil-based holding company.  *Pappas*, 2023 WL 317353, at *1. Plaintiff alleged that senior management of the Brazil-based holding company visited plaintiff's workplace at the U.S. subsidiary, and while there, evaluated plaintiff.  *Id.* Plaintiff alleged that one of the Brazilian managers had "extensive discussions about his impressions of" plaintiff with managers at the U.S. subsidiary, and that he was terminated as a direct result of that evaluation.  *Id*.  The district court concluded that these allegations were sufficient to "suggest that [the Brazil-based holding company] had the power to control the terms and conditions of employment for" the plaintiff.  *Id*. at *5.  "[A]s both *Felder* and the general common law of agency that it drew upon recognize, the ability to significantly control an employee's employment—even if that control is not constantly exercised—can create an employment relationship."  *Id.* (citing *Felder*, 27 F.4th at 844 and citations omitted).  The court also noted that the litigation was at the pleading stage, such that plaintiff did not need to "touch on all elements of an employment relationship in order to survive a motion to dismiss."  *Id.*

Unlike the plaintiff in *Pappas*, Dr. Popat is well past the pleading stage, and *Pappas* simply does not stretch as far as he would like.  What a plaintiff must show to survive a motion to dismiss is less than what a plaintiff must demonstrate to survive (or prevail on) a motion for summary judgment.  The record does not support finding Dr. Levy, in his role as a medical director at a Kaleida facility, held any substantive decision-making authority regarding Dr. Popat's relationship with Kaleida.  (Dkt. 205-28 at ¶ 38; Dkt. 218-2 at ¶ 9).

Dr. Levy was appointed to the medical director position at a Kaleida facility by UBNS pursuant to the terms of the independent contractor agreement between UBNS and Kaleida.  (Dkt. 218-2 at ¶ 9; Dkt. 205-10 at 2 § 1(a), 17, 38).  Dr. Levy's position did not allow him to exercise authority to make any employment decisions on Kaleida's behalf, or to grant or revoke privileges. (Dkt. 218-1 at ¶ 12; Dkt. 211-5 at 38:11-16; 39:4-9; *id*. at 39:14-18).[5]  Dr. Popat's privileges at Kaleida were tied to the Otolaryngology Department, and those privileges were not affected by the termination of his volunteer faculty appointment in the Neurosurgery Department.  (Dkt. 211-3 at 254:10-255:4; 274:4-9).  Nor does Dr. Popat point to any record evidence that Dr. Levy communicated with anyone at Kaleida about Dr. Popat.  On these facts, no reasonable juror could conclude that Dr. Levy's role at the Kaleida facility allowed him to exercise sufficient control to establish a joint employment relationship between UBNS and Kaleida, and Dr. Popat has failed to raise a question of material fact on the issue.  As discussed below, Dr. Levy's roles at UBNS and the University lead to a different conclusion.

### 2.    Joint employment by the University and Kaleida

Dr. Popat next argues that Kaleida is a joint employer with the University Defendants because Kaleida exercised control over hiring, supervising, investigating, and

---

[5]    Dr. Levy testified he "would have some input into granting privileges for physicians to perform stroke services," and with regards to revoking privileges, he "would have input if I thought there was a doctor who was dangerous or a clinician who didn't perform their duties consistent with expectations of Kaleida," because he was able to share his concerns with Kaleida's chief medical officer.  (Dkt. 211-5 at 36:21-37:13).

terminating him.  (Dkt. 206-4 at 22-24).  Kaleida argues the record does not support finding it a joint employer.  (Dkt. 218 at 11-16).

Kaleida did not pay Dr. Popat, did not provide him with any employment benefits, and did not cover his malpractice insurance, licensing fees professional dues, continuing medical education costs, insurances, or taxes.  (Dkt. 205-28 at ¶ 22; Dkt. 211-3 at 274:10-276:17).   The Affiliation Agreement expressly provides Kaleida, the University, and ECMC each retain control over their own management, assets, and affairs, as well as the authority and responsibility to appoint and retain members of their respective medical and administrative staffs at Kaleida and ECMC and their faculty members and administrative staff at the University.[6]  (Dkt. 205-9 at 7 § 2.5, 26-28 §§ 7-8; Dkt. 205-28 at ¶ 29).  Kaleida does not "direct members of the Medical Staff with respect to how they treat and care for patients."  (Dkt. 205-8 at ¶ 13).  Nor does Kaleida "assign patients to Popat, require him to see specific patients, or dictate which procedures he does or does not perform (assuming procedures are within his approved privileges)".  (*Id.* at ¶ 21). Rather, "physicians maintain discretion and control over how they will treat patients and what types of procedures they decide to perform, as well as the types of medications to be prescribed, tests to be ordered, etc." (*Id.* at ¶ 14).   Dr. Popat testified that he chose where his patients were admitted and where his surgeries were performed with "no stipulation from Kaleida."  (Dkt. 211-3 at 276:18-277:10).

---

[6]     The Affiliation Agreement does provide that Kaleida and the University share some input into hiring for their respective leadership positions, but does not require the parties to agree on a hiring choice and expressly retains to each the authority to appoint its own leadership.  (*See* Dkt. 205-9 at 7 § 2.5; 27-28 § 8, 29-30 §§ 9.4.2, 9.4.3).

Nor does the record support Dr. Popat's contention that Kaleida played a role in the decision to offer Dr. Popat a volunteer faculty appointment with the Neurosurgery Department.  (Dkt. 206-4 at 22-23).  Rather, the record—including Dr. Popat's own testimony—establishes that the University's faculty appointments were a "separate process" from his privileges at Kaleida.  (Dkt. 211-3 at 274:4-9; *see also* Dkt. 205-9 at 7 § 2.5 ("This Agreement shall not dimmish the ability of [the parties] to control the management, assets, and affairs of their respective organizations, including, without limitation, the authority and responsibility . . . of the UNIVERSITY to appoint and retain its Faculty Members . . ."), 26 §§ 7.1 ("The parties acknowledge and agree that the UNIVERSITY is solely responsible for determining a Faculty Member's type of appointment and rank, . . ."), 7.3 ("The UNIVERSITY is solely responsible for determining the requirements for and conferral of an appointment as a Volunteer Faculty Member.")).

Dr. Popat argues that Kaleida supervised him through its residency program director, a position he characterizes as a "Kaleida Director."  (Dkt. 206-4 at 23-24).  Again, the record does not support his contention.  The Affiliation Agreement provides: (1) residency programs are sponsored by the *University*; and (2) residency program directors are appointed by a *University department chair* to "provide overall supervision of the training and education of *Residents* in a particular Residency Program, . . ."  (Dkt. 205-9 at 5) (emphasis added).  Finally, Dr. Popat also argues that Kaleida's investigation into his complaint contributed to the decision to end Dr. Popat's neurosurgery appointment at the University.  Regardless of Dr. Popat's complaints regarding the quality of Kaleida's investigation (Dkt. 206-4 at 24), nothing in the record indicates that Kaleida's investigation

played any role in the decision to end Dr. Popat's volunteer faculty appointment. Indeed, the investigation took place after Dr. Levy sent Dr. Popat the termination letter. (*Compare* Dkt. 205-8 (Kaleida investigation reports dated September 11 and 16, 2014) *with* Dkt. 211-3 at 111:12-25 (Dr. Popat testified he received Dr. Levy's letter of termination on July 25, 2014)). A reasonable juror could not conclude on this record that Kaleida and the University jointly employed Dr. Popat, and Dr. Popat has failed to identify a genuine question of material fact on the issue.

### 3.    Joint employment by UBNS and the University

There are questions of material fact that preclude summary judgment to any party on this theory. First—and most critically—Dr. Levy purportedly ended Dr. Popat's appointment to the *University's* Neurosurgery Department in part based on how Dr. Popat handled a *UBNS* surgery. (Dkt. 211-1 at ¶¶ 65-67). That alone raises an inference that both the University and UBNS exercised control over Dr. Popat's role at the University. Additionally, UBNS physicians employed by the University were instrumental in having Dr. Popat appointed to the volunteer faculty position within the Neurosurgery Department. Dr. Siddiqui and Dr. Leonardo championed his appointment, and Dr. Levy made the final recommendation and forwarded it to Dean Cain. (Dkt. 206-2 at ¶ 37; Dkt. 219-2 at ¶ 37; Dkt. 207-13; Dkt. 211-9). There is also a genuine dispute of material fact as to whether UBNS physicians are the principal decision makers when a non-UBNS surgeon participates in a UBNS surgery, as Dr. Popat did here. (Dkt. 206-2 at ¶¶ 39, 65-66; Dkt. 219-2 at ¶ 39, 65-66). Dr. Popat testified that when he was performing surgery: "I'm an employee of Delaware Medical Group, I'm an employee of ECMC, depending where the

surgery is done.  I'm also attending surgeon and faculty member, medical staff member at various hospitals, I'm doing it under many hats."  (Dkt. 211-3 at 234:12-16).  A reasonable juror could, based on this record, conclude that UBNS and the University Defendants acted as Dr. Popat's joint employers, but the record would also allow a reasonable juror to draw the opposite conclusion, foreclosing summary judgment.

### C.   **Other Theories of Kaleida Employment**

### 1.   **Kaleida as Employer under Direct Employment Theory**

Dr. Popat declined to answer "yes" when asked if he was employed by Kaleida during his deposition:

> Q:   Dr. Popat, you weren't actually employed by Kaleida Health, were you?
>
> A:    I was working for Kaleida Health in my clinical services.
>
> Q:   But you didn't consider yourself to be an employee of Kaleida, right?
>
> A:   Well, we're all part of the workforce as Kaleida calls us whether -- you know, whether we're a nurse or physician, we're considered part of the Kaleida workforce, I think that's the term they use.

(*Id.* at 252:17-25).

