08:54:02
09:06:15

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X
SAURIN POPAT, M.D. ) 15CV1052
Plaintiff )
vs.
Rochester, New York
ELAD LEVY, M.D. and STATE
UNIVERSITY OF NEW YORK AT
BUFFALO, ET AL ) January 29, 2025
Defendants. 9:00 a.m.
- - - - - - - - - - - - - - - - - - X
**TRIAL - CLOSING STATEMENTS**

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE ELIZABETH A. WOLFORD**
**UNITED STATES DISTRICT JUDGE**

**FOR PLAINTIFFS:** PETER JOHN GLENNON, ESQ.
ASHLEY RAE WESTBROOK, ESQ.
The Glennon Law Firm, P.C.
160 Linden Oaks Drive
Rochester, NY 14625

**FOR DEFENDANTS:** COLLEEN K. MATTREY, ESQ.
DR. LEVY BRYAN J. DANIELS, ESQ.
Ricotta Mattrey Callocchia Markel & Cassert
496 Main Street
Buffalo, NY 14202

**FOR DEFENDANTS:** SOO-YOUNG CHANG, ESQ.
NICHOLAS RICHARD DIVIRGILIO, ESQ
New York State Office of the Attorney General
Buffalo Regional Office
350 Main Street, Ste 300-A
Buffalo, NY 14202

**COURT REPORTER: Karen J. Clark, Official Court Reporter**
**Karenclark1013@AOL.com**

S. POPAT V. E. LEVY, ET AL

**P R O C E E D I N G**
* * *

**(Whereupon, the proceeding continued.)**

**(TIME: 9:38 A.M.)**

THE COURT: I think we're ready to continue and what we're now at the phase of is the closing arguments. So you're going to hear from each of the attorneys for the parties as to what they believe the evidence has shown or not shown in this case. Again, you are the sole fact finders in the case. So what the facts are is ultimately up to you. And what the attorneys state, too, is not evidence. It's argument as to what they believe the evidence should show or does show or does not show. You should listen attentively to the attorneys as you have listened attentively throughout the course of the trial. But as I said, ultimately, what they say is not evidence.

With that, I'm going to turn to Mr. Chang who will go first on behalf of the University of Buffalo and UB Med.

MR. CHANG: Thank you, your Honor.

THE COURT: And you can set that up any way you want, if you want it closer.

S. POPAT V. E. LEVY, ET AL

MR. CHANG: Further.

I didn't want the cord to -- maybe you can't do it because you might turn the microphone off. I think it's back on.

MR. CHANG: Firstly, I want to thank you all for your patience, your attentiveness and public service for sitting through this trial now in its eighth day. Thank you for your part in resolving this case for us.

Secondly, on behalf of myself, my co-counsel and the University of Buffalo and its medical school, I apologize that you had to sacrifice your time from work, which I'm sure you'll have to make up when you return. I apologize that you had to take time away from your family, friends and precious leisure time to bring a resolution to the parties here. I apologize because a simple apology 10 years ago would have prevented this trial from being necessary. I'm not apologizing because UB did anything wrong, I am apologizing because empathy dictates that I recognize you have your own lives, that for eight days now this trial was not always interesting, that you probably had to spend additional resources to be here or will because of your time here. I apologize for having to endure five degree days and having to endure today's snowstorm. And I'm apologizing

S. POPAT V. E. LEVY, ET AL

09:41:59 because you may even resent the days you've sacrificed 09:42:03 to be here for us. And my apology is in recognition 09:42:09 that you may have had to make sacrifices to be here. 09:42:13 You may not even want to be here at all. My apology is 09:42:19 to let you know that we see you and we care about your 09:42:22 concerns. To let you know that we recognize your 09:42:24 thoughts and feelings.

09:42:29 People apologize to maintain relationships. 09:42:33 Team members and collaborators apologize to each other 09:42:37 all of the time to build trust as we work toward a 09:42:41 common goal. "Sorry I missed that shot." "That's all 09:42:45 right, we'll score next time." "I'm sorry I missed the 09:42:48 deadline." "Okay. I'll help you with your work next 09:42:53 time, so you won't miss it again."

09:42:58 When your team's work or collaboration 09:43:00 involves life and death decisions, trust is paramount, 09:43:06 it has to be. And the work that we've been talking 09:43:10 about here for the past seven days literally involves 09:43:16 brain surgery. You've all heard or used the word the 09:43:23 saying, "Well, it's not brain surgery." Well, it is. 09:43:28 This is what we're talking about. If you were a brain 09:43:32 surgeon like Drs. Levy, Siddiqui and Leonardo, could you 09:43:38 afford to work with someone you don't trust? If you or 09:43:45 a loved one were a patient and found a tumor in the

brain or near it, would you want to be operated by a team of members who don't trust each other? Giving an apology doesn't say you're wrong, it's not making you submissive. It's not debasing yourself. Being a real team player requires a modicum of humility. The humility to recognize that you may, at first, have missed the pregame call. The humility to recognize that another team member or the coach, even if you think they misjudged you, deserve an explanation of why there was a misunderstanding in the first place. And we've all worked with people who lack that humility. The ones that can do no wrong in their minds. The ones who immediately throw teammates and coworkers under the bus and point fingers and assign blame and make up excuses. You know, the ones we don't trust. The ones we don't -- the ones we pray we don't get assigned to work with or have to keep one eye open all the time with.

And let's face it, if we're in the position to choose who to work with, me immediately choose someone else.

Dr. Popat's actions, and particularly his inactions, before, during and after the July 22nd surgery, destroyed the trust that Drs. Levy, Siddiqui and Leonardo absolutely required to perform work that

09:45:36 could end with catastrophic consequences for the
09:45:40 patients.

09:45:42 You now have a full view of the events in
09:45:45 question, not only from documentary evidence, but from
09:45:47 live witnesses. And as you certainly know, while there
09:45:53 is some agreement on certain facts, other facts are
09:45:56 hotly disputed.

09:46:00 As the Judge just explained to you, the jury
09:46:04 is the sole finders of fact. Not the judge, not the
09:46:07 lawyers. And during jury selection, you assured us that
09:46:13 you're comfortable calling out a lie for a lie. And
09:46:17 comfortable deciding who is being truthful and who is
09:46:20 not. You also assured us that you would be able to set
09:46:26 aside your sympathies and only award damages if
09:46:30 Plaintiff met his burden of proof, which the judge will
09:46:34 instruct you on, and find that he is entitled to
09:46:37 damages.

09:46:42 In terms of the July 22nd surgery, the story
09:46:49 really begins when Dr. Levy assured the parents of a
09:46:54 16-year-old boy that he would handle the removal of a
09:46:58 tumor, which, at the time, appeared fraught with risk.
09:47:01 This wasn't about his ego or who was more capable of
09:47:05 doing the surgery or not. This was about assuming the
09:47:08 responsibility of that risk. And as he explained, this

S. POPAT V. E. LEVY, ET AL

was about being the face of the team of surgeons. And that he would take the brunt of the blame if something went wrong or didn't go wrong at all or didn't go as planned, because we know every surgery has risks. We now know there were understandings. Dr. Popat discussed it with the family. And he referred them to Dr. Siddiqui. That meant that Dr. Siddiqui would be the neurosurgeon and called UBNS with their concerns. Levy called Dr. Popat to ask what was going on. And after an explanation for the confusion, Dr. Popat apologized three times for, in his words, a breach in professional etiquette. He explained, he apologized, and it was over. Levy was going to move on and give him a second chance.

But importantly, it was during this phone call that Dr. Levy told Dr. Popat that Dr. Levy was going to be involved in the surgery. There is no mistake about that. And there is no dispute about it, either. And prior to the surgery, Dr. Popat knew that his role was to create access to the tumor. That is why he was brought in in the first place. He is not a neurosurgery. But remember, this is the first time Dr. Levy and Dr. Popat were going to work together.

Now, we all know the old adage, "Fool me

S. POPAT V. E. LEVY, ET AL

09:48:59 once, shame on you. Fool we twice shame on me." Or put
09:49:05 another way, forgive, but don't forget. This isn't a
09:49:10 flaw in character, this is common sense wisdom. So now
09:49:14 the surgery commences on July 22nd. Dr. Popat, Dr.
09:49:21 Siddiqui and two senior residents work on creating
09:49:24 access. But once they have eyes on the tumor, they
09:49:28 realize it's not what they believed what it was going to
09:49:32 be based on prior imaging. And the tumor begins to
09:49:35 slide on its own through the access and the surgical cut
09:49:39 having been created. Dr. Siddiqui says, "Let's stop
09:49:44 here and call Dr. Levy. He is supposed to remove the
09:49:48 tumor." At this point, a surgeon with a little
09:49:57 humility, a little deference for the team hovered above
09:50:03 a boy with a neck cut wide open to the skull, would have
09:50:07 said, "Okay. I guess I didn't understand the surgical
09:50:09 plan, but I know for certain this is Dr. Levy's patient,
09:50:13 let's stop."
09:50:15 But, as you know, Dr. Popat instead blurted
09:50:18 out "What? Why don't we just put the tumor back in?"
09:50:23 And then he took a sarcastic shot at Dr. Levy out loud
09:50:28 before UBNS residents, medical students and staff and
09:50:34 said, "If Dr. Levy really wants a challenge in removing
09:50:37 the tumor, we should use some tissue glue to secure the
09:50:42 tumor in position again." Fortunate for the patient, as

S. POPAT V. E. LEVY, ET AL

09:50:48 you know, Dr. Siddiqui is the type of person who just 09:50:50 let's things roll off his back. But at the same time, 09:50:57 he understood the gravity of the situation. He knew it 09:50:59 wasn't going to appear good for Dr. Levy when he came 09:51:04 in. And Dr. Siddiqui knew that he and Dr. Popat didn't 09:51:10 necessarily do anything wrong, but professional 09:51:17 etiquette dictates, your patient, your call. This he 09:51:21 understood.

09:51:24 And, again, this isn't some etiquette like 09:51:27 eating your salad with the correct fork. The reason for 09:51:33 this is because if something goes badly, it's life and 09:51:37 death. And the patient's doctor, in this case, Dr. 09:51:44 Levy, will be held responsible by the patient and his 09:51:46 family. As a result, it was already tense when Dr. Levy 09:51:58 arrived in the OR. And to cut the tension, Dr. 09:52:04 Siddiqui, perhaps unwisely, but with the intention of 09:52:07 both cutting the tension and feeling humble and 09:52:12 apologetic, made a self deprecating joke, an inside joke 09:52:16 with Dr. Levy and residents. He said, "I got it all 09:52:19 laid out, boss, just like UPS." When somebody, possibly 09:52:27 Dr. Popat, asked what that meant, Dr. Levy, realizing 09:52:31 that an inside joke could make somebody feel, excluded 09:52:36 explained the joke. He even apologetically and said, "I 09:52:42 hope no offense is taken."

S. POPAT V. E. LEVY, ET AL

09:52:44 Now, when somebody walks into a room that 09:52:46 you're in and clearly makes an inside joke to others 09:52:52 there, don't you feel left out? When that person says, 09:52:56 sorry, that is an inside joke and explains the joke to 09:52:59 you, that's an effort to be inclusive, to make you feel 09:53:04 part of the group. That is what builds a relationship 09:53:08 of trust.