Assuming *arguendo* Dr. Popat can rely on Kaleida's provision of a workspace, parking, and other facilities-based benefits to satisfy the requirement of remuneration[7], the *Reid* factors weigh strongly in favor of finding Kaleida is not Dr. Popat's direct employer. Kaleida does not, and has never, paid Dr. Popat any compensation, and the record does not

---

[7]   Dr. Popat and Kaleida dispute the services and equipment that Kaleida provides faculty members when working at Kaleida facilities, including parking and access to conference rooms and office space.  (Dkt. 206-2 at ¶¶ 50-52; Dkt. 218-1 at ¶¶ 50-52).

establish that Kaleida offered him any employment benefits such as health, disability, or life insurance, any type of retirement contributions, vacation, or other paid time off.  (Dkt. 205-28 at ¶ 22; Dkt. 211-3 at 274:10-276:17).  Kaleida paid none of Dr. Popat's licensing fees, professional dues, continuing medical education, medical malpractice insurance fees, or taxes.  (*Id.*).  Kaleida did not forward money to other putative employers to cover any of these costs for Dr. Popat.  (Dkt. 205-29 at ¶ 22).

Dr. Popat exercised full discretion over where to have his patients admitted and treated.  (Dkt. 211-3 at 277:3-11).  He was free to refer his patients to the physicians he thought best without any input from Kaleida.  (*Id.* at 278:20-279:13).  Dr. Popat maintained privileges at other hospitals in Western New York.  (*Id.* at 276:18-277:2).

Dr. Popat relies on *Salamon* for the proposition that Kaleida exercised control over his work.  (Dkt. 217 at 15).  In *Salamon*, a physician sued a hospital for Title VII violations, among other claims, and the district court granted summary judgment to the defendants on the ground that she was not an employee.  514 F.3d at 220-21, 228.  The district court concluded the physician was an independent contractor in large part because she "had ultimate control over the GI diagnoses, services and treatment plans that she provided to her patients . . . retained her own patients and only on occasion was obligated to treat [the hospital's] patients."  *Id*. at 228 (citation omitted).  The Second Circuit reversed.  It noted that Salamon asserted that the hospital "exercised substantial control not only over the treatment outcomes of her practice, but over the details and methods of her work.  Members of the [hospital] administration were designated as her supervisors, with the job of 'maintain[ing] continuing surveillance of [her] professional performance.'"  *Id.* at 229.

Additionally, the hospital allegedly "did not merely review the quality of her patient treatment outcomes but went further, by mandating performance of certain procedures (esophageal dilatation) and the timing of others (outpatient endoscopies), directing which medications she should prescribe, and recommending changes to her practice based on their financial impact to the department." *Id.* "The review was continuous, not merely for negative medical outcomes, but for 'variations' from the recommended procedures." *Id.* at 231. The Circuit concluded, "a reasonable fact-finder could conclude from the present record that the quality assurance standards extended beyond mere health and safety concerns or ensuring Salamon's qualifications." *Id.* at 232.

As discussed above, the record here does not support a similar conclusion. Dr. Popat's citations to the record do not support his contention that Kaleida exercised discretion over "when and how long Dr. Popat worked," or that it "scheduled physicians' specific work hours." (Dkt. 217 at 12-13). Indeed, Dr. Popat cited to the independent contractor agreement between Kaleida and UBNS, which states that "UBNS will be responsible for scheduling the physicians' specific work hours." (*Id.*; Dkt. 217-4 at 374 § 5(a)). To the extent that Kaleida decided the hours of operation for clinical and administrative services at its hospitals, this is not on par with dictating the hours Dr. Popat worked. (*See id.*). Dr. Popat points to nothing in the record that indicates Kaleida scheduled his time, and he testified that he decided where to admit and treat his patients and which other medical professionals would be involved in his patients' care, without being subject to Kaleida's approval. (*See* Dkt. 211-3 at 16:3-12, 277:3-10, 278:25-279:13).

Possessing admitting privileges at Kaleida's medical facilities and requiring those with privileges to abide by hospital policies is, as a matter of law, not sufficient to establish that Kaleida supervised or controlled Dr. Popat's work. *See, e.g.*, *Desai v. Univ. of Mass. Mem'l Med. Ctr.*, 605 F. Supp. 3d 255, 269 (D. Mass. 2022) (appointment to medical staff and granting of privileges insufficient to establish employment); *Brintley v. Saint Mary Mercy Hosp.*, 904 F. Supp. 2d 699, 716-20 (E.D. Mich. 2012) (requiring physician to follow hospital bylaws and rules did not rise to the level of the hospital controlling physician's work and could not establish hospital employed the physician, and collecting cases).

Drawing the inferences in Dr. Popat's favor, the facts simply do not allow an inference that Kaleida exercised the requisite control over Dr. Popat for it be considered his employer. *See, e.g., Henry v. Adventist Health Castle Med. Ctr.*, 970 F.3d 1126, 1131 (9th Cir. 2020) (physician's freedom to operate private practice was "inconsistent with employee status"); *Levitin v. Nw. Cmty. Hosp.*, 923 F.3d 499, 501-02 (7th Cir. 2019) (physician who set her own hours and practiced at other hospitals were factors supporting finding that she was not an employee); *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 261 (4th Cir. 1997) (emergency room physician was not hospital's employee for a number of reasons, including that the physician was free to do other work for other health care facilities).

## 2. Kaleida as Employer under Single Integrated Employer Doctrine

"[T]he 'single employer' doctrine applies when 'two nominally separate entities are actually part of a single integrated enterprise.'" *Lima v. Addeco*, 634 F. Supp. 2d 394, 399-400 (S.D.N.Y. 2009) (quoting *Arculeo*, 425 F.3d at 198). "Single integrated enterprises

can include parent and wholly-owned subsidiary corporations or separate corporations that operate under common ownership and management." *Id.* at 400 (citations omitted). "[W]here two entities are deemed part of a single integrated enterprise, then both entities are 'subject to joint liability for employment-related acts.'" *Id.* (quoting *Laurin v. Pokoik*, No. 02 Civ.1938 (LMM), 2004 WL 513999, at *4 (S.D.N.Y. March 15, 2004)). "Four factors are considered: '(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial support.'" *Id.* (quoting *Laurin*, 2004 WL 513999, at *4).

While Kaleida, the University, and UBNS share business relationships, the record does not support a finding that the three shared a centralized control of labor relations, common management, or common ownership. To the contrary, the Affiliation Agreement between the University and Kaleida makes clear that each entity retains final control over all labor relations and employment decisions and that they do not share finances. (Dkt. 205-1 at ¶¶ 43-47; *see* Dkt. 205-9 at 7 § 2.5, 26 § 7.1). Furthermore, the terms of the independent contractor agreement between Kaleida and UBNS are narrowly drawn, limited to UBNS' provision of physicians qualified in neurological surgery and related personnel "to provide clinical and administrative services to Kaleida Health and its patients," and the language in the agreement does not give rise to a plausible inference of shared labor relations, common management, or common ownership between the two entities. (Dkt. 205-10 at 1). The fact that Kaleida and the University share a relationship, standing alone, does not raise a question of material fact as to whether Kaleida was Dr. Popat's employer under the single integrated employer doctrine. *See, e.g., Shiflett v. Scores Holding Co.*, 601

F. App'x 28, 31 (2d Cir. 2015) (plaintiff failed to raise question of material fact on question of single integrated employer doctrine applied where "none of the evidence in this case is akin to 'handling job applications, approving personnel status reports, [or] exercising veto power over major employment decisions,' activities which we have held to constitute evidence of centralized control of labor relations.") (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000)); *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 285-86 (E.D.N.Y. 2013) (evidence of cooperation and interaction, without any indication that defendant "exercised 'control of labor relations'" , insufficient to raise a fact issue for the jury concerning employer status).

### 3.    Kaleida as Employer under Interference Liability Theory

Finally, Kaleida argues that it cannot be considered a joint employer under an interference liability theory.  The interference liability theory was first developed by the D.C. Circuit in *Sibley Mem'l Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973).  *See Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 373 (2d Cir. 2006).  Under this theory, liability under Title VII may extend "not only [to] employers in the traditional sense, but also [to] those who interfere with an individual's access to employment opportunities." *Id.* at 374.

As noted previously by this Court, "[t]he interference liability theory, although not necessarily foreclosed, is fairly circumscribed in this Circuit."  (Dkt. 42 at 16 n.3); *see also Yacklon v. E. Irondequoit Cent. Sch. Dist.*, 733 F. Supp. 2d 385, 389 (W.D.N.Y. 2010) (noting that the Second Circuit has "sharply limited the scope of that rule," and collecting cases).  In *Spirt v. Teachers Insurance & Annuity Ass'n*, the Second Circuit found "it is

generally recognized that 'the term "employer," as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an "employer" of an aggrieved individual as that term has generally been defined at common law.'"  691 F.2d 1054, 1063 (2d Cir. 1982) (quoting *Vanguard Just. Soc'y, Inc. v. Hughes*, 471 F. Supp. 670, 696 (D. Md.1979)), *vacated on other grounds sub nom. Long Island Univ. v. Spirt*, 463 U.S. 1223 (1983).

But after *Spirt*, the Second Circuit "never adopted a broad reading of the *Sibley* interference test." *Gulino*, 460 F.3d at 374.  *Spirt* "enunciated a narrow rule based upon a unique factual posture," that "where an employer has delegated one of its core duties to a third party—in that case, Long Island University delegated responsibility for the administration of a retirement plan to TIAA—that third party can incur liability under Title VII." *Id*. at 377; *see also Jansson v. Stamford Health, Inc*., No. 3:16-cv-260 (CSH), 2017 WL 1289824, at *23 (D. Conn. Apr. 5, 2017) ("the Second Circuit has recognized a carefully limited 'interference' theory under Title VII: 'where an employer has delegated one of its core duties to a third party' (*e.g.*, administration of a retirement plan)" (*quoting Gulino*, 460 F.3d at 377)); *Harris v. NYU Langone Med. Ctr.*, No. 12 Civ. 0454(RA)(JLC), 2013 WL 3487032, at *13 (S.D.N.Y. July 9, 2013) (finding interference liability theory inapplicable when plaintiff did not allege interference with her employment opportunities, nor allege a delegation of core employer responsibilities), *adopted in relevant part*, 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013).