09:53:13 Now, to the point of the UPS comment, there 09:53:16 is little dispute about what happened in the OR. There 09:53:19 was tension. Dr. Popat was exasperated. He was making 09:53:25 sarcastic remarks aimed at Dr. Levy. Dr. Siddiqui was 09:53:32 concerned that the access portion of the procedure went 09:53:35 too far. Your common sense should tell you that Dr. 09:53:40 Siddiqui had the motivation, the sense of humor, and the 09:53:46 humility to initiate the UPS comment. Does it make 09:53:52 sense to you that the first thing a surgeon says walking 09:53:58 into an OR saying, "Whoa, it looks like a UPS convention 09:54:04 in here. What can brown do for you?" And then laugh at 09:54:09 his own joke? Wouldn't you expect there to be prior 09:54:14 complaints about that kind of behavior. It certainly 09:54:17 wouldn't have been the first and last time. Wouldn't 09:54:24 you expect there to be evidence of similar behavior 09:54:27 before and after, but there isn't any. Dr. Levy is 09:54:33 unhappy when he sees the tumor has been essentially

S. POPAT V. E. LEVY, ET AL

09:54:40 removed and leaves. Dr. Siddiqui chases after him, and 09:54:44 as he told you, not because he felt he did something 09:54:47 wrong, but because he empathized with Dr. Levy. Dr. 09:54:53 Siddiqui and Dr. Levy's relationship existed well before 09:54:56 the surgery. One misunderstanding wasn't going to ruin 09:55:00 their relationship. But Dr. Siddiqui apologized because 09:55:05 he knew what Dr. Levy must have been feeling. Dr. Levy 09:55:10 accepted his apology because that is how trust is built 09:55:15 and maintained. And this was Dr. Levy's intention when 09:55:25 he asked Dr. Siddiqui to tell Dr. Popat to give him a 09:55:29 call to discuss what happened in the surgery. It wasn't 09:55:34 to make Dr. Popat bow down in submission to him. It was 09:55:40 to give him another chance after the scheduling mishap 09:55:46 to try and rebuild this now tenuous trust between them. 09:55:53 It was an olive leaf.

09:55:57 And it's at this point Dr. Popat claims for 09:56:02 the first time in 10 years that when Dr. Siddiqui 09:56:06 returned to the OR, Dr. Popat told Dr. Siddiqui that he 09:56:10 was offended by the UPS statement. I want you to know, 09:56:17 it's not as though this case just sat around for 10 09:56:21 years until we got a trial date. You heard how Drs. 09:56:25 Levy, Dr. Popat, Cain were deposed multiple times. 09:56:30 You've seen how many documents have been exchanged and 09:56:33 disclosed to one another. And you also now understand

09:56:39 that Dr. Popat took copious, contemporaneous reports and repeatedly said that he would defer to his own notes versus his recollection of events many years later. And you heard Dr. Popat on this witness stand admit that never once in those 10 years until he took the stand did he say that he complained about the UPS comments to anyone on July 22, the day of the surgery.

09:57:17 Now, while deliberating, I want you to know that you can request any of the exhibits in evidence and review them yourselves. You don't have to believe us or me. His notes are exhibit No. 539. 539. And, in fact, on page five of that, he does describe the conversation with Dr. Siddiqui after the surgery. And what it says is that Dr. Siddiqui came back and said, "Dr. Levy was indeed angry." It says that Dr. Popat, out of courtesy, apologized to Dr. Siddiqui for getting him in trouble." And then it says, "I saw him again at five p.m., simply to review, get and update on the patient's status condition." That was it. Nothing about complaining to Dr. Siddiqui about the UPS comment on July 22nd. And if you look at his notes, you'll see that he certainly wasn't shy about documenting every time he told anyone willing to listen about how offended he supposedly was about the UPS comments, which makes the omission even

S. POPAT V. E. LEVY, ET AL

more remarkable. So the next couple of days after the surgery, Dr. Siddiqui repeatedly contacted Dr. Popat imploring him to call Dr. Levy. Dr. Popat notes in his own notes that on July 23rd, the following day, Dr. Siddiqui told him that Dr. Levy had already drafted a letter to the Dean of the medical school to revoke his volunteer faculty appointment. And you'll see in his notes that it's only after he learned Dr. Levy had already drafted that letter that Dr. Popat first complained to Dr. Siddiqui about the UPS comment. You should take a look at page 6 of exhibit 539.

But Dr. Siddiqui didn't give up. He repeatedly asked Dr. Popat to call Dr. Levy and simply explain himself, just to tell Dr. Levy or to just tell Dr. Levy that he didn't mean to ridicule him and that the tumor unexpectedly emerged on its own. And as you heard Dr. Siddiqui tell us, Dr. Popat refused. And as Dr. Popat told you his reason was because of his reasonable sense of self respect. As the judge will instruct you, you're all here to apply the experience and backgrounds of your everyday lives. To apply your real world experience when gauging a witness' or party's credibility.

I can tell you this, in my real world, if I

S. POPAT V. E. LEVY, ET AL

know that my boss is angry with me, he is on the verge of firing me, and my boss' right-hand man is telling me that it will be fine once I call and explain myself, along with that same right-hand man telling me exactly what to say, and if I waited two days and left a voicemail message leaving just my number and then instead said, you know what, it's now my boss' responsibility to call me back, in my real world, I better start updating my LinkedIn profile and look for another job. And I suspect your real-world experience will tell you the same.

Someone who doesn't behave in a way that indicates he is concerned about losing a faculty appointment or business opportunities probably has a different motive.

Now, after July 25th, upon receipt of Dr. Levy's termination letter, the way I see it, the second chapter of the story begins. Now we have Popat strikes back. On July 31st, he meets with his lawyer. And the same day he drafts this complaint letter to Dean Cain as well as others. On August 13th he makes the complaint to Dean Cain. On August 24th, there is a meeting at Dr. Siddiqui's house. Dr. Popat clearly feels emboldened by now. The letter and the complaint is in. He knows Dr.

Levy is aware of the complaint by now because five days prior, Dr. Siddiqui called him and told him that Dr. Levy was contacted by the Dean's office about it. And at the August 24th meeting, Dr. Levy again extends an olive leaf. He will let Dr. Popat voluntarily resign then work with him for six months to build up the trust needed from a team player. And if all goes well, he offered to reappoint him to the volunteer faculty position again. Because the trust was gone by now, it had to be rebuilt. And Dr. Levy was offering him that opportunity to do that. But, as you heard, Dr. Popat declined. He told him at the meeting, he just wanted an investigation and nothing more. But he also told us that he expected the investigation to give him his appointment back, obviously, on his terms, and his terms alone. His scorched earth approach. You've seen the findings and recommendation of the investigative report that resulted from the investigation. I invite you to review that carefully. It's exhibit 3.

The investigation found insufficient evidence that the termination was in retaliation for Dr. Popat's complaint. There was insufficient evidence that Dr. Levy intimidated or harassed Dr. Popat and retaliation for the complaint. The report said Dr.

10:04:41 Leonardo told the EDI director that Dr. Popat seemed resistant to any form of resolution. And she clearly said that it was her decision not to work with Dr. Popat anymore because "surgery is more difficult when there is an absence of trust." Dr. Leonardo also said that if she were performing surgery on someone and there was no peace in the operating room, it could adversely affect the outcome of the surgery and endanger the patient. In other words, it wouldn't be safe for the patient. Because this was their first and foremost priority, patient safety. So Popat eventually learned of the investigation results, but wasn't happy with the outcome as he told you. Which is why 10 years later, we're all here.

Now, there has been an attempt to dispute whether Dr. Levy, as chair of the Department of Neurosurgery, had the authority to revoke Dr. Popat's appointment. Well, let's be clear, Dr. Cain testified here. I'm sorry, Dr. Cain, who is dean, testified here in no uncertain terms that the department chairs have that authority. There has been no evidence otherwise besides some confusion on the part of Dr. Levy in the past.

You might remember exhibit 138, the e-mail

S. POPAT V. E. LEVY, ET AL

10:06:27 where Dean Cain was asked on August 29th when the revocation was going to take effect and whether Dr. Popat was advised of that. Dean Cain replied in that e-mail chain to UB counsel and UBNS counsel, Mr. DiGiulio, that officially only the dean can appoint or terminate faculty. Now, Dean Cain didn't recall why he wrote that, but circumstantially, it sounded like he was suggesting that his office could notify Dr. Popat of the termination taking effect. Nonetheless Dean Cain testified to you that it's not true as the authority to terminate has been delegated to the department of chairs.

10:07:23 And when Dr. Levy's complete deposition testimony regarding this was read on the subject, he said that back then, sometime after litigation began, he was told by Mr. DiGiulio that the dean might be the only one able to terminate volunteer faculty and it was just a telephone game type of miscommunication.

10:07:54 With regard to the University defendants, the first person -- I'm sorry -- the first question you'll be asked is whether Plaintiff has proven by a preponderance of the evidence that he was an employee of UB and UB Medical School. As the Judge will instruct you, the answer is no, that inquiry ends -- I'm sorry --

10:08:20 that ends the inquiry on all of the retaliation claims. 10:08:24 The retaliation claims only apply to employees, not to 10:08:32 independent contractors. Here, Dr. Popat was and 10:08:37 remains a volunteer faculty appointee, but it's an 10:08:44 honorific title, as you've heard. He never received a 10:08:47 salary or got direct compensation for teaching 10:08:53 residents. Volunteer faculty do this because they want 10:08:55 to give back to the community. Dr. Popat received some 10:09:00 discretionary bonuses as otolaryngology volunteer 10:09:06 faculty. But as Dean Cain explained, it's not a set 10:09:09 amount of money, it's not at regular intervals. And 10:09:12 Dean Cain also explained that volunteer faculty members 10:09:18 don't receive a stipend. Dr. Popat is in private 10:09:24 practice. You heard from his employer, Dr. Haas, that 10:09:28 his practice group, Delaware Medical Group, does all of 10:09:32 the billing and bills insurance companies directly for 10:09:36 payment of his work.

10:09:37 THE COURT: I don't mean to interrupt you, 10:09:39 but I think it was Dr. Haar, wasn't it? You said Dr. 10:09:43 Haas. It's okay.

10:09:45 MR. CHANG: Well, at least I read it 10:09:47 correctly.

10:09:47 THE COURT: I don't want you to introduce 10:09:49 another witness that didn't testify.

S. POPAT V. E. LEVY, ET AL

10:09:53 MR. CHANG: At least I read it correctly, I misspelled. Thank you.

10:09:57 Dean Cain told you that UB, the medical school, and its practice plans, don't control the means and manners by which volunteer faculty work or the location of their work. They don't have the right to assign projects to volunteer faculty or dictate how long volunteer faculty work. They can't dictate how volunteer faculty are paid or how volunteer faculty hire their own staff. They don't issue IRS W-2 forms to volunteer faculty. And you'll recall that the first issue with scheduling a patient was a problem because Dr. Popat had his own surgeries to do on July 8th. None of the defendants could make him do surgery on that date. Dr. Popat also had to reschedule his own surgeries to accommodate the surgery for July 22nd. He rescheduled his surgeries on his own with his staff. We couldn't make him do that.

10:11:06 However, if you do decide that Plaintiff met his burden of proof and that the University defendants are his employer, you'll next decide whether UB and UB UB Medical School retaliated against Dr. Popat in violation of Title VII. As the Judge will instruct you, there are four elements that Plaintiff has to prove by a

10:11:29 preponderance of the evidence. The first is whether Dr.
10:11:35 Popat engaged in protected activity by opposing or
10:11:38 complaining of race discrimination. Now, it's very
10:11:42 important that you understand that in order to establish
10:11:46 this, Plaintiff must prove that he was motivated by good
10:11:50 faith, reasonable belief that he was opposing an
10:11:56 employment practice made unlawful by federal or state
10:12:00 law. This isn't only about whether he subjectively
10:12:04 thought he was making the complaint in good faith, he
10:12:07 also has to show that his belief was objectively
10:12:11 reasonable. And Dr. Popat knew why Dr. Levy was angry
10:12:21 about the surgery. Dr. Siddiqui went to great lengths
10:12:24 repeatedly explaining why. Dr. Popat's complaints about
10:12:32 the UPS comments were not voiced until he heard that Dr.
10:12:36 Levy was going to terminate his employment. He
10:12:41 weaponized the UPS comment to retaliate against the news
10:12:45 of the termination because Dr. Popat refused to be a
10:12:51 team player. If there was going to be a resolution, he,
10:12:59 as he explained, he wanted it on his terms, not the
10:13:03 coaches, not the team, as he keep analogizing, his.
10:13:10 Only good faith, reasonable belief is protected activity
10:13:26 here. And that is not the case here.