Dr. Popat argues that the University Defendants delegated to Kaleida its core responsibilities to provide medical care to patients and to "schedul[e] medical procedures and oversee[] physician credentials and hospital privileges to Kaleida[,]" and that Delaware Medical Group delegated inpatient care to Kaleida.  (Dkt. 217 at 18-20).  Even assuming *arguendo* both are true, this does not suffice to find employment under the interference theory, which looks to whether a core e*mployment* responsibility was delegated.  Dr. Popat identifies no such plausible delegation here, such that a reasonable juror could conclude that Kaleida employed Dr. Popat under an interference theory.

### D.      Conclusion on Issues of Dr. Popat's Employment Status

For the reasons set out above, the Court grants Kaleida's motion for summary judgment on the ground that it cannot be considered Dr. Popat's employer under any theory he set out in his Complaint.  (Dkt. 205).  Because it is not Dr. Popat's employer, the Court also grants Kaleida's summary judgment motion asking the Court to dismiss Dr. Popat's discrimination and retaliation claims arising out of Title VII, § 1981, and the NYSHRL. (*Id.*).  For the same reasons, the Court denies Dr. Popat's motion for summary judgment asking the Court to find Kaleida employed Dr. Popat and seeking summary judgment on his discrimination and retaliation claims arising out of Title VII, § 1981, and the NYSHRL. (Dkt. 206).

The Court denies Dr. Popat's motion asking the Court to find the University Defendants and UBNS employed Dr. Popat directly or jointly, because as set out above there are genuine questions of material fact to be resolved by a jury.  (Dkt. 206).  And the

Court similarly denies the University Defendants' motion asking the Court to find as a matter of law that they did not employ Dr. Popat.  (Dkt. 211).

## III.  __Disparate Treatment__

Dr. Popat moves for summary judgment on his Title VII discrimination claim, which incorporates a hostile work environment theory.  (Dkt. 206-4 at 26-30).  UBNS and Dr. Levy, as well as the University Defendants, oppose the motion.  (Dkt. 219 at 6-16; Dkt. 220 at 9-11).  Each also moves for summary judgment dismissing Dr. Popat's Title VII claim.  (Dkt. 207-2 at 9-25; Dkt. 211-19 at 13-22).

Title VII, § 1981, and NYSHRL discrimination claims are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  To establish a claim of racial discrimination, a plaintiff must show:  "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Id.* (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).  Plaintiff's prima facie showing need only be "*de minimis*."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).

"Once the plaintiff has established a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its adverse action."  *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015)).  "Upon that showing, the burden then

shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Id.*

The parties agree that (1) Dr. Popat is a member of a protected class, and (2) he is qualified for his position. (Dkt. 206-4 at 28; Dkt. 207-2 at 9; Dkt. 211-19 at 16). Turning to the third prong, Dr. Popat argues that he suffered an adverse employment action because he was forced to work in a hostile work environment. (Dkt. 206-4 at 28-30; *see also* Dkt. 215 at 19-22; Dkt. 216 at 16-21). However, disparate treatment claims and hostile work environment claims are two separate legal theories of liability under Title VII, and the Court treats them as such here.

With regard to Dr. Popat's disparate treatment claim, an adverse employment action is one where plaintiff "endures a materially adverse change in the terms and conditions of employment." *Vega*, 801 F.3d at 85 (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000), *abrogated on other grounds by Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)). "An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (quoting *Galabya*, 202 F.3d at 640). "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Id.*

The parties dispute whether (1) Dr. Popat's termination qualifies as an adverse employment action, especially given that he retained his role as a clinical assistant professor at the University's Department of Otolaryngology, and (2) whether he suffered

adverse consequences as a result of the termination.  (Dkt. 207-2 at 9-14 ("Dr. Popat received no compensation or cognizable benefit from UBNS based on his volunteer, temporary appointment . . . and he has not had any interruption with his employment prospects, expert work or other standing in the medical community as a result."); Dkt. 211-19 at 17-18 (noting that since Dr. Popat retained his voluntary appointment to the University's Department of Otolaryngology, "any benefit directly from the University Defendants, such as a University e-mail address, access to the University's library and the title of 'clinical assistant professor,' were retained"); Dkt. 215 at 24-28 ("After Dr. Levy terminated Dr. Popat's faculty appointment with SUNY Defendants, Dr. Levy, Dr. Siddiqui, and Dr. Leonardo stopped referring patients to Dr. Popat."); Dkt. 216 at 19-23 ("Dr. Popat's termination also diminished his responsibilities. . . . [he] could no longer train neurology residents, because only faculty members of SUNY Defendants' Neurology Department were allowed to formally train neurology residents.")).

Assuming *arguendo* that Dr. Popat can establish an adverse employment action, he still cannot establish a prima facie case of discrimination because he fails to identify sufficient evidence in the record to raise a question of material fact that his race or national origin were the motivating factors for the termination of his voluntary faculty appointment in the Neurosurgery Department.  "The fourth factor of the burden-shifting analysis 'is a flexible one that can be satisfied differently in differing factual scenarios.'" *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  For example:

> Circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position, or the employer's criticism of the plaintiff's performance in ethnically [or sexually] degrading terms, or its invidious comments about others in the employee's protected group, or the timing of the discharge.

*Krul v. DeJoy*, ___ F. Supp. 3d ___, 2023 WL 8449589, No. 6:20-CV-198, at *29 (N.D.N.Y. Dec. 6, 2023) (quoting *Chambers v. TRM Copy Ctrs. Corp*., 43 F.3d 29, 37 (2d Cir. 1994)), *appeal filed* Feb. 7, 2024.  None of these circumstances exist here.

Dr. Popat argues that temporal proximity establishes the necessary discriminatory animus.  (Dkt. 216 at 23).  "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d. Cir. 2010) (citing *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).  Here, Dr. Popat argues that "the termination letter was drafted within a few days of Dr. Popat's reaction to and complaint about the discrimination.  Dr. Levy admitted his final determination to terminate was due to Dr. Popat's complaint, and the termination was finalized within a few weeks of Dr. Popat refusing to withdraw the discrimination complaint."  (Dkt. 216 at 23).  But the record does not support this framing of events.

The letter of termination was dated July 23, 2014 (Dkt. 205-11), and the University began processing Dr. Popat's change in status at 9:28 a.m. on that same day (Dkt. 205-12 at 3).  Dr. Popat's own notes reflect that he discussed the comments made in surgery on the evening of July 23, 2014 with Dr. Leonardo, after Dr. Siddiqui called Dr. Popat earlier that

evening to tell him that Dr. Levy was revoking Dr. Popat's faculty appointment to the Neurosurgery Department.  (*See* Dkt. 207-9 at 6-7).  Dr. Popat received the termination letter on July 25, 2014.  (Dkt. 206-2 at ¶ 74; Dkt. 218-1 at ¶ 74; Dkt. 219-2 at ¶ 74).  Dr. Popat's letters to the dean of the Medical School and the CEO of Kaleida seeking formal investigations were dated July 31, 2014.  (Dkt. 206-3 at 518-23).  To the extent Dr. Popat is relying on the possibility of being reinstated to the volunteer faculty appointment to establish temporal proximity, that argument goes to his retaliation claim, not to his discrimination claim.  When arguing Dr. Levy terminated or refused to reinstate because Dr. Popat submitted and refused to withdraw his complaint, Dr. Popat is pointing to an action allegedly motivated by his engagement in a protected activity.  That is not the same as being discriminated against for belonging to a protected class.

Given that plaintiff's burden in making out a prima facie case is minimal, the Court completes the remainder of the burden-shifting analysis out of an abundance of caution.  If Dr. Popat had made out his prima facie case, the burden would shift to Defendants to offer a "legitimate, nondiscriminatory reason" for its adverse employment action.  *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 (2d Cir. 2023) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Here, Dr. Levy, UBNS, and the University Defendants offered legitimate, nondiscriminatory reasons for Dr. Popat's dismissal: (1) Dr. Popat's reported attempt to schedule the surgery with the patient's parents at a time Dr. Levy was traveling out of the country and referral of the family to Dr. Siddiqui;[8] (2) Dr. Levy's

---

[8]     Dr. Popat acknowledged that he "was clearly in the wrong in terms of professional etiquette" with some of his actions with the patient's family before the surgery, including

perception that Dr. Popat did not wait for Dr. Levy to arrive in the operating room before proceeding with removing almost all of the tumor; (3) Dr. Levy's belief that Dr. Popat compromised the patient's safety by failing to use a microscope during the surgery and by placing the tumor back into the wound bed; and (4) Dr. Levy was reminded, after the surgery, of an issue with Dr. Popat's billing raised by a staff biller at UBNS. (Dkt. 207-2 at 19-21; Dkt. 211-19 at 18-20).

"[T]he burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Bart*, 96 F.4th at 570. "[A] plaintiff may, but need not, show at the third stage of the *McDonnell Douglas* burden-shifting test that the employer's stated justification for its adverse action was nothing but a pretext for discrimination," or "a plaintiff may alternatively satisfy this burden by adducing evidence that, even if the employer had mixed motives, the plaintiff's membership in a protected class was at least one motivating factor in the employer's adverse action." *Id.* at 578. "At the final stage, the plaintiff then has 'the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision'—a burden that 'merges with the ultimate burden of persuading the court that []he has been the victim of intentional discrimination.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

A plaintiff may show pretext "by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prod, Inc*., 530 U.S. 133, 147

---

by not contacting Dr. Levy after he met with the patient, and Dr. Popat apologized to Dr. Levy "at least three times." (Dkt. 211-10 at 3; Dkt. 211-1 at ¶ 55).