10:13:26 I would also like to address the fourth
10:13:26 element. Where Plaintiff has to prove by a

S. POPAT V. E. LEVY, ET AL

10:13:28 preponderance of the evidence that the Defendants took 10:13:29 adverse actions because of Plaintiff's protected 10:13:32 activity. Now, to establish this, Plaintiff has to 10:13:35 prove that Defendants intended to retaliate against 10:13:40 Plaintiff for complaining about discrimination.

10:13:44 The thing is, it's impossible to retaliate 10:13:50 against someone for something you have no idea occurred 10:13:54 or exists. Plaintiff admitted into evidence Dr. Popat's 10:14:04 Personal Transaction Form, exhibit 136. And it shows 10:14:08 that the decision to terminate Dr. Popat was entered on 10:14:12 July 23rd, 2014, at 9:28 a.m., At the start of the day. 10:14:20 That is before any of Dr. Popat's notes, statements to 10:14:23 the EDI investigator or prior testimony indicates Dr. 10:14:28 Popat complained about the UPS comments to anyone. Can 10:14:43 you see why suddenly after 10 years Dr. Popat now says 10:14:47 that he complained to Dr. Siddiqui on July 22nd? Common 10:14:51 sense should tell you, he is lying about the 22nd 10:14:55 complaint. He only says it now to get around that 10:15:00 problem in this case.

10:15:05 There is no way Dr. Levy could have known 10:15:08 anything about any UPS complaint before he commenced the 10:15:11 termination. So there is no possible way he could have 10:15:14 intended to retaliate against Dr. Popat. You also will 10:15:22 be instructed to consider legitimate non-retaliatory

10:15:25 reasons or explanations for the termination, which 10:15:29 you've heard not only numerous reasons for their losing 10:15:34 their trust in him, but also the fact that Dr. Siddiqui 10:15:39 repeatedly told Dr. Popat why. And it had nothing to do 10:15:46 with the UPS comments.

10:15:53 Finally, if you do find that Plaintiff has 10:15:57 proven his retaliation case, you'll be asked whether the 10:16:01 retaliation caused Dr. Popat damages that were 10:16:04 proximately caused by the retaliation. First and 10:16:07 foremost, the specialty practice of Dr. Popat and Dr. 10:16:19 Leonardo aspired to create never lifted off the ground. 10:16:23 You can't just have blueprints of a house and then put 10:16:29 it in an insurance claim for the cost of a real house 10:16:32 after a hurricane or wild fire. And even if it were in 10:16:40 place, even if they had started receiving patients for 10:16:46 that specialty practice, Dr. Leonardo clearly stated to 10:16:51 the EDI investigator that she stopped working with Dr. 10:16:55 Leonardo because -- I'm sorry -- she stopped working 10:16:58 with Dr. Popat because she couldn't trust him and fear 10:17:01 for patient safety without any influence from Dr. Levy. 10:17:06 And of course, on top of that, she relocated to 10:17:09 Pittsburgh in 2016. There is no damages from this.

10:17:17 As for Dr. Siddiqui, he told you himself 10:17:21 that even if Dr. Levy tried, nobody tells Dr. Siddiqui

what to do or who to work with. He said that. And, again, he told you, trust issues were the reason why, not the complaint.

As for any other damages, they are made up of unsupported assumption after assumption. A surgeon can only do one surgery at a time. You heard from Dr. Haar, Dr. Popat's real boss, that Dr. Popat is Delaware Medical Group's top producer. You saw the sheet from the economist report showing Plaintiff's income from 2011 to 2013 where Dr. Popat's income from Erie County Medical Center consistently went up after 2014. And the economist agreed that more income means there was more work. And it follows that more work means that there is less capacity in time for other work and activities. And yet the economist simply assumed that Dr. Popat's capacity for more work was limitless. Again, you have to apply your normal real world experiences. You know that is not true. It also assumes that everyone's income rises automatically with inflation. You saw that the spike, the fact that Dr. Popat's salary at Delaware Medical Group remained the same from 2011 to 2023, I would assume that his income went up 3 percent every year. The economist conceded that after 12 years at the same job, same work, that salary would have gone up

10:19:40 magically by 2023 by over 42 percent despite the fact 10:19:46 that in history, it remained exactly the same at 10:19:52 $260,000. Does it comport with your real world 10:19:56 experience? If not, you should reject it outright.

10:20:05 Perhaps the most egregiously, the economist 10:20:09 just assumed that every endoscopic surgery done by UBNS 10:20:16 with an ENT doctor should have been and could have been 10:20:21 done by Dr. Popat, despite the fact that was never the 10:20:24 case before. And we know that nothing stops UBNS 10:20:29 surgeons who do still trust him from working with him. 10:20:35 Nothing except Dr. Popat's feeling that it's otherwise. 10:20:47 But his burden of proving it by a preponderance of the 10:20:50 evidence takes more than a feeling. Sorry. Did you see 10:20:54 what I did there?

10:20:55 Well, I'm done, and I thank you again, and 10:21:00 for the last time, I apologize.

10:21:05 THE COURT: Thank you, Mr. Chang.

10:21:06 Ms. Mattrey, are you ready?

10:21:08 MS. MATTREY: I am, your Honor.

10:21:09 THE COURT: Ladies and gentlemen, everybody 10:21:10 ready to continue? Okay.

10:21:12 You may proceed whenever you're ready.

10:21:14 MS. MATTREY: Thank you. "No man lies so 10:21:34 boldly as the one who is indignant."

S. POPAT V. E. LEVY, ET AL

May it please the Court counsel members of the jury. That quote by 19th Century philosopher Friedrich Nietzsche sums up the proof that has been offered in this courtroom for the past eight days. For the past decade, Dr. Popat has given many versions of events surrounding a surgery performed on a 16-year-old wrestler on July 22, 2014. The one consistent version that he has had has been that he never complained to anybody about the UPS, "What can brown do for you" until 8:30 p.m. on the 23rd of July. Nineteen pages of notes, a full investigation interviewing, seven different people, conducted by Ms. Nolan-Weiss, three depositions, 10 years, all saying the first time he complained was July 23, at 8:30 p.m. And now in January of 2025, when there is a jury sitting and waiting, he wants all of you to decide that he was terminated and retaliated against based on his complaint about the UPS "What can brown do for you." He is bringing claims for retaliation, for complaining about race-based comments, and intentional interference with a business opportunity, and he is asking for millions of dollars. And all of a sudden, in January of 2025, Dr. Popat decides, wait, I talked to Dr. Siddiqui outside of the OR on the 22nd. After 10 years of depositions and court filings and documents,

documents, some that Dr. Popat created himself, he claims that he told Dr. Siddiqui on the 22nd around noon when the surgery was over. Why? When asked why the change after 10 years, his response, "Well, both can be true."

Members of the jury, you did not check your common sense at the door. Dr. Popat figured out before this trial that his timeline did not work. He had to show that Dr. Levy made the decision to terminate him after he had complained, instead, about the 23rd, which has been his version all along. And the reason for Dr. Popat's termination, his behavior in that operating room on the 22nd. You saw proof yourself when that termination was filed on that HR form, as of 9:28 a.m. on the 23rd. It's in evidence. You can take a look at it yourself.

Mr. Glennon spent a good deal of time yesterday quabbling with Dr. Levy about when the letter was sent, when it was drafted, who signed it and did it say "terminated," did it say "resigned," it's all noise. The proof is in that HR room. The proof that it was started and filed by 9:28 in the morning, attaching the letter that Dr. Levy told Dr. Kedron to please draft on his behalf terminating Dr. Popat's appointment.

S. POPAT V. E. LEVY, ET AL

10:26:09 Ask yourselves, why would somebody go into 10:26:12 the HR database and enter this information if Dr. Levy 10:26:17 hadn't told his CEO on the 22nd just, as he testified, 10:26:22 "We need to get rid of this volunteer appointment." 10:26:30 It's very simple.

10:26:33 Members of the jury, the decision to 10:26:34 terminate was made by Dr. Levy on the 22nd in the 10:26:38 afternoon in his office. It just doesn't fit with Dr. 10:26:44 Popat's version, his original version, until he is 10:26:49 sitting in this courtroom that he didn't complain until 10:26:53 the evening of the 23rd. Because that doesn't fit with 10:26:59 his claims. That doesn't fit with this lawsuit where he 10:27:03 is asking you to give him millions of dollars.

10:27:12 His original timeline would also mean that 10:27:15 he was terminated before anybody in the neurosurgery 10:27:18 department, including Dr. Siddiqui, would have been made 10:27:23 aware that he was so offended by the UPS "What can brown 10:27:28 do for you." By the way, that both Dr. Siddiqui and Dr. 10:27:35 Levy have owned up to saying. And both have said, it 10:27:39 probably shouldn't have been said, but there was no 10:27:43 mal-intent. There was no intention to offend anybody. 10:27:47 They've admitted that.

10:27:50 So how do we make it fit? How do we stuff 10:27:54 it back in, just like that tumor that Dr. Popat said

S. POPAT V. E. LEVY, ET AL

10:27:58 maybe we should stuff it back in so that Dr. Levy has a 10:28:02 challenge? How do we make these jurors believe that I 10:28:08 was terminated because I complained about that UPS 10:28:12 comment, not because of my own unprofessional and unsafe 10:28:18 behavior? Just like that tumor, he joked or 10:28:25 sarcastically said, "stuff it back in" or "if he really 10:28:29 wants a challenge, let's use the Tisseel and let's glue 10:28:35 it back in." It doesn't fit, Ladies and Gentlemen of 10:28:39 the Jury. You want to know why? It can't. What else 10:28:42 can we do to make it fit? To make that narrative that 10:28:46 he was wrongly terminated based on his complaint. And 10:28:54 how can we make it fit that this behavior in the OR, the 10:28:58 unprofessionalism, the reason Dr. Levy terminated him, 10:29:03 how can we make that fit so it just appears to be a 10:29:06 cover so it appears that Dr. Levy is just a racist?

10:29:16 Well, you start with a complaint. I 10:29:19 encourage you to ask for that complaint and look at it 10:29:26 for yourselves. The complaint was made July 31st, not 10:29:30 sent until August 13th, and sent to the Dean of the 10:29:33 medical school, Dr. Levy's boss. Dr. Levy had just 10:29:37 become chairman of this department. Brand new chairman, 10:29:42 walks in and makes a racist comment directed to all of 10:29:47 the people of color in the operating room, and then 10:29:51 retaliates against Dr. Popat by terminating his

S. POPAT V. E. LEVY, ET AL

10:29:56 volunteer appointment, which Dr. Levy made happen. Dr.
10:30:00 Popat had been asking for years for that appointment.
10:30:03 Dr. Levy get it done and you can have it. But he wants
10:30:07 you to believe that he turns around seven months later
10:30:12 and terminates the very position that he gave him
10:30:16 because of the UPS comment, not because of Dr. Popat's
10:30:20 own behavior in that operating room.

10:30:23 THE COURT: Ms. Mattrey, hold on one second.
10:30:25 Tom, can we call the Marshals and tell them to try and
10:30:29 keep it down? They seem a little rambunctious today.
10:30:34 Thank you.

10:30:37 MS. MATTREY: Did you want me to hold off?