(2000) (quoting *Burdine*, 450 U.S. at 256).   Such a showing may be made "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate [] reasons for its action."   *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).   "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."   *Id*.   Here, Dr. Popat urges the Court to find that "UBNS's [and Dr. Levy's] proffered reason for terminating Dr. Popat is inconsistent and contradicted by testimony."   (Dkt. 216 at 25).   Specifically, he finds it inconsistent that UBNS and Levy maintain that: (1) "Dr. Popat was fired for not following the operative plan, while simultaneously asserting that Dr. Popat's surgeries were never directed or supervised by" UBNS or Dr. Levy; (2) Dr. Siddiqui accepted the blame for the failure to follow the operative plan, and "it is illogical to blame Dr. Popat for an action that Dr. Siddiqui admitted was his own fault"; (3) that Dr. Popat was fired for taking the tumor out and putting it back in the wound bed, which Dr. Siddiqui testified did not occur; (4) that Dr. Popat was terminated because of his behavior in the operating room, which Dr. Popat argues is false because defendants claimed to have no issues with his operating skills; and (5) that Dr. Levy's reliance on Dr. Leonardo's "coding concerns" was a pretext, because Dr. Leonardo stated she had no billing concerns regarding Dr. Popat. (*Id.* at 25-26).

The Court is unpersuaded that these are inconsistencies.   Dr. Popat can be faulted for failing to follow the surgical plan when participating in *Dr. Levy's surgery* without UBNS or Dr. Levy supervising *Dr. Popat's surgeries*, and the fact that Dr. Siddiqui accepted blame for failing to follow the operative plan does not absolve Dr. Popat of all

responsibility in the matter.  Dr. Levy can be unhappy with Dr. Popat's actions in the operating room while not taking issue with Dr. Popat's surgical skills.  And while Dr. Leonardo did aver that she did not discuss any billing concerns with Dr. Levy (Dkt. 207-22 ¶ 8), Mary Ann Kendron, UBNS's former chief executive officer, testified that she discussed Dr. Popat's treatment of a billing manager who questioned the codes used on co-surgeries with Dr. Levy (Dkt. 207-20 at 34, 40, 47-49; *see also* Dkt. 215-4, 518-539).  Again, this is consistent with Dr. Levy's explanation.

Moreover, Dr. Popat fails to raise a question of material fact, or adduce any evidence, that would allow a reasonable juror to infer that all or part of the motivation for the termination of his faculty appointment in the Neurosurgery Department was discriminatory.  Dr. Popat points to the UPS-related comment or comments purportedly made during the July 2014 surgery and "the prevalence of racist comments in the University and by USBN surgeons and residents" outside of the surgery to demonstrate discriminatory animus by Dr. Levy, UBNS, and the University Defendants.  (Dkt. 206-4 at 29-30).  No reasonable jury could find discriminatory animus based on this evidence cited by Dr. Popat.  Dr. Levy supported Dr. Popat's appointment to the volunteer faculty position in the Neurosurgery Department and wrote to Dean Cain asking that the appointment be approved.  (Dkt. 211-9).  While not dispositive, Dr. Levy's advocacy for Dr. Popat's appointment cuts against a finding of discriminatory animus.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (holding that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire").

At bottom, Dr. Popat has failed to raise a question of material fact on the issue of whether discriminatory animus played any role in the decision to terminate his volunteer faculty appointment.  Under the circumstances here, a reasonable jury could not find discriminatory animus.  For the reasons given above, Dr. Popat's motion for summary judgment on his Title VII, NYSHRL, and § 1981 disparate treatment claims is denied, and the motions by UBNS, Dr. Levy and the University Defendants for summary judgment dismissing Dr. Popat's Title VII, NYSHRL, and § 1981 disparate treatment claims are granted.

## IV.   **Hostile Work Environment**

"Title VII prohibits an employer from discriminating in 'compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex or national origin.'" *Littlejohn v. City of N.Y.*, 795 F.3d 297, 320 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)).  "The phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . , which includes requiring people to work in a discriminatorily hostile or abusive environment." *Id.* (quoting *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012)). Hostile work environment claims are also cognizable under § 1981 and the NYSHRL.  *See id.*; *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 465 (S.D.N.Y. 2023) (citations omitted).

"To survive summary judgment on a claim of hostile work environment harassment, a plaintiff must 'produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment.'" *Banks*, 81 F.4th at 261 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). "Hostile work environment claims brought under Title VII, § 1981, and the NYSHRL are assessed using the same standard." *Id*. at 261-62.[9]

Courts "employ a totality of the circumstances approach to evaluate whether an environment is hostile and abusive, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "This assessment has both an objective and subjective component: 'the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Id.* (quoting *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020)). "The hostility of the work

---

[9]    "Until fairly recently, the standard applicable to hostile work environment claims brought pursuant to the NYSHRL mirrored the federal standard." *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21 Civ. 02512 (CM), 2022 WL 524551, at *9 (S.D.N.Y. Feb. 22, 2022). Amendments to the NYSHRL that came into effect in 2019 "eliminated the 'severe or pervasive' standard." *Id.* (citing N.Y. Exec. Law § 300). "The new standard requires a plaintiff allege that they were subjected to 'inferior terms, conditions or privileges of employment because of the individual's membership in one or more . . . protected categories.'" *Id.* (quotation omitted). But the amendment to the NYSHRL is not retroactive. *Id.* (citing *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68-69 (S.D.N.Y. 2020)); *see also Kenny v. Cath. Charities Cmty. Servs.*, No. 20 Civ.3269 (PAE) (RWL), 2023 WL 1993332, at *26 n.23 (S.D.N.Y. Feb. 14, 2023) (same). As Dr. Popat's claims are based on conduct that occurred before 2019, the Court applies the severe or pervasive standard to his NYSHRL hostile work environment claim.

environment 'as a whole, not the motivation of one decisionmaker,' is the central inquiry in a hostile work environment claim, and 'liability is determined only by looking at all the circumstances.'" *Id.* (quoting *Rasmy*, 952 F.3d at 389).

"For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations, quotation marks, and alteration omitted). "Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Id.* at 110-11 (citations and quotation marks omitted). "[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998). The Second Circuit cautions, however, that "[w]hile the standard for establishing a hostile work environment is high," courts must avoid "setting the bar too high." *Terry*, 336 F.3d at 148.

To establish a hostile work environment, Dr. Popat relies on the alleged UPS-related and "BUNS" remarks made during the July 22, 2014 surgery, and on Dr. Levy's acknowledgment during the University's investigation that jokes regarding the prevalence of physicians of color were "made on a repeated basis" in the Neurosurgery Department. (Dkt. 206-4 at 29-30; Dkt. 206-3 at 512). The University's Report found:

> While the comments cited by Dr. Popat do not rise to the level of a violation of the Discrimination and Harassment Policy, EDI recommends that the Neurosurgery Department's faculty and residents receive training in

discrimination and harassment prevention.  Dr. Levy acknowledged that the jokes noting the prevalence of people of color in the department were made on a repeated basis, and explained that the residents felt the representation of physicians of color was a point of pride and that their comments reflected this.  While Dr. Levy's account of the comments did not indicate animus toward people of color, any jokes regarding protected factors such as national origin, race or color are inappropriate in a professional work environment. Even when well-intended, comments that reference protected factors could create discomfort and misinterpretation of intent, particularly when made in the presence of others who may not understand the background or intended meaning of the comments.

(Dkt. 206-3 at 512).  Dr. Popat argues that Dr. Levy's acknowledgment set out in the investigation report establishes "[t]he prevalence of racist comments in the University and by [UBNS] surgeons and residents[.]"  (Dkt. 206-4 at 29).

Even considering all reported comments in the record related to the national origin or skin color of individuals in the Neurosurgery Department, this does not suffice to show a hostile work environment.  The only statements made within Dr. Popat's hearing occurred during the July 22, 2014 surgery, which, without more, cannot be characterized as either severe or pervasive.  *See, e.g.*, *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("[I]ncidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *Schwapp,* 118 F.3d at 110-11 (same).

Dr. Popat also relies on Dr. Levy's acknowledgment in the Report "that jokes noting the prevalence of people of color in the department were made on a repeated basis, and explained that the residents felt the representation of physicians of color was a point of pride and that their comments reflected this."  (Dkt. 206-4 at 29; Dkt. 206-3 at 512). "Because the crucial inquiry focuses on the nature of the workplace environment as a

whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." *Cruz v. Coach Stores, Inc*., 202 F.3d 560, 570 (2d Cir. 2000), *superseded on other grounds by statute*).  Even allegations of harassment that the plaintiff was unaware may support his claim.  *See Perry*, 115 F.3d at 151 ("[T]he issue was not whether Perry had notice of the harassment of others but whether there was a pervasive hostile environment").  But here, the record lacks evidence supporting a conclusion that the comments referenced in the Report were severe or pervasive.  And as set forth below, the record shows that the comments were not regarded as harassing by others.  On this record a rational jury could not find that the comments referenced in the Report created a hostile work environment.  There is no evidence as to how pervasive the comments were, and as discussed below no evidence that the comments were severe.  Dr. Popat failed to raise a question of material fact on the issue.

Crediting that Dr. Popat subjectively viewed the comments as hostile, there is insufficient evidence in the record that would allow a reasonable juror to infer that the comments were hostile when viewed objectively.  At best, the record reflects that joking about the prevalence people of a particular race or national origin in the Neurosurgery Department was viewed as a point of pride.  *See, e.g.*, Dkt. 206-3 at 506 (Dr. Levy explaining that residents made such jokes because "they're proud of their culture"), 511 (witnesses viewed the UPS comment "as a light-hearted joke" and "did not view [the UPS-related comments] as being derogatory in any way"), 512 ("jokes noting the prevalence of people of color in the department" were made because "residents felt the representation of

- 57 -

physicians of color was a point of pride," such that the jokes "did not indicate animus toward people of color[.").   Accepting *arguendo* that the jokes were inappropriate in a workplace setting, this does not render them actionable.