10:30:38 THE COURT: No. I wanted to let them know
10:30:41 we were doing -- we were hearing them.

10:30:44 MS. MATTREY: Okay. And after that
10:30:47 complaint is made and the EDI does their investigation
10:30:51 and they interview seven different people, none who
10:30:56 support Dr. Popat's version of the events, and say there
10:31:00 was no discrimination, there was no retaliation. Dr.
10:31:06 Popat files an EEOC complaint, and that is also in
10:31:10 evidence for your review. And that is brought to your
10:31:13 attention because now, it's not -- he is doubling down.
10:31:18 Now he is saying that the discrimination and the
10:31:23 harassing behavior started in January of 2014. You

S. POPAT V. E. LEVY, ET AL

heard from Dr. Popat himself, he never worked with Dr. Levy ever until July of 2014. So how can he possibly have been abused and harassed or been present for any racially harassing comments for seven months when he never even stepped foot in a room with Dr. Levy.

And I also ask you to pay attention to the EEOC complaint because nowhere on that complaint does it say he is an employee of UBNS. And when he is asked for examples of this many events preceding, as he told Dr. Cain, the many events of harassing and coercive and abusing behavior - couldn't give any. Not one, because he never worked with Dr. Levy before July. He wasn't there. He wasn't an employee of UBNS. He wasn't an employee of the Department of Neurosurgery. And more likely, members of the jury, because it just didn't happen.

You heard Dean Cain testify. In his term of 15 years as dean from 2006 to 2021, other than Dr. Popat's complaint about Dr. Levy, there have been no other complaints of any kind filed against him. Ms. Nolan's report, which you have an opportunity to review if you want to, interview with residents, interview with Dr. Siddiqui, with Dr. Leonardo, all say Dr. Levy is supportive, he is inclusive, he has never made us feel

S. POPAT V. E. LEVY, ET AL

that our race, our gender, our ethnicity, our religion have anything to do with practicing neurosurgery or being trained to be a neurosurgeon. You can read those accounts yourself. These are the people that worked day in and day out with Dr. Levy, who have no agenda to make up for poor and unprofessional behavior in an operating room, and now we're asking you to compensate him for it. Unfortunately, the former resident that I told you that was going to come testify became ill and could not fly here. But, certainly, you've heard Dr. Levy's testimony about what they discussed and you can read Ms. Nolan's report fur yourself.

Mr. Glennon's response to all of the witnesses that didn't support Dr. Popat and his version of events, well, Dr. Elad Levy must have just bullied them. He must have just guilted them, strong armed them, again, trying to make it fit where, frankly, there is just no credible proof. Now, you saw in Ms. Nolan's report, Dr. Siddiqui and Dr. Leonardo adamantly deny that they were ever told not to work with Dr. Popat, that they were ever told about the UPS comments by Dr. Popat until after he received that letter from Dr. Levy.

Dr. Siddiqui, he was here, he told you about the multiple conversations he had with Dr. Popat

10:35:17 starting in the operating room, "please call Dr. Levy, 10:35:22 it's a misunderstanding, please just talk to him. He 10:35:25 wants to hear it from you." Not once, not twice, three 10:35:32 to four times and that is from Dr. Popat's own 10:35:35 testimony. Both Dr. Popat and Dr. Siddiqui testified to 10:35:40 the discussion on the 23rd. Dr. Siddiqui, of course, 10:35:45 adamantly states he didn't hear anything about this UPS 10:35:50 comment on that occasion. But either way, both of them 10:35:54 say that Dr. Siddiqui told him very clearly, "Elad is 10:35:59 upset. He wants to here from you. He is going to 10:36:03 terminate your volunteer faculty position." And Dr. 10:36:08 Popat's response, "I didn't even know I had the 10:36:13 position."

10:36:15 But Mr. Glennon's question to Dr. Levy and 10:36:23 Dr. Siddiqui over and over, why didn't Dr. Levy call Dr. 10:36:28 Popat? Why didn't anybody specify the reasons he was 10:36:31 being terminated. By Dr. Popat's own testimony, he knew 10:36:35 why Dr. Levy was upset. He knew that Dr. Levy wanted 10:36:41 some understanding of what happened before he got there 10:36:46 on the 22nd at the surgery.

10:36:50 Dr. Popat didn't give him the opportunity to 10:36:54 have that discussion. He didn't call him until over 48 10:37:00 hours had transpired. That surgery was over at noon. 10:37:07 Forty-eight hours would have been noon on the 24th. He

S. POPAT V. E. LEVY, ET AL

10:37:13 doesn't bother to call him until 5:30, not so much as a text, not so much as an e-mail, not so much as telling Dr. Siddiqui, hey, look, I'm really tied up with cases, can you let Dr. Levy know can we talk over the weekend. Can we get a cup of coffee. Can we talk after my cases are over. Nothing.

Now, members of the jury, all of you, I'm sure, have been in employment situations where somebody in a role above you wants to have a discussion. Do you say, "I'll think about it"? Do you say, "I don't know, I can allow that for myself respect"? Perhaps you don't really think that you owe them anything because they are not your employer. Dr. Popat tried to explain his behavior in the OR again by saying he was being sarcastic, he was frustrated, he was in shock. He was trying to explain his behavior away so that he could say that Dr. Levy really didn't have a legitimate reason to terminate him. This was all pretextual. It was all because of the UPS comment that now, for the first time in 10 years, happened outside of the OR on the 22nd.

Dr. Popat also asserts he never knew about the surgical plan. He never knew he was the access surgery. Mr. Glennon said on opening he was the access surgeon. I encourage you to look at Ms. Nolan's report,

S. POPAT V. E. LEVY, ET AL

Dr. Popat's own words, he was the access surgeon. Again, doubling down. Dr. Popat goes on to say that having to wait for Dr. Levy puts this patient at severe risk. And, of course, his statements about gluing the thing back in or stuffing it back in just out of frustration, they weren't teaching moments, so they don't count. Instead, he tells you that if he had to do it all over again, the teaching moment would be to turn to the residents, the neurosurgical residents and say, "We really shouldn't be waiting for Dr. Levy. This is dangerous for the patient." Not, "please excuse my comments, I'm just frustrated," not "I shouldn't have said that." He is doubling down. "I should have told those neurosurgery residents that we shouldn't be waiting for their chairman because it's dangerous."

Dr. Popat says during the surgery, he is in the state of incredulousness. And he says Dr. Levy comes in and sees this tumor is essentially out. Pay attention, members of the jury. Take a look at the evidence. Because he says that he was sarcastic and everybody in the room knew that he wasn't serious about stuffing this thing back in. And then he goes on to tell Ms. Nolan in her report, as documented in her report, the resident put it back in. But in his own

10:40:54 personal notes, which are in evidence and you can take a look, and he underlines and bolds, "Dr. Siddiqui put it back in." These are a few examples of the ever evolving stories, changing from document to testimony, now changing again at trial. Trying to make this fit.

Now, the Judge will give you some instructions on witness credibility. And I ask you to pay very close attention to that. Because in this case, when the only proof that the Plaintiff has offered to you, the only witness other than the economist that they have offered to you about the events is Dr. Popat, who has been contradicted by every other witness in this case, who was contradicted by every other witness interviewed by the EDI office, when the only proof that Dr. Popat is offering you that he was terminated and retaliated against for complaining about the UPS comments. You should pay attention to how many times his version of events has changed. You need to ask yourself, has Dr. Popat been honest with us in this courtroom or is he simply trying to make it fit.

You've listened very intently over the last many days, I've lost count. You've seen documents and heard witnesses, so I'm not trying to stand up here and rehash all of the facts or all of the documents that you

S. POPAT V. E. LEVY, ET AL

already have seen and heard. I just want to take a moment because this is the last time I get to talk to you before you deliberate to go over a few other things. Dr. Popat testified about that meeting at Dr. Siddiqui's office or his office, I'm sorry, his house with his lovely wife Josephine on August 24th. And he maintains that this was a quid pro quo, you withdraw your complaint and we'll give you your appointment back.

Dr. Levy has been very consistent across two depositions and his trial testimony, that was never going to happen. That was never offered and that was never said. "What I said was, I will give you a chance to resign as opposed to being terminated. And then work with us. Let's rebuild the trust. And then we'll re-evaluate."

Not good enough.

What Plaintiff cites as the proof that he was retaliated against and that he has lost so much because he made these complaints and Dr. Levy fired him for it? Lost employment? Nope. He is the highest earner at Delaware Medical Group. You heard from his boss, Dr. Haar, consistent, never falls below the amount that he has been guaranteed. Lost privileges at hospital? No. He still has all of his privileges.

S. POPAT V. E. LEVY, ET AL

Lost malpractice coverage? Nope. These are all of the things that, if you recall, he cited in his letter to Dean Cain as the potential damages that he was going to suffer because his volunteer appointment was revoked. Lost library access? He had it all along because his primary appointment was with ENT, Otolaryngology, his given specialty. Lost parking at the hospital? Members of the jury, again, this is a common sense thing, all doctors that have privileges at a hospital have parking at a hospital. That is not something given to him by his secondary appointment by the neurosurgery department. And, of course, the real loss he cares about is the loss of referrals from Dr. Siddiqui and Dr. Leonardo. Both who told, very clearly, Ms. Nolan-Weiss it was their choice. They didn't trust him. Dr. Levy never told them not to work with Dr. Popat. And when asked on the stand, "Dr. Popat, did anybody ever tell you that Dr. Levy said you can't work with them?" What is his response, "it was just a feeling."

Members of the jury, he is asking you to find that Dr. Levy retaliated against him for race-based comments and get him millions of dollars on a feeling.

So what is Plaintiff's proof? That Dr. Levy told no residents in the room, either. Okay. Well, we

already heard that you had a feeling that he told Dr. Leonardo and Dr. Siddiqui not to work with him. Dr. Leonardo very clearly said, "I made the decision not to put residents in that room on September 3rd," which was her last case with Dr. Popat. I made that decision as the director of the residents, I'm sorry, the residency program director, apologize. Must have just been another feeling.

Members of the jury, you can read that report yourself from Ms. Nolan. Dr. Popat wants you to believe retaliation, because without it, his lawsuit doesn't fit. Drs. Leonardo and Siddiqui could not have been clearer, this was our choice. We worked with him from 2010 to 2014, and that was our choice. Even before he had the appointment to the department, he was freely working with them at their discretion. Dr. Popat told you on the stand, every surgeon has a choice who they want to work with. But all of a sudden, Dr. Leonardo and Dr. Siddiqui, he wants it to be a choice that Dr. Levy took away from them. That is not what they said. They said it was our choice. It was always our choice. Dr. Popat just didn't like that choice.

And let us not forget, Dr. Leonardo, who Dr. Popat himself sent 95 percent of those referrals that he

is talking about between 2010 and 2014, came from Dr. Leonardo, who left Buffalo, moved out of state, moved to Pittsburgh in June of 2016. He is obviously not going to be getting any referrals from her. He is not going to be building a specialty practice with her.

So what is the response? Well, the guy that took over should have been sending me these cases. But acknowledges on the stand that Dr. Davies has a right to work with whoever he wants. But it just doesn't fit. It doesn't fit the narrative that he is harmed by Dr. Levy.