Even a cursory review of cases finding a plaintiff adduced sufficient evidence to proceed to a jury on a hostile work environment claim demonstrates that the conduct Dr. Popat complains of falls well below the requisite threshold.   For example, in *Banks* the Second Circuit found a reasonable jury could conclude that conduct was sufficiently pervasive and widespread to have created a hostile work environment when plaintiff "was the recipient of sexually demeaning language, as were her female colleagues, and worked in a setting where images of pin-up women and sexually explicit silhouettes were common" and plaintiff "and other Black employees saw nooses, Confederate flags, and other racially offensive material around the plant, including a Black test dummy seated on a vehicle wearing minimal and tattered clothes[,]" among other incidents.   81 F.4th at 264-65; *see also Krul*, 2023 WL 8449589, at * 35-37 ("isolated incidents of possibly harassing or sex-motivated comments" do not "create a triable issue of fact on a hostile work environment claim" and collecting cases where hostile work environment claim survived summary judgment).   Viewing the circumstances in their totality, taking in account the nature, severity, and frequency of the conduct, *see Harris*, 510 U.S. at 23, there is simply not enough evidence in the record that would allow a reasonable jury to conclude Dr. Popat was forced to work in a hostile work environment.

## V.     __Retaliation__

Title VII prohibits an employer from "discriminat[ing] against" an employee where that employee "opposed any practice" that Title VII forbids or "has made a charge, . . . or participated in any manner in an investigation, proceeding, or hearing under" Title VII.  42 U.S.C. § 2000e-3(a).   "Retaliation claims brought under the NYSHRL and § 1981 are subject to the same standards as federal claims under Title VII."  *Banks*, 81 F.4th at 275.  "To present a prima facie case of retaliation under this provision, a plaintiff must show that (1) 'she participated in an activity protected by Title VII,' (2) this 'participation was known to her employer,' (3) the employer 'subjected her to a materially adverse' action thereafter, and (4) a 'causal connection' existed between the 'protected activity' and the adverse action."  *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010)).

The University Defendants received the letter of complaint from Dr. Popat regarding the comments made during the July 2014 surgery and Dr. Levy's termination of Dr. Popat's faculty appointment in the Neurosurgery Department, and they also referred the matter to the Chief Compliance Officer for UB Associates, Inc. because the allegations related to UBNS.  (Dkt. 211-13; Dkt. 211-14).  Therefore, the University Defendants and UBNS were aware that Dr. Popat engaged in protected activity.

As to the next prong, whether Dr. Popat suffered an adverse employment action, there is a genuine dispute of material fact precluding summary judgment.  "[T]he antiretaliation provision of Title VII, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."  *Burlington*

*Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). "Rather, '[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Banks*, 81 F.4th at 275 (quoting *Burlington Northern*, 548 U.S. at 68). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." *Vega*, 801 F.3d at 90. The Supreme Court has explained:

> Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Burlington Northern*, 548 U.S. at 69 (quotation and citations omitted).

There is a genuine dispute of material fact as to whether Dr. Popat suffered a materially adverse action when he lost the volunteer faculty position in the Neurosurgery Department. Dr. Popat asserts that he lost business because UBNS physicians stopped working with him or stopped referring patients to him in retaliation for him making, and refusing to withdraw, his complaint. (Dkt. 206-4 at 32-33). The reduced revenue from referrals, he alleges, also led to a reduction and eventual elimination of bonuses from Delaware Medical. (Dkt. 206-4 at 33). While defendants correctly assert that there is evidence in the record showing some UBNS surgeons continued to work with Dr. Popat

(Dkt. 206-1 at ¶¶ 42-43), the fact remains that both Dr. Siddiqui and Dr. Leonardo indicated they stopped working with Dr. Popat after he filed his complaint (Dkt. 206-3 at 510-11; Dkt. 207-22 at ¶¶ 5-7; Dkt. 211-11 at 194:13-195:-13).   In other words, from a temporal standpoint, people who worked with Dr. Popat before he filed his complaint ceased working with Dr. Popat after he filed his complaint.   Dr. Popat also asserts that he lost the opportunity to continue participating in the Center for Excellence being developed in conjunction with Dr. Leonardo and other doctors.   (*See* Dkt. 215 at 27).

UBNS and Dr. Levy argue that there is no evidence Dr. Levy urged Dr. Leonardo and others at UBNS not to work with Dr. Popat.   (Dkt. 207-2 at 28, 34).   Dr. Levy testified that, in relation to working with Dr. Popat, he told Dr. Leonardo and others "please do what is good for you, what is good for your practice and what's good for your patients.   My issues should not interfere with the way you practice and the way you treat your patients." (Dkt. 211-5 at 75:15-76:16).   Dr. Levy testified that he personally did not want to work with Dr. Popat again, because:

> He's accused me and my department and the University of condoning racism, which is hurtful.   I feel I can't trust him.   Trust is very important when you're operating, and so for all the -- and, again, to be sensitive to time, I won't list all the reasons, but it's a matter of trust.

(*Id.* at 214:10-17).   Dr. Levy elaborated:

> Q:   [W]hat is the trust that you don't have in him, trust for what?
> []
> Q:   To keep your patients with you, is that what you mean?
> []
> A:   No, I think this whole racism allegation as -- obviously I won't say it's baseless, I'm going to say it's retaliatory because it occurs weeks after he's terminated.   And I'm also going to say he's been defamatory to Dr. Fahrbach, to Dr. Castiglia, to other people in the community.

(*Id.* at 216:7-17).

In the University's Report, Dr. Leonardo described working with Dr. Popat in the aftermath of the meeting at Dr. Siddiqui's house as "awkward," and she averred that she stopped regularly performing surgeries with Dr. Popat before she stopped working for UBNS in 2016.  (Dkt. 206-3 at 511; Dkt. 207-22 at ¶¶ 2, 7).  Dr. Levy testified that he and Dr. Siddiqui were close friends.  (Dkt. 211-5 at 61:17-21 (describing Dr. Siddiqui as his "brother from another mother")).  Dr. Siddiqui testified that he decided not to work with Dr. Popat because he lacked trust in Dr. Popat after the meeting at Dr. Siddiqui's house. (Dkt. 211-11 at 195:5-16).

Dr. Popat need not demonstrate Dr. Levy organized a wholesale boycott by every physician associated with UBNS for a reasonable juror to find that he lost business because he filed complaints with the University Defendants and Kaleida.  The loss of even some business "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 548 U.S. at 68 (quotation omitted).  UBNS, Dr. Levy, and the University Defendants point to record evidence to support their argument that Dr. Popat did not lose income or otherwise suffer professionally following the filing of his complaint (Dkt. 211-1 at ¶¶ 81, 83-85; Dkt. 207-27 at ¶¶ 54-56), but that evidence simply raises a question of material fact.  It is not so overwhelming as to foreclose a reasonable juror from finding that Dr. Popat suffered an adverse action.  The extent, if any, of Dr. Popat's economic loss is a question for the jury.  A factfinder could draw the inference that Dr. Popat's increased income indicates he did not suffer an adverse action,

but a factfinder could also draw the inference that but for defendants' retaliatory behavior Dr. Popat's income may have increased more. Whether Dr. Popat suffered an adverse action for retaliation purposes cannot be resolved as a matter of law on this record.

For the last leg of the analysis, "[a] plaintiff must show a connection between the protected activity and the adverse action, that is, that 'the retaliation was a "but-for" cause of the employer's adverse action.'" *Banks*, 81 F.4th at 275 (quoting *Vega*, 801 F.3d at 90). "[I]n addressing a discrimination claim, however, there can be more than one 'but-for' cause of an adverse employment action." *Id.* (citing *Bostock v. Clayton Cnty, Ga.*, 590 U.S. 644, 656 (2020). "The plaintiff's burden in this regard is 'de minimis' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Id.* (quoting *Hicks*, 593 F.3d at 164).

The record raises a genuine question of material fact as to whether retaliation motivated Dr. Levy's refusal to reinstate Dr. Popat to the volunteer faculty position following the August 24, 2014 meeting at Dr. Siddiqui's house. After receiving Dr. Popat's complaint, Dean Cain emailed Dr. Levy and asked him to confirm that Dr. Popat's neurosurgery appointment was, in fact, terminated. (Dkt. 206-3 at 525). Dr. Levy replied, "[a]t this point there are some issues that need to be resolved regarding his conduct. I will defer on confirming rescinding of his appointment till we [dig] into this matter further." (*Id.*). A reasonable juror could draw the inference that as of that August 19, 2014 emails, Dr. Popat's reinstatement was a possibility.

On August 20, 2014, Dr. Levy emailed Dean Cain and others stating that he believed Dr. Popat fabricated his accusations of racial discrimination. (*Id.* at 528-29). Dr. Levy stated he was "responsible for all of the patients entrusted to our care and I cannot palliate deceitful behavior. Therefore, I had to make the decision to remove Dr. Popat from our service." (*Id.*). In his deposition, Dr. Levy testified that he was "hurt" by the complaint. (Dkt. 211-5 at 194:16-20 ("I thought it was hurtful. I thought it was disingenuous. I thought it was disgusting.")). He testified he believed Dr. Popat filed the complaint "as a retaliation. I believe that [it] wasn't sincere, I believe it wasn't genuine, and I believe he was playing the race card in a retaliatory fashion, and so I wasn't angry, I was hurt." (*Id.* at 195:14-17). He agreed to meet with Dr. Popat at Dr. Siddiqui's house because "I wanted to see -- you know, he wants to have a conversation, let's see if we can repair this, let's see how we can move forward, and that was at Dr. Siddiqui's suggestion." (*Id.* at 198:3-6).

On August 24, 2014, a meeting was held at Dr. Siddiqui's house to discuss the situation with Dr. Levy, Dr. Leonardo, and Dr. Popat. (Dkt. 206-2 at ¶ 87; Dkt. 219-2 at ¶ 87). Dr. Levy testified that "Dr. Popat wanted to have his volunteer faculty appointment back. He had made an allegation of racism. He was willing to walk back that allegation of racism in exchange for me reinstating him as volunteer faculty." (Dkt. 211-5 at 122:11-14). Dr. Levy's position was that "it's a matter of principle, I'm not going to let somebody play a race card in order to get a volunteer faculty appointment back." (*Id.* at 122:18-20). He further testified:

> [Dr. Popat] was willing to rescind allegations of racism and discrimination in exchange for returning the volunteer faculty appointment. It was tempting, but I felt -- I don't know if you want to call it blackmail or harassment or

> playing the race card, I don't know what you want to call it, and it was a truly
> -- that was going to test my medal [sic] as a young chairman.  And I made
> the decision to say no, if you would like to resign, you could resign, but I'm
> not going to reinstate you.  And if you want to pursue whatever allegation
> you want to pursue, of course it's your right, but I will not be threatened,
> coerced or forced to give anyone a volunteer faculty, you know, out of fear
> tactics.