Members of the jury, Dr. Popat's feelings that he should have gotten all of these referrals, it's just that, hopes, feelings. He was never guaranteed those referrals. You heard from his own testimony he was never guaranteed. There was no agreement, there was no contract, he was not assigned cases, that is not how this worked. When the need would arise, they would call him if that is who they chose to work with and say, do you want to get involved. He always had the choice to say no. That is not an employee/employer relationship. Those are community surgeons working together. Every single opinion offered by Dr. Wall, Plaintiff's only witness, besides himself, saying that Dr. Popat has

S. POPAT V. E. LEVY, ET AL

suffered millions of dollars in lost revenue because of these referrals stopping, referrals that he was never guaranteed, he was never entitled to, and his entire opinion is based on the assumption that Dr. Popat would continue to get these referrals when he first did his report that outlined his opinion back in 2021 assuming all of these million dollar damages, he didn't have some key facts, he didn't know Dr. Popat wasn't a neurosurgeon, he didn't know that Dr. Popat's main source of referrals left in 2016. He was projecting losses into 2021. On the assumption, the feeling that Dr. Leonardo would have continued to send these referrals and the economist didn't even know she was gone. That is pretty big information to miss. Most importantly, as you heard on cross examination of Dr. Wall, he has no familiarity with any federal rules there may be about referrals. He had no idea there was no agreement whatsoever between Dr. Leonardo, Dr. Siddiqui and Dr. Popat.

Dr. Wall didn't even know, as of the time he sat here, that Dr. Popat's time at ECMC, you heard about that 25 percent FTE, had gone to 50 percent. One human can only be in so many places at so many times. Obviously if his time on location has gone up at ECMC,

S. POPAT V. E. LEVY, ET AL

10:52:30 his time to do surgeries or to have patients at Delaware 10:52:36 Medical Group is going to go down. But of course that 10:52:38 wasn't considered. He didn't even know. Again, pretty 10:52:42 big information to not know when you're here on the 10:52:46 stand saying that he is entitled to millions of dollars 10:52:50 in lost revenue. Because it didn't fit. He didn't even 10:52:58 consider the cost difference from year to year. He only 10:53:02 had one year of figures as to what the cost, the 10:53:07 overhead, that was reduced or would have been taken away 10:53:12 from Dr. Popat's overall income that would determine his 10:53:16 bonus. One year. 2021. Nothing from 2010, nothing 10:53:22 from 2011, nothing from 2015 after these events, '16, 10:53:28 '17 and so on. Why? How do we know Dr. Popat didn't 10:53:34 have a banner year in 2015, but it was reduced by the 10:53:38 fact that they hired three people or that his 10:53:42 malpractice premiums tripled. We don't know because the 10:53:46 Plaintiff chose not to put that proof in front of you. 10:53:50 Why? Because it doesn't fit.

10:53:55 Members of the jury, all of these changes to 10:53:59 Dr. Popat's story, all of these attempts to make it fit, 10:54:02 to make it so that Dr. Levy retaliated against him for 10:54:07 comments that he didn't even know Dr. Popat was upset 10:54:11 about. His attempts to malign a surgeon who has spent 10:54:25 the last 20-plus years of his very distinguished career

10:54:31 at such a young age, saving lives, innovating new ways
10:54:37 to treat devastating strokes, teaching and mentoring
10:54:39 young neurosurgeons, and encouraging the neurosurgery
10:54:44 community to promote diversity and promote women because
10:54:49 that just doesn't fit. Plaintiff has failed in their
10:54:54 burden to make it fit. So I ask you to return the only
10:55:00 verdict that this evidence supports. He was not an
10:55:06 employee; the answer is no. There was no retaliation
10:55:13 under Title VII; the answer is no. There is no
10:55:18 retaliation under sections 1981 and 1983 in the New York
10:55:25 State Human Rights Law; the answer is no, no, and no.
10:55:32 And as to whether Dr. Levy interfered with his business
10:55:38 practices, his hopes and his dream, the answer to that,
10:55:42 I submit to you, considering the credible evidence, is
10:55:46 no.

10:55:48 Thank you for your time and your attention.

10:55:51 THE COURT: Thank you, Ms. Mattrey.

10:55:53 Mr. Glennon, are you ready?

10:55:55 MR. GLENNON: Could we take five minutes?

10:55:56 THE COURT: Sure. Why don't we plan on
10:55:58 taking a 10-minute break, ladies and gentlemen? And
10:56:00 we'll be back here about five after. I would just
10:56:03 remind you do not talk about the case and we'll see you
10:56:06 back here shortly.

10:56:07 (Whereupon, the jury is escorted from the courtroom.)

10:56:09 (Whereupon, there was a discussion on the record.)

10:56:09 (Whereupon, there was a break in the proceeding.)

11:15:33 THE COURT: Welcome back, everybody. Everybody can have a seat. Thank you for your continued attention and patience.

11:15:39 And, Mr. Glennon, whenever you're ready, you can proceed with the Plaintiff's closing argument.

11:15:43 MR. GLENNON: Thank you, your Honor.

11:15:46 Still morning.

11:15:47 Good morning, everybody.

11:15:48 I just want to join with the defense counsel in sharing our appreciation for what you guys have been doing and going through and what you've been missing out at home or at work. It can be a chore. But thank you very much for your attentive, careful dedication, both during this past week and for the task that you're about to partake in.

11:16:14 Dr. Popat personally thanks you for your attention to this matter. As I said in my opening, Saurin has waited a long time, a long time to present

S. POPAT V. E. LEVY, ET AL

11:16:25 his claims to a jury. He is not here for sympathy, and 11:16:30 he is not here to profit from the past. Now, Saurin 11:16:34 Popat is here on principle. That is what it's always 11:16:40 been for him. The Defendants' actions were wrong and 11:16:43 they're wrongful conduct caused financial harm, as Dr. 11:16:49 Wall, the only expert testifying in this trial, shared 11:16:52 with you.

11:16:53 Now, Saurin has been on this journey for 11:16:56 over 10 years, driven by principle. And based on his 11:17:04 background and life experiences, he believes he was 11:17:08 wronged, he was offended, and he has been willing to see 11:17:11 this through for 10 years right to this moment with you. 11:17:16 He wants his voice to be heard against the power and 11:17:20 authority of the State of New York, the University of 11:17:25 Buffalo, and a whole lot of people filled with octane. 11:17:30 My firm has been by his side for this whole journey 11:17:34 through every twist and turn, through every one of those 11:17:38 depositions you heard about. We've been there with a 11:17:41 responsibility of watching out for his rights and 11:17:45 advocating for his principles. But today, at this 11:17:52 moment, Ashley, Nicholas and I, we have to turn that 11:17:56 responsibility over to you. That is why we did this 11:18:00 trial, for you to hear it out and for you to decide. We 11:18:09 trust you.

S. POPAT V. E. LEVY, ET AL

In my opening I said that I think this is a simple case. I know over the past seven days, witnesses, different timings, hearing about deposition testimony read in, I understand it's taken some time and maybe you don't see it. But I still think it's simple, particularly when you focus on the relevant evidence and you exclude the distractions or what I call "noise."

Dr. Levy walked into an operating room, he looked out over a group of talented and experienced surgeons and other medical professionals, mostly people of color who had labored on a young patient for three hours, and he decided to make demeaning race-based comments that offended Dr. Popat. Dr. Popat complained to the dean about the comment. The neurosurgery department circled the wagons, rallied around the chairman, and they wanted Dr. Popat to withdraw his complaint. He refused. Five days later, Dr. Popat was terminated.

Now I appreciate that this fact pattern is not a classic, classroom textbook example of retaliation, but it's in there. And it's visible and it's clear when you focus on the relevant evidence and exclude the noise. And similarly, the fact that we call this a volunteer faculty appointment, that may be a

S. POPAT V. E. LEVY, ET AL

11:19:58 little misleading. I mean, clearly this is not a
11:20:01 classic example of a volunteer going to help clean up
11:20:06 the town park. There is more to it. So let's focus on
11:20:10 the relevant evidence which proves Dr. Popat's claims.

11:20:15 Initially in 2014, Dr. Popat had an
11:20:19 appointment with the ENT department at UB Med and a
11:20:23 three-year faculty or three-year term as a faculty
11:20:27 appointment with UB Med's Neurosurgery Department. It
11:20:31 came with a title - clinical assistant professor of
11:20:36 neurosurgery. Look at exhibit 6. On July 22, 2014, for
11:20:44 the first time ever, Drs. Popat and Levy worked
11:20:49 together, and Dr. Siddiqui was present. Race-based
11:20:52 comments were made, although Dr. Levy previously denied
11:20:55 it, he did finally admit it here in this trial that he
11:20:59 did make race-based comments, "What can brown do for
11:21:03 you," at a minimum. So then Dr. Popat filed his formal
11:21:08 written complaint with UB Med's Dean, Dr. Cain,
11:21:13 complaining first and foremost about Dr. Levy's "brown
11:21:17 people comments" during the July 22, 2014 surgery. That
11:21:20 is exhibit 4.

11:21:23 Ladies and Gentlemen of the Jury, as I said
11:21:25 in my opening, that is where this retaliation and
11:21:31 tortious interference case begins, with the filing of
11:21:37 the formal complaint with Dean Cain. Dean Cain then

went and shared that complaint with Dr. Levy just out of practice in his August 19, 2014 e-mail. That is exhibit 43. And you heard the complaint hurt Dr. Levy. He thought it was disgusting. It made him want to vomit. He was upset about it. He was upset about Dr. Popat's complaint of hearing about the brown people comments after he had been working on this young boy. Dr. Levy didn't like having that complaint made against him. And the evidence shows that the complaint was perceived to be an attack on UB Neurosurgery. In that same e-mail, Dean Cain asked Dr. Levy to confirm that Dr. Popat's appointment rescission that was raised in Popat's complaint. That e-mail is exhibit 43. Dr. Levy responded stating that he would defer on confirming rescinding of his appointment until we dig into this matter further. Levy put the termination on hold. As you heard, he didn't have the authority to terminate Popat, so the July 23 letter is a nullity. But even if he did have the authority to terminate Popat, this deferral matters because it put any possible termination on hold. You heard that from Dr. Cain, and we saw that in Jessica Baker's, the UB attorney's e-mail, it was on hold and Dr. Levy was digging into this matter. How so? What matter is he digging into? By that time, Dr.

Siddiqui, as you heard him testify, had already taken responsibility for the surgery and the issues that Dr. Levy had on July 22. And Dr. Popat had reached out to Dr. Levy, but Dr. Levy never called back. And by the way, don't forget that Dr. Levy's testimony yesterday, the surgery ended around 2:30 or 3, so if anyone is considering 48 hours, that point is not clear in the evidence. But Dr. Levy chose not to call back Dr. Popat, even though he has 10 seconds for everybody else.

But Dr. Levy was digging into the matter. Either way, this is where the claims begin. How Dr. Levy dig into this matter? By having Siddiqui set up the meeting at Siddiqui's house on August 24 with Dr. Siddiqui, Leonardo and Popat. And there the evidence from both Dr. Siddiqui and Dr. Popat show that Popat was asked to withdraw his complaint and he declined. At Dr. Siddiqui's house, Popat was asked to withdraw his complaint of race-based discrimination and Dr. Popat declined. We've read in a portion of Dr. Siddiqui's deposition testimony, go back and read it. It's what Dr. Siddiqui said. The important thing is that Dr. Popat was asked to withdraw his complaint, which is a protected activity. He doesn't have to withdraw it. Dr. Siddiqui testified to this in his deposition, which

we read with Mr. Schwarm. The digging in, folks, wasn't about the surgery, it was all about trying to get rid of Dr. Popat's complaint because it was disgusting, it made Dr. Levy want to vomit. Finally, Popat was terminated five days after that meeting at Dr. Siddiqui's house because he wouldn't withdraw the complaint.

Now, there should be no questions about what happened with the July 22 surgery. As I said, Dr. Siddiqui's testimony was clear. Siddiqui felt bad about having gone too far and he didn't stop the surgery sooner. He is the one that Dr. Levy spoke with and said, hey, call me first. It's only Siddiqui to whom Levy said stop before you get to the tumor. Siddiqui took responsibility. And for those, whether they were considered silly or sarcastic, as the evidence came in, remarks by Dr. Popat about the tumor and the Tisseel glue, and the tumor, and Siddiqui confirmed, silly, sarcastic. And you heard Dr. Siddiqui say, no tumor was stuffed back in. No tumor was stuffed back in. Dr. Siddiqui stated all of this and it supports Dr. Popat's testimony.