(*Id.* at 123:15-124:3).  Dr. Siddiqui testified that he may have been the one to suggest Dr.

Popat retract his complaint in exchange for reappointment: "I'm sure I proposed hey, what

if -- what if, you know, we rescind this and you rescind that, is there a way we can work

together, can we de-escalate.  So, that is the context in which I'm sure it came up.  And I'm

sure it was again my idea to say hey, can we back off, can we both back off, but there was

no backing off."  (Dkt. 211-11 at 198:2-8).  Dr. Siddiqui also testified:

> Q:    Was there discussion of possibly reappointing Dr. Popat?
>
> A:    I wanted that, that's what I had suggested.
>
> Q:    What about Dr. Levy?
>
> A:    Dr. Levy was -- he was I believe -- if the conversation had -- if Dr.
>       Popat had been a bit more conciliatory, I believe we would have gone
>       that way.  But, Dr. Popat really was so adamant in his complaint of
>       racism, that there was no other dialogue that we had at that occasion.

(*Id.* at 198:18-25).

Dr. Siddiqui testified his intent in scheduling the meeting "was to de-escalate," as

he "felt that [Dr. Levy] would be willing to, you know, rescind his previous letter and get

us back to normal, that's what my hope was.  That is what I wanted."  (*Id.* at 184:18-23).

He continued:

> Q:    But [Dr. Levy] would not rescind the termination letter?

A:    Because [Dr. Levy] -- because [Dr. Popat] was accusing him of racism when that had nothing to do with anything, it had nothing to do with [Dr. Levy].  [Dr. Levy] was upset at how the case had gone and had prior baggage about issues, but the biggest thing was about how the case had gone, that was his biggest issue. And [Dr. Popat], instead of addressing that, accused him of racism.

(*Id.* at 184:24-185:7).

From this record, a reasonable juror could find Dr. Levy's decision not to reinstate Dr. Popat to his volunteer faculty position was driven by retaliatory animus.   This conclusion is reinforced by the fact that the meeting took place within a week of Dr. Levy learning that the complaint was filed.  (*See* Dkt. 206-3 at 525-26).  *See Banks*, 81 F.4th at 277 ("temporal proximity" between the protected conduct and the retaliatory action can support a finding of retaliatory animus).

Once a plaintiff meets his prima facie burden, "a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Isaac v. City of N.Y.*, 271 F. App'x 60, 63 (2d Cir. 2008) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).   As discussed above, Dr. Levy presented legitimate, non-retaliatory reasons for his actions, shifting the burden back to Dr. Popat to show that retaliation was a "but-for" cause of the adverse action.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).   "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846.  "A plaintiff may prove that retaliation was a but-for cause of an adverse

employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id*.

Dr. Levy's testimony and other record evidence demonstrating his anger with Dr. Popat for bringing the complaint, combined with the very close temporal proximity between his protected conduct and Dr. Levy's refusal to reinstate him, suffice to create a triable issue of fact as to pretext. Drawing all inferences in Dr. Popat's favor, a reasonable juror could conclude that Dr. Siddiqui and Dr. Leonardo stopped working with Dr. Popat because he refused to withdraw his complaint. Dr. Levy and Dr. Siddiqui were close friends, Dr. Levy was Dr. Siddiqui's boss, and the Report notes that Dr. Siddiqui stated that "it felt as if [Dr. Popat] were attacking the department." (Dkt. 206-3 at 510). Dr. Siddiqui was copied on the August 20, 2014 email Dr. Levy sent to Dr. Cain and others regarding the complaint. (Dkt. 206-3 at 528). In that email, Dr. Levy made clear that he was "truly distressed" by the complaint, which he thought was done "to obfuscate, and retaliate against, my revocation of his adjunct appointment to our department[.]" (*Id.*). While there is a dispute over how much business—if any—Dr. Popat lost, it is undisputed that at a minimum, both Drs. Siddiqui and Leonardo worked with Dr. Popat in the past and stopped after he filed his complaint. Retaliation need not be a coordinated effort led by Dr. Levy to be retaliation. On this record, a reasonable juror could conclude that certain UBNS physicians no longer worked with Dr. Popat because he filed the complaint against UBNS, either out of anger for the filing of the complaint, loyalty to Dr. Levy or loyalty to UBNS, or some combination thereof. A reasonable juror could also conclude that UBNS-affiliated

physicians stopped referring patients to Dr. Popat, leading to a reduction in income and bonuses.  On the other hand, drawing all inferences in Defendants' favor, a reasonable juror could conclude that Dr. Popat did not suffer an adverse action because several UBNS physicians continued to work with him, his medical credentials and privileges were unaffected, and his overall income increased.  The question is one for the jury.  For this and the reasons set forth above, the motions for summary judgment on the Title VII, § 1981, and the NYSHRL claims, made by Dr. Popat, Dr. Levy and UBNS, and the University Defendants are denied.

## VI.   <u>Section 1983</u>

### A.   <u>State Actor</u>

"The Fourteenth Amendment provides public employees with the right to be 'free from discrimination.'"  *Vega*, 801 F.3d at 87 (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)).  "To state a claim under § 1983, a plaintiff must allege two elements: (1) 'the violation of a right secured by the Constitution and laws of the United States,' and (2) 'the alleged deprivation was committed by a person acting under color of state law.'"  *Id.* at 87-88 (quoting *Feingold v. N.Y.*, 366 F.3d 138, 159 (2d Cir. 2004)).  "A state employee acting in his official capacity is acting 'under color of state law.'"  *Id.* at 88.

As a professor at the University, Dr. Levy is considered a state actor.  (Dkt. 85 at 30-31) ("The law in this Circuit is 'clear that a professor employed at a state university is a state actor.'") (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir. 2003) and collecting cases).  UBNS is a "nominally private entity" whose action may be attributed to the state when, as relevant here, "the entity's functions are 'entwined' with state policies

('the joint action test' or 'close nexus test')[.]"  *See Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)).

Dr. Popat relies on the "close nexus" test to establish that UBNS is a state actor. (Dkt. 206-4 at 38-40).  "In certain circumstances, a private organization may be so entwined with government that its conduct may be deemed *per se* state action."  *Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 244 (S.D.N.Y. 2005) (citing *Brentwood Acad.*, 531 U.S. 288 and citation omitted).  "[A] private entity may be considered a state actor 'when it is entwined with governmental policies, or when government is entwined in its management or control.'"  *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014) (quoting *Brentwood Acad.*, 531 U.S. at 296).  "That is, the State need not have coerced or even encouraged the events at issue in the plaintiff's complaint if 'the relevant facts show pervasive entwinement to the point of largely overlapping identity' between the State and the entity that the plaintiff contends is a state actor."  *Horvath v. Westport Libr. Ass'n*, 362 F.3d 147, 154 (2d Cir. 2004) (quoting *Brentwood Acad.*, 531 U.S. at 303).  "The Second Circuit specifically noted that to show state action in the context of an organization's employment decisions, a plaintiff is 'required to show that the State is so entwined with [the defendant's] management that its personnel decisions are fairly attributable to the State.'"  *Stefanoni v. Darien Little League, Inc.*, 101 F. Supp. 3d 160, 174 (D. Conn. 2015) (quoting *Grogan*, 768 F.3d at 268).

On this record, it is clear that UBNS and the University Defendants share a "close nexus," making UBNS a state actor.  UBNS, Levy, and the University Defendants make no

argument to the contrary as to Plaintiff's § 1983 claim.  (*See* Dkt. 207-2 at 30-32; Dkt. 219 at 24-25; *see generally* Dkt. 211-19; Dkt. 220).  The practice of clinical medicine by UBNS and University and the education of medical students and professors by the University are intertwined.  (Dkt. 206-2 at ¶ 27; Dkt. 219-2 at ¶ 27; Dkt. 211-7 at 97:3-98:19; Dkt. 211-11 at 44:24-45:10).[10]  Practice plans, including UBNS, exist for the primary reason of providing medical students and residents with clinical experience and instruction.  (Dkt. 206-2 at ¶ 28; Dkt. 219-2 at ¶ 28; Dkt. 211-6 at 7).  The position of department chair at the Medical School and president of the related practice plan are generally held by the same person.  (*See* Dkt. 206-2 at ¶ 29; Dkt. 219-2 at ¶ 29; Dkt. 211-7 at 41:12-22).  UBNS provides benefits packages to University faculty who "have a state line,"[11] and as dean of the Medical School, Dr. Cain exercised oversight over UBNS.  (Docket 206-2 at ¶¶ 33-34; Dkt. 219-2 at ¶¶ 33-34; Dkt. 211-7 at 42:22-43:7; *see* Dkt. 211-6 at 6).  Each practice plan submits five percent of their income to the Medical School as the so-called "dean's tax." (Dkt. 206-2 at ¶ 35; Dkt. 219-2 at ¶ 35; *see generally* Dkt. 220-1).  If a practice plan shuts down, its remaining assets revert to the University.  (Dkt. 206-2 at ¶ 36; Dkt. 219-2 at ¶ 36; *see generally* Dkt. 220-1).  Moreover, Dr. Levy is the president of UBNS, and he is also the one who terminated Dr. Popat's neurosurgery volunteer faculty appointment.  From

---

[10]    The University Defendants do not dispute the factual allegations in Dr. Popat's Statement of Undisputed Facts set forth in this paragraph.  (*See* Dkt. 220-1).

[11]    The University Defendants dispute the factual allegation in Dr. Popat's Statement of Undisputed Facts set forth in paragraph 33 because it suggests that the University Defendants provided Dr. Popat with a benefits package, which they did not.  (Dkt. 220-1 at ¶ 6).

these facts, a reasonable juror could only conclude that UBNS and the University were "entwined."