Once Dr. Popat filed the formal complaint and once Dr. Levy deferred the rescission, which means putting it on hold and then he tried to get the

S. POPAT V. E. LEVY, ET AL

11:26:49 complaint withdrawn. See, so let's talk about the
11:26:51 relevant evidence. Title VII, 1981 and Human Rights
11:27:02 Law, two of those start on August 19th. Everything that
11:27:05 happened prior to August 19th, maybe it's context for
11:27:10 you, but much of it is just noise, distracting you from
11:27:16 seeing the legal claims that the relevant evidence shows
11:27:22 and that relevant evidence is what you need to render
11:27:25 your verdict on retaliation.

11:27:29 Let me give you a couple of examples of
11:27:31 noise. This whole topic of July 22nd, Dr. Popat told
11:27:38 Dr. Siddiqui that he was offended by the complaints or
11:27:42 the comments, excuse me, we haven't argued that is when
11:27:46 retaliation started. Think back to my opening
11:27:49 statement. And this is where it begins. We've always
11:27:54 argued that retaliation and tortious interference
11:27:58 started with the filing of the complaint post marked
11:28:04 August 13th. It is interesting, though, as they say,
11:28:09 it's the first time in 10 years they've ever heard Dr.
11:28:13 Popat say that. It's also the first time in 10 years
11:28:16 here in this courtroom when Dr. Levy said that he
11:28:19 drafted this termination letter on July 22nd. Don't you
11:28:23 remember first it was later on the 23rd and he also told
11:28:27 EDI, I wrote it 48 and 72 hours. Only here, in front of
11:28:31 you, he says, yes, I made my decision on the 22nd.

S. POPAT V. E. LEVY, ET AL

Interesting.

Levy's inconsistencies and his stories that have changed over the years, that is for you to decide. They speak for themselves. I think he is worried about something, but I don't know why it goes on.

Let me give you another example of noise. The EEOC complaint saying January 1, 2014. Go ahead. Please go get it. It doesn't say anything about claims of harassment or discrimination prior to the July 22 surgery. It just happens to have a date on it, January 1, 2014, and it coincides with his appointment. You heard Dr. Popat testify it was just an administrative date.

So, folks, let's avoid the noise and just stay focused on the relevant evidence. My thoughts on what evidence is relevant, might be easier to do going along with the verdict sheet the Court is going to share with you. A bunch of questions you've heard about. The Court, of course, is going to instruct you on the law. You must follow what Judge Wolford says, not me. And as you'll hear, though, the legal standard for what Dr. Popat has to do to prove the relevant evidence, to prove his claims, is preponderance of the evidence. This just means more likely true than not true. More likely true

S. POPAT V. E. LEVY, ET AL

11:30:11 than not true. But I give you a football analogy. Dr. 11:30:18 Popat only has to get the ball across the 50 yard line. 11:30:22 He doesn't have to score a touchdown, he doesn't have to 11:30:26 kick a field goal, he just has to get that ball across 11:30:31 the 50 yard line. That is it. That is enough to prove 11:30:34 by a preponderance of the evidence his claims that are 11:30:36 being presented to you. And he has, as I'll explain.

11:30:44 Question one on your verdict sheet is 11:30:48 whether Dr. Popat was an employee at UB and UB Med. The 11:30:53 answer should be yes. Yes. As the Court will instruct 11:30:58 you, there are two steps to decide this question and 11:31:01 here the relevant evidence satisfies both of them. 11:31:04 First, Dr. Popat indeed received remuneration from UB 11:31:11 Med. No, he didn't get a salary, that is not needed. 11:31:14 Dr. Popat received remuneration that consisted of 11:31:20 substantial benefits not merely incidental for the 11:31:25 activity. Wasn't going to just pick up a park. He was 11:31:28 part of the UB faculty and he had volunteer faculty from 11:31:32 two departments, and he did receive annual stipends. 11:31:36 The answer is from the ENT department, this wasn't a 11:31:41 discretionary bonus. Read it. You've heard Dr. Popat 11:31:46 testify about consistent annual stipends, and we put, in 11:31:52 I don't know, four or five letters as examples. But 11:31:55 exhibit 14, that one covers the year 2014. Doesn't say

11:31:59 "bonus." It says, "Thank you for your contributions of 11:32:05 time, energy, effort and expertise to our residency 11:32:09 training program. Without your work and that of the 11:32:12 other faculty, the residency would not exist." The 11:32:16 other faculty. "The enclosed is a check for your 11:32:20 teaching efforts." He is getting a stipend or money 11:32:24 from UB's department.

11:32:29 As you'll hear, a stipend is sufficient to 11:32:35 satisfy the requirement of remuneration, no matter what 11:32:39 the other benefits University Defendants may have 11:32:41 provided to Dr. Popat. And there were other benefits 11:32:45 that Popat testified to. Yes, he had the title 11:32:49 "clinical assistant professor neurosurgery and 11:32:52 otolaryngology." He had a UB Med e-mail address. There 11:32:59 were specific benefits he testified to and that you'll 11:33:03 find in the SUNY regulations that were moved into 11:33:06 evidence that talk about special access, permissions to 11:33:10 the library. He testified to lockers at Kaleida for 11:33:14 that work. So it's there.

11:33:17 Having proven remuneration, the second step 11:33:21 is a review of a series of factors that should be 11:33:25 balanced and the Court's instructions will explain those 11:33:27 to you and list them out. But you'll also hear not all 11:33:31 of the factors must be satisfied and there is not one

S. POPAT V. E. LEVY, ET AL

factor that is dispositive on its own. You can even disregard factors. But here is an overview of the evidence that satisfies this second element. As a UB faculty member, Dr. Popat had to comply with SUNY UB, UB Med and department regulations, policies and rules. You probably heard that a few times throughout the testimony here. You also heard it when we read in deposition testimony of Sharon Nolan-Weiss. He had to follow UB Med standards for training residents and medical students with their direction and he received feedback, you heard him testify to that. The location of the work was dictated by UB Med because it had to be done at affiliated area hospitals. Remember what you heard from Dr. Cain, UB is the only one without a teaching hospital. They had affiliation agreements, not with all hospitals in Buffalo. No, you had to go to certain hospitals, including Kaleida and ECMC.

Dr. Popat also had a duration of a relationship with UB Med. He had term appointments. Exhibit 6 shows three years for neurosurgery. January 1, 2014 through December 31, 2016. Dr. Popat wasn't permitted to hire assistants or pay them for his teaching at UB. UB provided the residents to assist him as he trained. And these factors, with others, get Dr.

S. POPAT V. E. LEVY, ET AL

11:35:17 Popat across that 50 yard line. Therefore, based on 11:35:21 that evidence, the answer to question one should be 11:35:23 "yes." Popat was an employee of UB and UB Med.

11:35:30 So that moves you on to the second question. 11:35:33 Joint employer. You heard Ms. Mattrey go read the EEOC. 11:35:39 Dr. Popat didn't allege in his EEOC complaint that he 11:35:43 was an employee of UBNS. But listen to the law as 11:35:47 instructed by the Court. UBNS may be considered a joint 11:35:57 employer. Joint employer with UB and UB Med. I submit 11:36:00 the evidence dictates that the answer is yes, UBNS was a 11:36:06 joint employer along with UB and UB Med. Because UB 11:36:13 department or UBNS shared in controlling the terms and 11:36:21 conditions of Saurin's position. UBNS and UB Med, 11:36:29 absolutely, technically separate entities, but they 11:36:33 handled several aspects of Dr. Popat's employment 11:36:39 jointly. Dr. Popat had to comply with everybody's 11:36:42 policy. Dr. Popat provided the UB Med training to the 11:36:46 residents in the clinical environment that is run by 11:36:49 UBNS. I think we've heard a lot of testimony about the 11:36:54 distinguishing clinical and training. Dr. Popat's work 11:36:57 was done clinically with UBNS. You heard a lot of 11:37:03 testimony, UBNS and UB Neurosurgery Department, the med 11:37:08 school had overlapping operations. Dr. Siddiqui, again, 11:37:12 testified to this. You heard intermingled, you heard

S. POPAT V. E. LEVY, ET AL

11:37:16 Dr. Popat say there were mirrors, mirror groups. Dr. 11:37:21 Cain testified to this. The department chair, Dr. Levy, 11:37:25 is the practice plan, UBNS's, president. The department 11:37:32 chair's assistant Mary Ann Kedron, was the practice plan 11:37:38 CEO. UBNS practice plan had to pay a dean's tax 5 11:37:43 percent back to the med school. It's like a royalty, 11:37:48 like a franchise fee. It's going back. They are 11:37:52 invested. You also heard in Dean Cain's deposition 11:37:59 testimony read into the Court where he stated if 11:38:02 practice plan was to close, all of its assets go back to 11:38:07 UB, UB Med; they all revert there. And it's the UB 11:38:11 neurosurgery faculty, full-time faculty, who trained the 11:38:16 UB Medical Neurosurgery residents through UBNS's 11:38:22 clinical practice. Same employee. UBNS had significant 11:38:27 control over Dr. Popat. Don't forget, you heard the 11:38:33 patience originated from UBNS doctors, not from Dr. 11:38:38 Popat. He didn't bring his patients. Go back and check 11:38:41 his testimony. UBNS and their neurosurgeons had the 11:38:44 patients. UBNS, you heard, scheduled the surgeries for 11:38:48 their patients. Sure they had to confirm Dr. Popat's 11:38:51 availability, but they scheduled them. And the 11:38:56 surgeries were scheduled for the hospitals or clinics 11:38:59 with which UBNS and UB had those affiliation agreements, 11:39:05 including Kaleida. Indeed, Dr. Levy testified that he

initially wanted to terminate Dr. Popat because of Popat's comportment in a UBNS surgery, in the OR. That is clinical practice. And it's the UBNS President, and he had his UBNS CEO, prepare letters and delegated admin tasks. Therefore, based on this relevant evidence, ladies and gentlemen, the answer to question No. 2 is "yes." Yes, UBNS was a joint employer. So now let's talk about retaliation against or by the University Defendants, UB and UB Med. This is question three in the verdict sheet. Has Dr. Popat gotten the ball across the 50 yard line to show if UB and UB Med retaliated against him? Yes. He got that ball across.

There are four essential elements that you'll hear from the Court. First one is that Dr. Popat engaged in a protected activity by complaining of race discrimination. As you'll be instructed, doesn't affect the result if there was no unlawful discrimination. Doesn't have to violate the law for making a complaint to be considered protected activity. Dr. Popat must prove by the preponderance of the evidence, more likely true than not true, that he had a good-faith reasonable belief that he was opposing an employment practice made unlawful by federal or state law. Now, in today's world, even 10 years ago, people were aware that

demeaning race-based comments in the workplace were not appropriate and could violate the law. The question is what did Dr. Popat believe. That is all.

He testified to his background. Being a refugee, being discriminated against, growing up in government housing. I don't think this was a new topic for him. He told you that he understood or heard about Title VII, he attended workplace trainings and learned about demeaning comments in the workplace involved. Now, he is not an attorney. He doesn't know definitively if something constitutes a violation of Title VII; most non-attorneys don't. But he believed as a person and based on his personal background and history, knowledge and training that in the context of that July 22 surgery, working for three hours on a patient, with a whole team, mostly people of color, just have a lone white surgeon enter that OR and ask, "What can brown do for you?" It's the type of behavior Dr. Popat believes is prohibited under federal and state law. Maybe it doesn't offend everyone. Maybe that comment wouldn't offend you. Maybe Dr. Popat's complaint wouldn't offend you, either, but different people are offended in different ways. That is why we're here. I think Dr. Popat was reasonable for his

S. POPAT V. E. LEVY, ET AL

good-faith belief. Also, when he was asked to withdraw his complaint, Dr. Popat said "no." He doesn't have to withdraw his complaint.