The same cannot be said for Kaleida. Kaleida is a private not-for-profit entity. (Dkt. 205-1 at ¶ 3; Dkt. 205-28 at ¶ 5). Dr. Levy holds a position at Kaleida as Medical Director of Neuroendovascular services at Buffalo General Medical Center/Gates Vascular Institute, but Dr. Popat testified that when his neurosurgery faculty appointment was terminated, it had no impact on his privileges at Kaleida. (Dkt. 211-3 at 274:4-9 (noting that the University's faculty appointments and Kaleida's grant of privileges "are separate processes, in a sense")). While Kaleida and the University are parties to an Affiliation Agreement, as explained above that agreement explicitly reserves to each party the right to manage its affairs. On this record, no reasonable juror could conclude Kaleida is a state actor.

For the reasons given above, Dr. Popat's motion for summary judgment asking the Court to find UBNS is a state actor for the purposes of his § 1983 claims is granted; Dr. Popat's motion for summary judgment asking the Court to find Kaleida is a state actor for the purposes of his § 1983 claims is denied; and Kaleida's motion for summary judgment dismissing Dr. Popat's § 1983 claims is granted.

## B.     First Amendment Retaliation

Dr. Popat argues that Dr. Levy and UBNS violated his First Amendment rights by not reinstating him to his volunteer neurosurgery faculty position after his complaint, and by keeping him from working with UBNS surgeons and patients. (*See* Dkt. 206-4 at 44). A plaintiff bringing a § 1983 First Amendment claim must show "(1) he has a right

protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

Dr. Popat argues: (1) he complained of racism, which is a matter of public concern, *see Feingold*, 366 F.3d at 160; and, (2) there is evidence in the record that Dr. Levy refused to reinstate him, and UBNS surgeons declined to work with him, because of his complaint, and that the complaint and retaliation took place within days of each other, demonstrating causation. (*See* Dkt. 206-4 at 44-46). For substantially the same reasons set out in the Court's retaliation analysis above, there are questions of material fact as to whether Dr. Levy was motivated by retaliatory intent when he refused to reinstate Dr. Popat to his volunteer faculty position and whether at least some UBNS physicians declined to work with him because he filed a complaint.

## VII.   Section 1981 claims

"Section 1981 provides that 'all persons have equal right to make and enforce contracts.'" *Silva v. Farrish*, 47 F.4th 78, 89 (2d Cir. 2022). To state a claim under § 1981, "plaintiffs must prove: '(1) they are members of a racial minority; (2) an intent to discriminate on the basis of their race by defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.).'" *Id.* (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)).

Dr. Levy and UBNS seek summary judgment on the ground that Dr. Popat cannot demonstrate that termination of his volunteer faculty appointment with the Neurosurgery

Department "interfered or in any way affected his rights under his employment contract with Delaware Medical Group[.]" (Dkt. 207-2 at 29). As set out above, Dr. Popat's § 1981 claims rise and fall with his Title VII claims, and the Court has granted Dr. Levy and UBNS's motion to dismiss the discrimination claims, but denied the motion regarding his retaliation claim. For the reasons discussed above, the Court grants the motion for summary judgment dismissing the § 1981 discrimination claims and denies the motion as to the § 1981 retaliation claims.

## VIII. <u>Tortious Interference</u>

Before proceeding to analyze the parties' arguments, the Court wishes to make clear what claims remained viable following its decision and order of September 17, 2018. (Dkt. 85). There, the Court dismissed Dr. Popat's claim for tortious interference with contract against UBNS "to the extent it is based upon an alleged breach of Dr. Leonardo's oral agreement." (*Id.* at 41). The Court allowed Dr. Popat to proceed with his "claim for tortious interference with contractual relations against Dr. Levy based upon an alleged breach of the oral agreement between UBNS and Plaintiff to develop a specialty practice group." (*Id.* at 43).[12] In addition, "[b]ecause UBNS and Dr. Levy failed to adequately brief any argument regarding the sufficiency of Plaintiff's allegations regarding his claim for tortious interference with business relations and prospective economic advantage," the Court did not dismiss those claims. (*Id.* at 38).

---

[12] Dr. Levy and UBNS misstate the Court's ruling as allowing Dr. Popat to pursue a claim that "Dr. Levy tortiously interfered with an oral contract between Dr. Popat and Dr. Leonardo to start a specialty practice group." (Dkt. 207-2 at 32).

Dr. Popat seeks summary judgment on his claims against Dr. Levy for tortious interference with prospective economic advantage and tortious interference with his contract with UBNS, but does not seek summary judgment as to the remaining tortious interference claims.   (*See generally* Dkt. 206-4 at 47-51).   UBNS and Dr. Levy, misconstruing the Court's September 17, 2018 Decision and Order as finding viable only the "claim that Dr. Levy tortiously interfered with an oral contract between Dr. Popat and Dr. Leonardo to start a specialty practice group" seek summary judgment only on that claim.  (Dkt. 207-2 at 32).  Dr. Popat argues that because Dr. Levy and UBNS "failed to address the sixth claim against UBNS tortious interference with business relations and prospective economic advantage, and only partial addressed the claim for tortious interference with a contract, the court should not dismiss the sixth claims for tortious interference as against UBNS." (Dkt. 216 at 32).

### A.   Tortious interference with business relations/prospective economic advantage

Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003);[13] *see also Zahler v. Empire Merchs., LLC*,

---

[13]     As the Court previously noted, "tortious interference with business relations and tortious interference with prospective economic advantage are not distinct causes of action."  (Dkt. 85 at 38 n.5) (quoting *Glob. Packaging Servs., LLC v. Glob. Printing &*

No. 11-CV-3163 (JG)(CLP), 2012 WL 273698, at *6 (E.D.N.Y. Jan. 31, 2012) (stating that allegations regarding tortious interference with contract, tortious interference with business relations, and tortious interference with prospective economic opportunity all "require a basic three-party structure: A (the plaintiff) has a contract or relationship with B (a third party) and C (the defendant) interferes by inducing B to breach the contract or cease doing business with A, causing harm to A."). A valid contract is not necessary to state a claim for tortious interference with prospective business relations. *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998) (citations omitted). "Rather, it is well-settled that a plaintiff can recover if that plaintiff can prove that the defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.'" *Id*. (quoting Restatement (Second) of Torts § 766B cmt. c (1979)).

There are material questions of fact precluding summary judgment on this claim as alleged against Dr. Levy. The parties dispute whether Dr. Popat's putative business relationship—the collaborative specialty practice—existed with Dr. Leonardo or with UBNS. (*Compare* Dkt. 206-2 at ¶ 112 *with* Dkt. 219-2 at ¶ 112). In an April 9, 2013 email exchange between Dr. Levy and Dr. Leonardo discussing ways to increase efficiencies in medical practices, Dr. Leonardo wrote: "Will send invite to entire pituitary clinic with Saurin Popat and do grand unveiling of our new partnership endeavor with Neurosurgery.[]

---

*Packaging*, 248 F. Supp. 3d 487, 494 (S.D.N.Y. 2017) and citing *Katz v. Travelers*, 241 F. Supp. 3d 397, 404 (E.D.N.Y. 2017) ("Tortious interference with a business relationship is sometimes called 'tortious interference with prospective economic advantage'; no matter the term used, the elements are the same."), *reconsideration denied*, No. 16-CV-4389(ADS) (SIL), 2017 WL 4180012 (E.D.N.Y. Sept. 20, 2017)).

Popat is leaving block time open so we can do joint cases on Wednesdays with neurosurgery. We are going to Toronto together to see how Gentil does it.[] That is already planned for March." (Dkt. 206-3 at 331). The email exchange included Dr. Levy's UBNS address, and copied three others at their UBNS email addresses, including Dr. Siddiqui, but appears to have been sent from Dr. Leonardo's personal email address. (*Id.* at 330).

Another email exchange in October and November 2013 between Drs. Leonardo, Levy, Popat, Siddiqui and another individual at UBNS discussed how Dr. Popat's appointment to the Neurosurgery Department faculty would facilitate the proposed new collaborative specialty practice. (*See id.* at 336-37). On October 31, 2013, Dr. Leonardo wrote to the group: "we need to make this a priority to really expand our skull base program." (*Id.* at 336). Separately, on August 23, 2013, Dr. Leonardo, in an email to unspecified individuals, wrote in relevant part: "we have been hoping [Dr. Popat] could be granted a neurosurgical affiliation . . . but nothing was ever finalized. Is this something we can revisit? Would like to really start to advertise the minimally invasive skull base portion of this (need a good name! *UBNS minimally invasive skull base or UBNS minimally invasive brain endoscopy*—or some catch phrase/title) i.e. for the website and for future skull base course and advertisements." (*Id.* at 335 (emphasis added)).

In his deposition, Dr. Levy disputed that the effort was a specialty practice, and instead described it as "maybe a branding, like, you know, something they could market in Western New York, a multidisciplinary care branding to these tumors." (Dkt. 211-5 at 74:4-8). He also testified that "prior to this, Dr. Siddiqui and Leonardo were doing them themselves, but the thought was if they can create a multidisciplinary brand, perhaps they

can grow the practice, maybe some day eventually maybe try to recruit patients from outside the Western New York area." (*Id.* at 74:9-13). He confirmed Drs. Leonardo, Siddiqui, and Popat "were trying to work together, do cases together, you know, see what could come out of it." (*Id.* at 74:18-23). In the letter seeking Dr. Popat's appointment to the Neurosurgery Department faculty, Dr. Levy wrote that Dr. Popat was "a key part of the emerging Endoscopic Center of Excellence that is being developed by Dr. Leonardo." (Dkt. 211-9).