So let's just be clear, after the Siddiqui meeting, Dr. Levy was done with this. He couldn't get Dr. Popat to withdraw his complaint. He was angry. You heard from Siddiqui and Popat that tempers and emotions were high at Siddiqui's house at the meeting. Levy was over it. That, Ladies and Gentlemen of the Jury, is when Levy decided to terminate Dr. Popat. August 24, 2014, at Dr. Siddiqui's house, that is when the hold came off this rescission. And it came off because Popat wouldn't make a deal. He wouldn't withdraw his complaint. What did we hear, Popat wouldn't tell us what he wanted. Popat was reticent and wouldn't share what he wanted. He wouldn't make a deal. Wouldn't withdraw his complaint, so he was terminated August 29th. And UB and UB Med knew this on August 29th and they did nothing. They let it happen. They let Levy, fueled with his octane and frustration over his perception that Popat was attacking him and the department, terminate Popat's appointment. And Siddiqui and Leonardo fell in line. Team before self. Remember that? Team before self. That is what Dr. Levy brought

S. POPAT V. E. LEVY, ET AL

to the culture of the neurosurgery department and UBNS. Rally around the chairman. Circle the wagons. Team before self.

Second, the Defendants knew, this is the second element, the Defendants knew of Plaintiff's complaints of race discrimination. That is clear, Dr. Popat had his July 31 complaint, exhibit 4, e-mailed that on August 13th. Dr. Cain reviewed it and passed it onto EDI Sharon Nolan-Weiss and Larry DiGiulio, and a copy to Dr. Levy. We heard Drs. Cain and Levy testify to this and we saw the August 19, 2014 e-mails, exhibit 43. They knew, University Defendants and Dr. Levy, knew of the complaint. Cain was the Dean for the medical school. They knew about it and Drs. Siddiqui and Leonardo and Levy asked him to withdraw the complaint. And remember, Dr. Siddiqui is not on Dr. Popat's side here. He is brothers from another mother with Dr. Levy. But the demand to withdraw the complaint was acknowledged by Dr. Siddiqui.

Third element, Popat was subjected to a materially adverse action by the defendants. Yes. What happened to Dr. Popat could dissuade a reasonable worker from making or supporting a charge of discrimination or maintaining it. Somebody else saw that Dr. Popat's

11:46:42 neurosurgery appointment was terminated because he made 11:46:45 and refused to withdraw the complaint as a result that 11:46:51 could dissuade him. Dr. Levy testified in his 11:46:57 deposition that Dr. Popat was losing responsibilities. 11:47:01 Dr. Popat would be unable to hold himself out as a 11:47:04 member or part of the UBNS neurosurgery. Sure, he is 11:47:08 still with UB and ENT, but he was stripped of his 11:47:12 neurosurgery title and responsibilities. Simply stated, 11:47:16 that is a materially adverse action. Neurosurgery 11:47:21 residents were no longer assigned to him. And the UBNS 11:47:26 or UB Neurosurgery faculty who are also UBNS surgeons, 11:47:32 Dr. Siddiqui and Leonardo, stopped working with him. 11:47:40 They knew about it and this was a materially adverse 11:47:43 action. Now, they stopped, Siddiqui and Leonardo, they 11:47:47 stopped working, we've heard it throughout the trial, we 11:47:51 heard it this morning, broken trust. Broken trust was 11:47:55 their collective reason. What a convenient line for 11:47:59 everyone to share. Trust in what? They worked together 11:48:05 for four years before. Four years they worked together. 11:48:09 Teammates. They don't throw a teammate under the bus. 11:48:12 Remember hearing that?

11:48:16 So what was the broken trust really about? 11:48:18 It's about the complaint. It's the only reasonable 11:48:22 conclusion. They praised Dr. Popat's surgical skills

S. POPAT V. E. LEVY, ET AL

even though Dr. Levy told EDI, I told Jody Leonardo, "if you feel safe feel." Safe for what? A complaint. He doesn't like complaints. He doesn't like the department being attacked. So they had a collective reason to stop working with him. Dr. Levy denies that he pressured anybody. But Dr. Leonardo did state, EDI investigation report, look closely, starts at the bottom of one page, and goes to the next one, six and seven, she says, Dr. Levy was upset with Dr. Leonardo because she was upset about the rift between those two doctors.

Dr. Leonardo had trained at UB, she had been sent to the Netherlands for the fellowship because of UB, as Dr. Siddiqui testified, and her first job was right there at UB Neurosurgery Department.

Also take a look at Dr. Popat's notes. He told you, defer to the notes. And he did record in there what he understood from Dr. Leonardo about why she felt she was unable to work with him or would be unable to work with him after this. The evidence does prove there was implied pressure on Dr. Siddiqui and Leonardo. Team before self. Right? Collegiate athletes, team before self. Yes, there was materially adverse action.

Fourth element, was there a causal connection between the protected activity and the

S. POPAT V. E. LEVY, ET AL

materially adverse actions, such that but for Plaintiff's participation in this protected activity, he would not have suffered the adverse action? Yes. This goes back to Dr. Siddiqui's house and the collective desire for Popat to withdraw his complaint. Yes, Dr. Levy testified to initially wanting to terminate Popat, but once the complaint was filed, that termination was put on hold. August 19 e-mails. Confirmed in the August 29th e-mails. So what is it that ultimately changed the whole status to the termination status? I told you, it's simple, Popat's refusal to withdraw his complaint. Had he agreed to withdraw it per Dr. Siddiqui in his deposition testimony, it was possible that the termination would not have occurred. Read back his deposition testimony that we read in. But for filing the complaint and refusing to withdraw it, Dr. Popat would not have suffered all of those adverse actions I just laid out. Therefore, based on this evidence, the answer to question three in your verdict sheet is "yes," because Dr. Popat gets the ball across the 50 yard line. It's more likely true than not true that UB and UB Med retaliated against him in violation of Title VII.

So the next questions, four and five, are

about whether Dr. Levy and UBNS retaliated in violation of Title VII, 1981, and the New York State Human Rights Law. And those questions too should be answered "yes." As the Court will explain, the same analysis is used to prove section 1981, and New York State Human Relations claims as was used for proving Dr. Popat's retaliation claims under Title VII. And for all of the same reasons that I just laid out for question three, demonstrate that Dr. Popat also got across the 50 yard line for questions four and five.

Specifically for question five, that is about Dr. Levy, has the Plaintiff proven by a preponderance of the evidence that Dr. Levy retaliated against him in violation of Section 1981 and the New York State Human Relations law? Yes. Why? Because Dr. Levy is liable because he actually participated in this retaliation, in the conduct giving rise to the retaliation claim. Evidence is clear, Levy terminated him after he refused to make a deal at Siddiqui's house. And the evidence, even if circumstantial, proves that Dr. Levy's influence over his teammates, the team that worked for him, Siddiqui and Leonardo, caused them to stop working with Dr. Popat.

So the next question you have is question

11:53:27 No. 6. You may not have heard a lot about this one, but 11:53:31 it's tortious interference. It's against Dr. Levy 11:53:39 alone. And the question that should be answered yes 11:53:42 based on the evidence, says has the Plaintiff proven by 11:53:44 a preponderance of the evidence that Dr. Levy tortious 11:53:48 ly interfered with his prospective economic advantage. 11:53:54 Well, the evidence is that Dr. Levy intentionally 11:54:00 interfered with Dr. Popat's work with Dr. Siddiqui and 11:54:05 Leonardo in their co-surgeries and building the Center 11:54:09 of Excellence. And, again, even Dr. Leonardo said that 11:54:12 Levy was upset with her because she was upset about the 11:54:16 rift, which sounds like she is upset that she is not 11:54:20 going to be able to work with Dr. Popat. Simply she 11:54:24 wasn't going to be able to work with him to continue 11:54:27 with those co-surgeries and building that Center of 11:54:32 Excellence anymore. Remember what Dr. Wall testified to 11:54:35 and the number of surgeries that had been done already 11:54:37 and how they were growing year by year, more and more 11:54:41 every year.

11:54:44 You'll learn that there are six elements 11:54:48 that have to be satisfied in order to prove that Dr. 11:54:55 Levy tortious ly interfered with this opportunity. 11:54:58 First one is pretty clear. Dr. Popat was working with 11:55:05 Dr. Leonardo and Siddiqui and others to develop the

11:55:09 Center of Excellence in endoscopic skull base practice through UBNS. The Dr. Popat had this opportunity and he was invited by Dr. Leonardo and supported by Dr. Siddiqui. See the e-mails that we presented early on. They were exhibits 23, 25, 26, 27, 28, 29. Read through them. That is where Dr. Leonardo asked Dr. Popat if he remains interested in developing this and working together, and getting the relationship going. And Dr. Popat discusses, he says, yes, but he also discusses going to Toronto and other places to see how others are doing this successfully.

Second element is that Dr. Levy knew of that business opportunity. Of course. See the e-mails, the same ones, Dr. Levy is included. And what do we also know? He wrote it in Dr. Popat's recommendation to Dr. Dean or, excuse me, to the Dean. That is exhibit 2. Dr. Levy's recommendation letter to get Popat appointed says, oh, he is working with Dr. Leonardo to build the Center of Excellence. So he was aware it.

Third, that Levy intentionally interfered with that business opportunity. Dr. Levy, here in this trial, finally admits he terminated Dr. Popat. Dr. Cain said the same thing that Levy did it, terminated it. And yesterday you heard Dr. Levy, as he acknowledged his

earlier deposition testimony that included that he knew that terminating Popat resulted in removing him from responsibility and he would no longer be able to hold himself out as being a part of UB Neurosurgery. That is the home of the Center of Excellence. You can't be a part of one, you can't be a part of the other. That matters.

Dr. Popat was working to develop this practice as shown in those e-mails and including learning about how other regional practices do it.

Fourth element, business relationship would have existed but for Dr. Levy's interference. True. In the e-mails that I referenced from Dr. Leonardo, even just a week or so prior to the July 22 surgery, Dr. Popat was still being brought in for co-surgeries with new UBNS patients. Drs. Popat and Leonardo were friends. And they with have continued, at least performing co-surgeries at least until she left in 2016. They were getting traction. Anybody that has ever built a business knows you got to get traction and momentum and you get it going. Those surgeries and those co-surgeries and programs and speaking opportunities, they were all starting to grow. Certainly it's not unreasonable to think that at least in those two years,

S. POPAT V. E. LEVY, ET AL

had Dr. Leonardo still left, that they would have gotten something going very strongly that would have been continued. You also heard that Dr. Wally Grant had started the basic of this practice. And then Dr. Leonardo took over and now Dr. Davies, with a little less motivation, is handling the endoscopic surgeries. Dr. Popat was motivated and he had a lot of energy. And it's likely even with Dr. Leonardo leaving, UBNS would have continued this practice with Mr. Popat and Siddiqui and maybe Davies. At a minimum, we do know from Dr. Wall, Plaintiff's damages expert, since Dr. Popat was terminated, at least 104 more of these co-surgeries have occurred over the last ten years. And I think the evidence would show that relationship would continue.