There is evidence in the record that would allow a reasonable jury to conclude the project was with UBNS and not just Dr. Leonardo. As discussed above, emails between Dr. Leonardo, Dr. Siddiqui, Dr. Levy, and others discuss the broad strokes of a plan to develop such a practice under UBNS's aegis, and suggest names that included "UBNS." Moreover, there is record evidence from which a jury could conclude that the neurosurgical faculty appointment was key to building such a specialty practice given that the emails make clear that Drs. Leonardo and Siddiqui sought Dr. Popat's appointment to the Neurosurgery Department faculty in aid of building the new specialty practice. And as set out above, a reasonable jury could find Dr. Levy engaged in retaliatory conduct, that would suffice to demonstrate that he acted "out of malice, or used dishonest, unfair, or improper means." *See Carvel Corp.*, 350 F.3d at 17; *see also* Dkt. 85 at 56 ("[T]he court is inclined to agree that discriminatory, retaliatory, or hostile conduct on the basis of one's race or national origin is sufficiently reprehensible so as to constitute a 'wrongful means.'"); *30 CPS, LLC v. Bd. of Managers of Cent. Park S. Med. Condo.*, 23 Misc. 3d 1024, 1032 (N.Y. Sup. Ct., N.Y. Cty., 2009) ("unlawful discrimination is sufficiently culpable to support a

claim of interference with prospective economic relations").  Conversely, a reasonable jury could conclude Dr. Levy's refusal to reinstate Dr. Popat did not involve an improper motive.

Finally, a reasonable jury could find causation.  Causation is established when a plaintiff demonstrates "that []he 'would have entered into an economic relationship but for the defendant's wrongful conduct.'"  *Clean Coal Techs., Inc. v. Leidos, Inc*., 377 F. Supp. 3d 303, 322 (S.D.N.Y. 2019) (quoting *Tucker v. Wyckoff Heights Med. Ctr*., 52 F. Supp. 3d 583, 598 (S.D.N.Y. 2014)), *reconsideration denied*, No. 17 Civ. 9678 (KPF), 2019 WL 5960202 (S.D.N.Y. Nov. 13, 2019).  As discussed above, both Dr. Siddiqui and Dr. Leonardo declined to continue working with Dr. Popat after he filed his complaint.  A reasonable jury could infer they did so to avoid angering Dr. Levy, who they knew to be upset by Dr. Popat's actions.

For these reasons, Dr. Popat's motion for summary judgment on his claim for tortious interference with prospective economic advantage/business relations against Dr. Levy is denied, as is Dr. Levy's motion seeking to dismiss that claim against him.  In addition, the Court dismisses Dr. Popat's claim against UBNS for tortious interference with business relations and prospective business relations.  While Dr. Popat purports to maintain that he has a claim for tortious interference with business relations and prospective business relations as against UBNS, the Court—after a thorough review of the record—sees no basis for such a claim.  UBNS is not a third party to the alleged relationship between Dr. Popat and UBNS, and that fact is fatal his claim.  *See Zahler*, 2012 WL 273698, at *6 (tortious interference causes of action require defendant interfere with a relationship between

plaintiff and a third party); *see also Jackson v. Fed. Express*, 766 F.3d 189, 197 (2d Cir. 2014) ("when a party, whether *pro se* or counseled, fails to respond to an opponent's motion for summary judgment, a district court . . . must examine the movant's statement of undisputed facts and the proffered record support and determine whether the movant is entitled to summary judgment.").

### B. Tortious interference with contract

Dr. Popat also seeks summary judgment on his claim against Dr. Levy for tortious interference with contract, that is, with an actual existing contract rather than prospective contractual relations. (Dkt. 206-4 at 49-51). The elements of such a claim under New York law are: "[1] *the existence of a valid contract between the plaintiff and a third party*, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc*., 88 N.Y.2d 413, 424 (1996) and emphasis added).

"A plaintiff must identify the specific third-party contract with which the defendant allegedly interfered." *MMS Trading Co. Pty Ltd. v. Hutton Toys LLC*, 20-CV-1360 (MKB), 2021 WL 1193947, at *12 (E.D.N.Y. Mar. 29, 2021) (citing *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 104 (2d Cir. 2012)). "It is imperative that, in bringing a tortious interference claim, a plaintiff identify 'the relevant terms of the contract[ ] that existed' that were breached by defendant." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 791 (S.D.N.Y. 2019) (quoting

*Leadsinger, Inc. v. Cole*, No. 05 Civ. 5606(HBP), 2006 WL 2320544, at *12 (S.D.N.Y. Aug. 10, 2006)).  A plaintiff must provide details about, among other information, "the formation of the contract, the date it took place, and the contract's major terms[.]"  *Valley Lane Indus.*, 455 F. App'x at 105; *see also MMS Trading*, 2021 WL 1193947, at * 13 (collecting cases). "By its very nature, '[t]here is no cause of action for inducing breach of a contract where there is no contract in existence at the time of the wrongful interference.'"  *Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 218 (S.D.N.Y. 2019) (citing 72 N.Y. Jur. 2d Interference § 13 and *Avant Graphics Ltd. v. United Reprographics*, 252 A.D.2d 462, 463 (1st Dep't 1998) ("dismissing a tortious interference with contract claim because 'plaintiff had no contract with either [defendant] at the time of the purported interference'")).

Here, Dr. Popat averred that he entered into an oral agreement with UBNS and Kaleida to "develop a Specialty Practice Group focusing on Skull Based Surgery."  (Dkt. 206-1 at ¶ 52).  As to the terms of the agreement, Dr. Popat states:  "Under this agreement, I would utilize my specialty skills of otolaryngology, and, in return, UBNS would contribute UBNS employed doctors" who work in other specialties.  (*Id.*)  The parties were "to work together for public recognition of this practice area, receive referrals jointly from outside parties, treat patients jointly, and develop an economically successive [sic] professional practice."  (*Id.*).  He also averred that Dr. Leonardo "also agreed with me to share patients and work together to market these joint specialties, particularly in a sub-specialty of Endoscopic Skull Base Surgery."  (*Id.* at ¶ 53).  The two agreed "to share patients, attend related conferences, consult each other regarding patient treatment and our joint practice development, collaborate to obtain favorable insurance rates for our joint

services, and collaborate on research in this field." (*Id.*).  The two also "began publishing peer reviewed academic journal articles jointly.  (*Id.*).

Dr. Popat's declaration fails to raise a question of material fact as to the existence of an oral agreement with UBNS and Kaleida to develop a specialty practice.  Dr. Popat testified that he and Dr. Leonardo had planned to meet with Kaleida to "just develop the whole program," but that meeting never happened.  (Dkt. 211-3 at 331:11-332:11).  He also testified that he needed ECMC's "buy in" for the idea before approaching Kaleida, and he did not get it.  (Dkt. 211-3 at 344:6-346:3).  No reasonable juror could draw an inference that an oral agreement existed with Kaleida when the record is devoid of any evidence that Dr. Popat had even pitched the idea.  Moreover, neither Dr. Popat's declaration nor the emails he relies on (Dkt. 206-3 at 328-29, 331) set forth the essential terms of any agreement.[14]  Both lack details from which the Court could glean the essential terms of a contract, such as: when it was formed, what consideration was exchanged, or what the terms would be.  *See, e.g.*, *Valley Lane*, 455  F. App'x at 104 ("Without providing additional factual allegations regarding, *inter alia*, the formation of the contract, the date it took place, and the contract's major terms, the proposed amended complaint [] fails to sufficiently plead the existence of a contract."); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202

---

[14]    Without sufficient facts, it also not possible to determine whether the alleged agreement runs afoul of New York's Statute of Frauds. *See* General Obligations Law § 5-701[a][1] ("Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime.").

(S.D.N.Y. 2008) (dismissing counterclaims that failed to plead sufficient details regarding contract's formation) (collecting cases).

Without sufficient evidence of a contract, a plaintiff cannot make the necessary showing that the defendant's actions caused a breach of that contract. For this reason, Dr. Popat's motion for summary judgment on his claim against Dr. Levy and UBNS for tortious interference with contract is denied. Dr. Levy's motion for summary judgment on that claim is granted. After a careful review of the record, the Court also grants UBNS summary judgment on this claim, as the lack of a contract makes it impossible for Dr. Popat to proceed on this claim against any defendant.

## IX.   <u>Counterclaim</u>

Dr. Popat seeks summary judgment dismissing Dr. Levy's counterclaim for slander per se on the ground that it is time barred and not pled with the requisite specificity. (Dkt. 206-4 at 51-53). Dr. Levy did not respond to those arguments in his responding memorandum (Dkt. 219), and he did not include his counterclaim in his own motion for summary judgment. (Dkt. 207-2). Where, as here, a counseled non-moving party submits "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others," that response "may be deemed an abandonment of the unmentioned claims." *Jackson*, 766 F.3d at 195. Even "[w]here abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended." *Id*. at 196. As Dr. Levy does not address Dr. Popat's arguments regarding his counterclaim for defamation, the counterclaim is dismissed as abandoned.

## **CONCLUSION**

For the reasons set forth above:

(1) Kaleida's motion for summary judgment is granted (Dkt. 205), Dr. Popat's motion for summary judgment against Kaleida is denied (Dkt. 206), and the Clerk of Court is directed to enter judgment in favor of Kaleida;

(2) Dr. Popat's motion for summary judgment against Dr. Levy and UBNS is granted on the issue of whether Dr. Levy and UBNS are state actors; granted to the extent it seeks dismissal of Dr. Levy's counterclaim; and otherwise denied (Dkt. 206);

(3) Dr. Levy and UBNS's motion for summary judgment is granted to the extent it seeks dismissal of Dr. Popat's Title VII, NYSHRL, § 1981, and § 1983 claims for discrimination and hostile work environment; granted as to any claims for tortious interference brought against UBNS; granted as to the claim for tortious interference with contract asserted against Dr. Levy; and otherwise denied (Dkt. 207); and

 (4) the University Defendants' motion for summary judgment is granted to the extent it seeks dismissal of Dr. Popat's Title VII claims for discrimination and hostile work environment; and otherwise denied (Dkt. 211).

Thus, the claims that will proceed to trial are as follows:  (1) the retaliation claim under Title VII against the University Defendants; (2) the retaliation claim under Title VII, § 1981, and the NYSHRL against UBNS and Dr. Levy[15]; (3) the § 1983 First Amendment

---

[15]     Of course, there is no individual liability under Title VII.  *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) ("Employers, not individuals, are liable under Title VII.").

retaliation claim against Dr. Levy and UBNS; and (4) the tortious interference with business relations and prospective economic advantage against Dr. Levy.

      SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      August 5, 2024
           Rochester, New York