And fifth element. Dr. Levy acted for the sole purpose of harming the Plaintiff. There is no other benefit. Dr. Levy gained nothing by interfering, nothing personal for him. No, Dr. Levy was upset, hurt and disgusted. He didn't want Dr. Popat associated with the UBNS Department. And he did this to harm Popat knowing that Dr. Popat was receiving income for the UBNS surgeries. He knew it. He knew that Dr. Popat with co-surgeries, with Dr. Leonardo and Siddiqui and others from UBNS, was receive receiving income. Dr. Wall

S. POPAT V. E. LEVY, ET AL

11:59:57 testified to that. He was receiving income.

12:00:00 Sixth, and final element, Plaintiff 12:00:00 sustained damages as a result of Dr. Levy's 12:00:04 interference? Yes. Our expert Dr. Wall created the 12:00:07 table seven that is in evidence and before you, he 12:00:09 testified to the damages that Dr. Popat suffered by 12:00:17 Levy's interference for this opportunity. Therefore, 12:00:17 based on the evidence, the answer to question No. Six is 12:00:20 yes. Dr. Levy tortious ly interfered with Popat's 12:00:25 economic advantages. By the way, you'll see, even if 12:00:29 you don't agree that retaliation occurred, you can still 12:00:33 find tortious interference in the relevant evidence that 12:00:38 supports that finding.

12:00:39 So, now, let me conclude at the end of your 12:00:42 sheet, damages. Question 7 is retaliation damages. 12:00:50 Damages are up to you. And the Court is going to 12:00:52 instruct you on damages. We do have table seven as a 12:00:59 blow up from Dr. Wall. There is a piece of evidence 12:01:02 piece of paper size version of that. It shows the 12:01:07 present value of the surgeries that Dr. Popat lost from 12:01:12 termination until the end of 2024. And it proposes what 12:01:17 those present value dollars would be for future 12:01:20 surgeries, estimating only 20 surgeries a year. He 12:01:26 testified to, it's about 115,000 a year. And he

S. POPAT V. E. LEVY, ET AL

12:01:30 testified that roughly $5700 per surgery. So take a 12:01:34 look at that. It's got the present value. And the 12:01:40 decision is up to you on the evidence. You can go with 12:01:44 Dr. Wall, you can go higher or lower. It's all up to 12:01:49 you what you think is reasonable.

12:01:50 Just two points I want to make, though, 12:01:53 about damages, for retaliation and for tortious 12:01:58 interference. The Court will instruct you on the law, 12:02:01 but you'll see that the defendants have the burden to 12:02:05 prove that Dr. Popat didn't mitigate his damages, that 12:02:10 he just sat back and let this happen. I suggest to you 12:02:15 defendants, did not meet that burden because if that 12:02:18 happened, we can reduce the damages. I don't recall any 12:02:22 evidence from defendants about a known substantially 12:02:29 comparable position that Dr. Popat could have found to 12:02:32 replace what he was doing with the UB neurosurgeons, not 12:02:35 just the financial but the academics. We talked about 12:02:38 this. You heard from Dr. Popat testified he tried, but 12:02:39 the position with the neurosurgery department was 12:02:41 unique. There is no other med school in Buffalo. There 12:02:45 were no substantially comparable options thus there 12:02:49 should be no reduction in any retaliation damages that 12:02:52 you decide to reward.

12:02:53 My second point relates to retaliation and

S. POPAT V. E. LEVY, ET AL

12:02:57 tortious interference. There shouldn't be any reduction in those, not only due to mitigation, but Dr. Wall and Dr. Popat each testified that Dr. Popat had the willing, excuse me, Dr. Wall testified that the future damages are possible if Dr. Popat had the willingness and the capacity or ability to take on 20 surgeries a year. You heard from Dr. Popat, he did. He still does. Day and a half, two days a week, he could be doing surgeries. But all that other work that Dr. Popat has done since he has been terminated, he could have done in addition to the co-surgeries he has been doing. So there shouldn't be any offset, and that is my second point. Everything that Dr. Popat has done since 2014, he could have done anyway. He could have continued doing the neurosurgery co-surgeries, average about 20 a year. And still done the additional work he was doing, whether at ECMC or through Delaware Medical Group. Therefore, it's additional work, should be no offset. There is no replacement for it. He could have had these numbers plus the numbers he had. I think we've proven these damages, real numbers, through Dr. Wall. There was no competing expert evidence. And the present values are listed here.

12:04:27 But there is a second question in question

12:04:29 7, 7, B, kind of an alternative damages award. The Court will explain the law, but if you don't think, if you do think Dr. Popat proved retaliation, but you don't think he suffered any damages, and you really don't like these damages that Dr. Wall proposed, you don't think he suffered monetary value damages, but you have -- you found liability, you can -- you must return an award of up to one dollar. You could do that. That is question 7B. I think the damages were well laid out by Dr. Wall. But if you don't agree with that, you just award a dollar. I want to be clear. Damages, to make things right, damages are to make things right for the harm that Dr. Popat suffered, shown by Dr. Wall's table 7. As I mentioned, they are based on 20 surgeries a year over 10 years at about $5700 a surgery is what Dr. Wall testified to. And, again, if it's hard to reach consensus on how much those damages could be for Dr. Popat, you could still find liability and award a dollar. That would show principle that Dr. Popat has sought for the last 10-plus years.

12:06:04 Remember, he testified he didn't want anybody fired over this complaint. He didn't want anything to happen other than to ensure that demeaning race-based comments weren't made in the workplace

S. POPAT V. E. LEVY, ET AL

12:06:17 anymore. Based on the investigations findings and 12:06:22 conclusions and the trainings done by the department, 12:06:25 Popat's achieved part of that goal, but he was wronged 12:06:29 in the process. And you can fix that with your verdict 12:06:33 today, even if it's just a dollar.

12:06:38 Just to conclude, tortious interference 12:06:41 damages, court's going to explain to you how you can't 12:06:45 award double damages. He can't receive Dr. Wall's table 12:06:51 7 twice. And listen to the instructions on that, please 12:06:55 pay attention. But looking solely at question 8, 12:06:59 because if you don't find retaliation, you can still 12:07:02 award the full damages for tortious interference. But 12:07:06 just, so, just looking at question 8, Dr. Wall's 12:07:11 testimony in table 7 again present reasonable numbers to 12:07:15 answer this question of how much damages, again there 12:07:17 should not be any mitigation or offset for the tortious 12:07:21 interference damages because any income Dr. Popat's 12:07:26 earned over the years would have been additional to what 12:07:29 he could have made with the UB neurosurgeons. There 12:07:34 should not be an offset. 'For tortious interference, 12:07:38 like I said about retaliation, tortious interference, 12:07:41 your damages are whatever you want them to be. Zero up 12:07:44 to this reward. I believe we proved tortious 12:07:51 interference, and I do believe in these numbers that Dr.

S. POPAT V. E. LEVY, ET AL

12:07:54 Wall testified to. And you can award those. You can 12:07:58 also award something greater or less. And even for 12:08:02 tortious interference, if you think just a dollar on 12:08:09 principle, that is your prerogative. I think the 12:08:13 damages are closer to Dr. Wall's numbers, but it's 12:08:16 clearly your decision, ladies and gentlemen. But for 12:08:19 all damages, Dr. Popat asked only that you put -- that 12:08:23 you award what you think is reasonable under these 12:08:27 relevant facts. He is not here to get rich.

12:08:32 There is one last question on your sheet - 12:08:35 punitive damages. This is at your discretion and the 12:08:38 Court will explain it to you. But I just wanted to 12:08:41 share, I believe the answer to these questions is "yes," 12:08:44 as well. And that is whether all four defendants acted 12:08:50 with malice or reckless indifference to the Plaintiff's 12:08:53 rights. Who kept passing the buck here? Could 12:08:59 something have been done earlier? Dean Cain testified 12:09:03 he dropped out, pushed it on over, even though if he 12:09:10 just took all of the information and took two pieces of 12:09:13 paper together, he would have seen there is an issue and 12:09:18 why let the supervisor handle this. He dropped out and 12:09:21 the facts were there. Popat stated as much in his 12:09:25 complaint to show he had never met with Levy, he had 12:09:28 never spoken with Levy. He never agreed to any

12:09:32 resignation. And Dr. Cain, on behalf of UB, UB Med, knew that this complaint hurt Dr. Levy, and he still let Dr. Levy handle the matter, however Dr. Levy wanted to do it. UB's Attorney Jessica Baker raised a good question about Dr. Popat in her August 29 e-mail. She didn't act on it. Neither did Dr. Cain. Dr. Levy, President of UBNS, according to his deposition testimony, was really upset about the complaint, found it disgusting. And as I explained regarding tortious interference, acted against Dr. Popat for the sole purpose of harming him. There is no other reason. The UBNS team, they just pushed through a false resignation submission to UB Med. I don't know who wrote the letter but it says that we spoke about this. They pushed that. And they prepared these letters to the Dean with false information about meeting with Dr. Popat. So, yes, the evidence shows that each of these defendants acted with either malice or reckless indifference to Dr. Popat's rights.

12:10:48 Finally, there is -- I apologize, one final question. There are three questions, really, but it is for the 1983 claim. We believe every one of those questions could be answered "yes." But it's questions 10, 11 and 12. Question 10, yes. As I discussed Dr.

S. POPAT V. E. LEVY, ET AL

Popat had a good-faith belief that his rights were being violated. Question 11, yes. Dr. Popat believes that his complaint to Dr. Cain was substantially true. Didn't make it up. And, in fact, Dr. Levy now admits that he said, "What can brown do for you," in the context of a three-hour surgery. Disagree with me on 11, you can go onto 12. I think 12 should be answered yes. Because there was no evidence that Dr. Popat's complaint about the brown people comments was false. He didn't fabricate it. We've heard everybody say, yes. It's one question about UPS convention, who said it, what can brown do for you, it happened.

So, ladies and gentlemen, that completes your verdict sheet. And as I've said, this is a simple case when you focus on the relevant evidence and ignore the noise. This case is about Dr. Levy and the Defendants terminating Dr. Popat's faculty position because he made a complaint against Dr. Levy for his demeaning race-based comments in the operating room. Dr. Levy got angry and wanted Dr. Popat to withdraw that complaint and Dr. Popat declined. Dr. Popat was then terminated and the UBNS teammates stopped working with him. That interference by Dr. Levy of Dr. Popat's relationship with Leonardo and UBNS was intentional.

S. POPAT V. E. LEVY, ET AL

12:12:41 Sure, for all of this there may be some disputes over 12:12:46 some of the evidence. Credibility is absolutely key, 12:12:50 and that is question solely for you guys. But I think 12:12:55 this whole case, if you're trying to weigh credibility, 12:13:00 it can be generalized as coming down to who do you 12:13:04 believe, Drs. Siddiqui and Popat or Dr. Levy. There are 12:13:14 material differences between those two options. Dr. 12:13:17 Siddiqui is not on Dr. Popat's side. You heard him say 12:13:20 "we used to be friends." "Used to be."

12:13:24 Dr. Siddiqui's and Dr. Popat's testimony are 12:13:26 mostly consistent in the material relevant facts. Look 12:13:31 closely. Read back Dr. Siddiqui's deposition testimony 12:13:36 that we read in. If Dr. Popat withdrew his complaint, 12:13:47 very possible that he could have kept his position. Go 12:13:56 read Siddiqui's testimony. So could be, Dr. Popat, 12:14:01 after this long journey, looks to you and respectfully 12:14:05 asks for yes responses for every question on the verdict 12:14:09 sheet and for reasonable damages to compensate him for 12:14:12 his harm, but at least one dollar for principle for what 12:14:15 this man has gone through.

12:14:18 I thank you very much for your time. Saurin 12:14:22 Popat thanks you very much as well. Thank you.

12:14:25 THE COURT: Thank you, Mr. Glennon.

(Whereupon, the proceeding continued.)

S. POPAT V. E. LEVY, ET AL

* * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

S/ Karen J. Clark, RPR

Official Court Reporter